**Robert B. ALEXANDER, et al., Plaintiffs,**

v.

**NATIONAL FARMERS' ORGANIZATION, et al., Defendants and Counterclaim Plaintiffs,**

v.

**ASSOCIATED MILK PRODUCERS, INC., et al., Counterclaim Defendants.**

**No. 19191–A–1.**

United States District Court, W.D. Missouri, W.D.

July 5, 1985.

---

See also, 8th Cir., 696 F.2d 1210.

David A. Donohoe, Akin, Gump, Strauss, Hauer & Feld, Washington, D.C., for Na-

tional Farmers' Organization, defendant and counterclaim plaintiffs.

Donald W. Barnes, Arent, Fox, Kintner, Plotkin & Kahn, Washington, D.C., for Associated Milk Producers, Inc., counterclaim defendants.

Colvin A. Peterson, Jr., Watson, Ess, Marshall & Enggas, Kansas City, Mo., Sydney Berde, Richard M. Hagstrom, Berde & Hagstrom, P.A., St. Paul, Minn., for Central Milk Producers Coop., counterclaim defendants.

George A. Leonard, Shughart, Thomson & Kilroy, Major W. Park, Jr., Gage & Tucker, Kansas City, Mo., for Mid-America Dairymen, Inc., counterclaim defendants.

## MEMORANDUM OPINION, FINDINGS OF FACT, AND CONCLUSIONS OF LAW ON REMAND

JOHN W. OLIVER, Senior District Judge.

The parties agreed that ten major issues were presented by the various motions and voluminous briefs and appendices filed after the Court of Appeals' remand. After the Court had read and considered all the post-remand briefs that had been filed, nine of those major issues were the subject of three days of oral argument.[1] The parties waived oral argument to the tenth issue and agreed that it should be decided on the briefs that had been filed.

After oral argument the parties presented an agreed order directing further proceedings in regard to each of the ten major issues presented. The paragraphs of that post-oral argument order were designed to track with the order in which the various issues had been orally argued.

This memorandum opinion, which will serve as our findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, will track with the paragraphs of the post-oral argument order. During the course of this memorandum opinion we will frequently refer to the counterclaim plaintiff as

"NFO" and to the counterclaim defendants as "defendants."

Our consideration of the arguments of the parties required that we study the entire transcript of the testimony of all the witnesses and exhibits adduced on the issue of damages. We were also required to study a substantial portion of the testimony of a substantial number of other witnesses and other exhibits adduced on questions other than damages during the trial of the entire case. In addition, we have reviewed and considered the handwritten notes we made during the trial of the case which, in accordance with our established practice in non-jury cases, included our contemporaneously recorded reaction in regard to the credibility of the various witnesses as they testified and of the various exhibits as they were adduced in evidence at trial.

It is, of course, impossible for the Court to comply with the mandate of Rule 52(a) that "judgment shall be entered pursuant to Rule 58" at this time. For, as will be apparent from our determination of the various issues, a number of those issues are not in procedural posture for the entry of a final judgment.

A number of interlocutory orders will, however, be entered during the course of this memorandum opinion in regard to particular issues. Appropriate procedures will be directed under which final judgments may be simultaneously entered in regard to the interlocutory orders entered in regard to those issues and in regard to the orders that will later be entered in regard to all ten of the issues presented after remand. We turn now to the first issue presented after remand.

## ISSUE NO. 1—STANDING—DEFENDANTS' RENEWED JOINT MOTION TO DISMISS

After remand, defendants CMPC, AMPI, and Mid-Am, filed a renewed joint motion

---

1. The 550-page transcript of oral argument, to which some reference will be made, has been filed as a part of the record on remand.

to dismiss NFO's damage claims for lack of standing. That renewed motion was based primarily on the defendants' view of *Associated General Contractors v. Carpenters*, 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983) and their view of the Eighth Circuit's application of the principles stated in that case in *McDonald v. Johnson & Johnson*, 722 F.2d 1370 (8th Cir.1983).

Defendants contended at oral argument that the granting of the renewed motion to dismiss for lack of standing would end the need for further inquiry in regard to any other question that might be presented on remand in that such a ruling would constitute a determination that NFO would not be able to recover any damages in this case. (Oral Argument: p. 51–52).

The Court of Appeals accepted the defendants' argument that "NFO cannot recover its asserted 'price reduction' damages." *Alexander v. National Farmers Organization*, 687 F.2d 1173, 1208 (8th Cir. 1982). However, that court expressly rejected "defendants attempt to bootstrap from this price reduction issue to deny NFO standing to recover any damages." *Id.* at 1209.

■ The Court of Appeals made a number of specific factual findings in the course of its discussion of the standing question. It found that NFO transacted business through the NFO Dairy Trust; that NFO cannot be considered in isolation from the NFO Dairy Trust; that NFO and the NFO Dairy Trust were *not* a mere conduit for monies to pass from buyers to producers; that buyers of NFO milk arranged purchases through NFO, and not through individual farmers; that buyers, terminating purchases in the face of defendants' harassment, sent notice of such termination to NFO and not to individual farmers; that buyers dealt with NFO as a single entity; that buyers viewed the trust arrangement, if at all, as a bookkeeping matter; that the trust fund was not a mechanical pass through device; that NFO reblended the proceeds of its marketing efforts through the trust; that NFO determined the actual pay price to producers;

that NFO deducted marketing expenses from the trust proceeds; that NFO's marketing program was in direct competition with the defendant co-ops; that NFO, as a competitor, was a direct target of the unlawful conspiracy; that NFO was not an indirect or derivative victim of actions aimed at individual farmers; that NFO earned net revenues in the form of membership dues and check-off fees; and that NFO's losses of dues and fees represent direct injury to its business or property.

Many of the findings of fact made by the Court of Appeals are inconsistent with any number of the findings of fact proposed by defendants in the appendix attached to the defendants' pending standing motion. We are satisfied that the parties and this Court must accept the findings of fact made by the Court of Appeals. We are equally satisfied, contrary to defendants' basic contention, that the Supreme Court did not make any substantial change in antitrust law when it handed down *AGC.* Nor did the Eighth Circuit when it decided *McDonald v. Johnson & Johnson.*

We shall therefore enter an interlocutory order denying defendants' renewed motion to dismiss NFO's damage claims for lack of standing. Accordingly, it is

ORDERED (1) that defendants renewed joint motion to dismiss NFO's damage claims for lack of standing should be and the same is hereby denied.

## ISSUE NO. 2—NFO'S RULE 37 MOTION FOR MONETARY SANCTIONS AGAINST DEFENDANTS

### I.

NFO's Rule 37 motion, filed solely against AMPI, prays for an order awarding NFO the following monetary sanctions:

1. NFO's costs, fees and expenses incurred in connection with uncovering AMPI's suppression and destruction of evidence in an amount to be determined;

2. NFO's costs, fees and expenses incurred in connection with pursuing

relief under Rule 37, in the amount of $182,942.53;

3. NFO's costs, fees and expenses incurred in connection with defending the claims brought by AMPI in Phase III of this litigation, in an amount to be determined;

4. An additional amount equal to one percent of AMPI's 1982 gross revenues; and

5. Such other amounts as this Court may deem just and proper.

NFO's suggestions in support of that motion accurately state that this Court determined in November of 1978 that NFO's Rule 37 motion against AMPI would be granted and that the imposition of sanctions would be deferred until after the appeals in this case were resolved.

NFO argues that "this Court's determination that Rule 37 sanctions should be imposed has been emphatically endorsed and even broadened by the Court of Appeals, leaving only the question of the particular sanctions that should be imposed in order to achieve the purposes of Rule 37." NFO therefore contends that at least two considerations support its request that sanctions should be imposed in an amount not less than $26,347,780; namely "(1) AMPI's conduct was properly labeled by the Court of Appeals as 'egregious' and 'outrageous' and cannot be characterized as merely negligent or inadvertent; it was rather deliberate, pervasive, carried out at the highest levels of AMPI and involved not just delay but irretrievable destruction of evidence. It thus presents this Court with a record of wrongdoing which surpasses anything in the annals of Rule 37" and "(2) [m]any of the forms of sanctions available under Rule 37—e.g., claim preclusion, costs of pursuing the Rule 37 motion, striking of pleadings, etc.—would be futile here because NFO has already won on the merits of its claim, and on AMPI's counterclaim, and NFO is already entitled to attorneys' fees and costs, as the prevailing plaintiff in an antitrust case; accordingly, many of the customary forms of sanctions would not materially serve the compensatory and deterrent purposes of the Rule." (NFO's Sugg. in Support at 5–6).

NFO suggests that this Court (a) determine that NFO "is entitled to the fees and expenses incurred in uncovering AMPI's suppression and destruction of evidence and in pursuing this Rule 37 motion." (*Id.* at 6–7). Specifically, NFO requests that this Court "endorse the principle that NFO is entitled to compensation for the expenditures and for the hours devoted to the Rule 37 effort." (*Id.* at 7). NFO adds that "[u]pon the receipt of such a ruling, the parties may then confer in an effort to arrive at an agreed-upon figure." (*Id.* at 7). NFO also requests that compensation for this and all other sanction items be calculated at "the higher billing rates in effect today, in order to adjust for inflation and to avoid rewarding delay." (*Id.* at 8).

In a similar manner, NFO proposes that "this Court endorse the principle that NFO is entitled to compensation for items, such as the San Antonio Grand Jury costs— again at current rates—and leave the specific allocation task to the efforts of counsel, at least in the first instance." (*Id.* at 10).

NFO directs attention to the Court of Appeals' statement that "the district court properly could have imposed the most severe sanctions upon AMPI—dismissal of its claims and default judgment against it on NFO's claim." (*Alexander v. NFO, supra,* 687 F.2d at 1205; *see* NFO's Sug. at 12.) NFO contends that the "remedial purposes of the Rule would thus be served if this Court requires AMPI to compensate NFO for all its costs and fees incurred in defending AMPI's Phase III claim." (*Id.* at 12). NFO again suggests that "the Court adopt this sanction in principle at this time." (*Id.* at 13).

And finally, NFO, with primary reliance upon *Litton Systems, Inc. v. American Telephone & Telegraph Co.,* 700 F.2d 785 (2d Cir.1983), requests that this Court impose a fine of at least $26,347,780 on AMPI for the reason that such a sanction is "the *only* available sanction which could advance the deterrence goal" of Rule 37.

(NFO Sugg. in Support at 14, NFO's emphasis).

## II.

AMPI argues that "NFO is seeking a windfall" (AMPI's Suggestions in Opposition, p. 2); that "[t]o award NFO additional relief on top of the adverse inferences already drawn by the Court of Appeals ... would be unjust" and that "NFO has failed to demonstrate any reason why it should be accorded any relief beyond that which already has been bestowed upon it by the appellate court." (*Id.* at 2); that "NFO has failed to show any prejudicial impact resulting from the challenged conduct"; that "NFO engaged in document suppression and destruction of its own" (*Id.* at 3); that "NFO's proposals are grossly overreaching"; and that "[g]ranting NFO's requests would constitute a miscarriage of justice under the circumstances." (*Id.* at 10). AMPI further argues that "[i]f this Court decides to award additional, monetary sanctions, such a deflator [as that applied by the Court of Appeals], applied to both hours and hourly rates, is appropriate here." (*Id.* at 12).

AMPI, as did NFO, made appropriate recognition of this Court's letters of August 12 and August 25, 1983 (which directed attention to the Supreme Court's admonition in *Hensley v. Eckerhart*, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1982), that "an application for attorney's fees should not and need not result 'in a second major litigation' ") and stated that "[i]n accordance with this Court's admonition, the parties will confer in good faith about fees when and if this Court determines that compensation for particular activities is appropriate." (*Id.* at 13).

## III.

It is apparent from what we have stated above that both NFO and AMPI indicated in their respective briefs that they were willing to confer in good faith in regard to the amount of any attorneys' fees and expenses that might be awarded by way of Rule 37 sanctions. That willingness was confirmed at oral argument. The agreed post-oral argument order provided:

2. *SANCTIONS—Rule 37 NFO Motion Against AMPI.* The parties shall meet, confer, and attempt to reach agreement on those portions of NFO's motion for costs, Appendix A, totalling $167,717 in attorneys fees and $15,225 in disbursements, together with items NFO is claiming in relation to the San Antonio grand jury proceeding. Commencing June 4, 1984, NFO shall make available to counsel for the counterclaim defendants all underlying records to substantiate those claims for Rule 37 attorneys fees and costs. Commencing June 14, 1984, NFO shall likewise make available to counsel for counterclaim defendants all underlying records to substantiate its claims for costs and fees relating to the San Antonio grand jury matter.

On or about June 25, 1984 counsel shall submit to the Court a report indicating which items of Rule 37 and San Antonio grand jury costs and fees are agreed and those which remain in dispute. Agreement by the counterclaim defendants that any particular costs were incurred by NFO shall not constitute an admission, or a waiver of any argument by counterclaim defendants that the agreed upon expenditure was reasonably or necessarily incurred or is recoverable as a matter of law.

In conjunction with its Rule 37 motion NFO has also claimed attorney fees and costs in defense of Phase III of the litigation. Because the Phase III costs and fees overlap, at least in part, the same category of fees and costs claimed by NFO in its Cost petition, and because resolution of the issue will necessarily entail a direct apportionment of those costs, NFO's Rule 37 request for Phase III attorney's fees and costs shall be handled in conjunction with the resolution of this issue in the context of NFO's Cost petition and in the manner set forth in Paragraph 10 below.

Mr. Donohoe's June 29, 1984 letter and Mr. Barnes' sequel letter of July 10, 1984

both advised the Court that NFO's and AMPI's negotiations pursuant to paragraph 2 of this Court's May 31, 1984 order have been unsuccessful.

## IV.

The transcript of the proceedings held November 20, 1978 shows that this Court refused to impose the sanction of default or dismissal against AMPI because it believed that to have done so would have been contrary to the construction placed on Rule 37 by several then recent decisions of our controlling Court of Appeals. Pages 12,214 and 12,215 of the transcript reflect our citation of the then most recently decided Eighth Circuit case of *Schleper v. Ford Motor Co., Auto Div.*, 585 F.2d 1367 (8th Cir.1978). We also directed attention to *Edgar v. Slaughter*, 548 F.2d 770 (8th Cir. 1977) which, as did *Schleper*, had cited *Fox v. Studebaker-Worthington*, 516 F.2d 989 (8th Cir.1975), with approval.

We further noted that *Edgar* had quoted Judge Van Oosterhout's statement in *Fox* to the effect that "[t]here is a strong policy favoring a trial on the merits and against depriving a party of his day in court." *Edgar, supra,* 548 F.2d at 772. (Tr. 12,-215).

The Note entitled "The Emerging Deterrence Orientation in the Imposition of Discovery Sanctions," 91 Harv.L.Rev. 1033, accurately reflected that the Eighth Circuit's policy as expressed in *Fox* was consistent with the views expressed by most courts until the Supreme Court handed down its brief per curiam opinion in *National Hockey League v. Metropolitan Hockey Club, Inc.*, 427 U.S. 639, 96 S.Ct. 2778, 49 L.Ed.2d 747 (1976). While that Note urged a "[t]ougher use of Rule 37 sanctions, and of dismissal and default judgments in particular" (*id.* at 1055), it conceded that "[t]he view of discovery sanctions reflected in *National Hockey League* and other recent cases has not yet been fully developed" and that "[s]everal questions pertaining to the way in which sanctions will be administered under this view remain unanswered" (*id.* at 1047).

*National Hockey League* was, of course, on the books at the time the Eighth Circuit in *Edgar* reiterated its Rule 37 policy favoring a trial on the merits rather than the imposition of a default or dismissal sanction under Rule 37. And the Court of Appeals cited *Fox* to support its conclusion that this Court did not abuse the discretion vested by Rule 37 when it elected to follow the policy stated by the Court of Appeals in that 1975 case.

The Court of Appeals, however, in this case emphatically stated its view that "[w]e can only describe AMPI's conduct as outrageous." *Alexander v. NFO, supra,* 687 F.2d at 1205.

While the Court of Appeals did not cite *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 100 S.Ct. 2455, 65 L.Ed.2d 488 (1980), it is clear to this Court that the Court of Appeals had in mind the Supreme Court's admonition in that case which, quoting *National Hockey League*, stated that "Rule 37 sanctions must be applied diligently both 'to penalize those whose conduct may be deemed to warrant such a sanction, [and] to deter those who might be tempted to such conduct in the absence of such a deterrent.'" *Roadway Express, supra,* 447 U.S. at 763–64, 100 S.Ct. at 2462–63.

In short, we are satisfied that the Court of Appeals has implicitly directed this Court to penalize AMPI for conduct which the Court of Appeals characterized as "egregious" and "outrageous" and also to impose sanctions which will deter others who might be tempted to such conduct in other cases.

Judge Conner's district court imposition of sanctions was affirmed by the Second Circuit in *Litton Systems, Inc. v. American Tel. & Tel. Co.*, 700 F.2d 785 (2d Cir. 1983). As did this Court, Judge Conner first ruled the merits of the defendant's Rule 37 motion but deferred his decision on the sanctions to be imposed until after the conclusion of the trial. See *Litton Systems, Inc. v. American Tel. & Tel. Co.*, 90 F.R.D. 410, 421 (S.D.N.Y.1981). Judge Conner's opinion imposing sanctions is re-

ported in 91 F.R.D. 574 (S.D.N.Y.1981). That opinion shows that the defendant was insisting upon the extreme sanction of dismissal because of plaintiff's failure to comply with discovery orders rather than the imposition of a lesser sanction. Judge Conner, in reliance upon both *Roadway Express, Inc. v. Piper* and *National Hockey League* held that:

> Our adversarial system of civil justice rests upon access of all parties to all evidence bearing on the controversy between them, including that in the control of adverse parties. This, of course, requires the absolute honesty of each party in answering discovery requests and complying with discovery orders. Destruction or concealment by a party of relevant documents in its files threatens the viability and public acceptance of the system.

*Litton Systems, supra,* 91 F.R.D. at 576.

Judge Conner added that:

> "Among the factors to be considered in determining what sanction is appropriate for a willful failure to make discovery are the importance of the information sought; the offending party's record of cooperation in other respects; whether and in what circumstances it ultimately produced the information; the extent of prejudice occasioned by the delay in its production; and public policy aspects of the litigation."

(*Id.* at 576).

Judge Conner concluded that apart from the conduct which he discussed in both of his district court opinions, that "the discovery conduct on both sides in this case has been generally good." (*Id.* at 577). We find that the same thing was generally true in this case. In *Litton* all the documents that were withheld were ultimately produced. Except for the relatively small number of the unknown documents that were destroyed, the same thing is true in this case. Furthermore, no one has attempted to make the untenable argument that any of the destroyed documents could have in any way related to the amount of damages which NFO claims in this case.

We have carefully weighed the factors which control the imposition of sanctions as above discussed, including but not limited to public policy considerations, and conclude that NFO is entitled to an order imposing sanctions as generally prayed for in its Rule 37 motion with one exception. We do not believe it is either proper or appropriate to impose an additional amount of monetary sanctions equal to one percent of AMPI's 1982 gross revenues as prayed for in paragraph 4 of NFO's Rule 37 motion.

The interlocutory orders to be entered, of course, cannot state specific amounts because the hope that the parties would be able to agree on those amounts has not been realized. Because of that factor we also defer ruling the question of whether NFO's counsel should be compensated at the higher billing rates in effect today as specifically prayed for in paragraph 2 of its motion and generally prayed for in regard to paragraphs 1 and 3 of its motion. For the reasons stated, it is

■ ORDERED (1) that this Court endorses the principle that NFO is entitled to compensation for the efforts devoted to its Rule 37 motion. The parties are accordingly directed again to confer in an effort to arrive at an agreed figure. It is further

ORDERED (2) that this Court also endorses the principle that NFO is entitled to the compensation in connection with the San Antonio grand jury proceeding. The parties are accordingly directed to confer in the same manner in that regard. It is further

ORDERED (3) that this Court endorses the principle that NFO is entitled to be compensated for at least some of its costs and fees incurred in defending AMPI's Phase III claim. The parties are accordingly directed again to confer in the same manner in that regard. The extent to which the total costs and fees incurred in defending AMPI's Phase III claim will be determined after review of NFO's claim in that regard, and after review of the agree-

ment, if any, of the parties in that regard. It is further

■ ORDERED (4) that it would be unjust under all the circumstances for this Court to exercise its discretion in favor of NFO's prayer stated in paragraph 4 of its motion that AMPI, in effect, be fined the sum of $26,347,780, the alleged equivalent of one percent of AMPI's gross annual revenues. That portion of NFO's Rule 37 motion should be and the same is hereby denied.

### ISSUE NO. 3—AMPI'S MOTION AGAINST NFO FOR SANCTIONS

#### I.

Following remand, AMPI filed a memorandum and suggestions in further support of (1) its April 18, 1975 Motion For Order For NFO To Show Cause Why It Should Not Be Held in Contempt and a Motion for Order Compelling Discovery and (2) in support of its April 21, 1976 Motion For Order Declaring NFO In Contempt.

The relief sought by those motions requested dismissal of NFO's market penetration claims as a sanction for the alleged "cleanout" of NFO's home office in anticipation of document production and for NFO's alleged failure and delay in producing various documents in a timely manner.

NFO's memorandum in opposition points out that all of the exhibits attached to AMPI's memorandum and suggestions were earlier filed with the Court of Appeals. NFO therefore argues that AMPI implicitly submitted to the Court of Appeals the issue as to whether this Court erred in not granting AMPI's motions. Indeed, AMPI argues that the Court of Appeals necessarily considered and ruled upon AMPI's motions for sanctions for the reason that the Court of Appeals did not impose any sanctions on NFO. NFO argues that the Eighth Circuit's mandate puts AMPI's motions "out of the reach of this Court on remand" and that "this Court is foreclosed and relieved from ruling upon them now."

AMPI's reply to that argument suggests that the very principles espoused by NFO in opposing AMPI's motion for sanctions would be directly applicable to NFO's Rule 37 motion for sanctions and that NFO, having received the sanctions it requested from the Court of Appeals, must be deemed to have abandoned any claim for the monetary sanctions for which they now contend on remand.

We conclude that an order should be entered consistent with paragraph 3 of this Court's May 31, 1984 order which was agreed to by all parties.

#### II.

Examination of Exhibit F, AMPI's January 24, 1977 narrative based on then existing discovery in support of AMPI's motions, and Exhibit G–1, which was the February 22, 1977 NFO answer to that narrative statement, establish that NFO's admissions, standing alone, establish, at the very least, that substantial delay was involved on the part of NFO in its production of particular documentary evidence in this case. NFO's outright denials of particular paragraphs of AMPI's narrative and NFO's guarded and qualified admissions of other paragraphs establish the existence of a substantial conflict in the testimony of particular witnesses whose depositions were eventually taken.

AMPI's April 19, 1977 reply to NFO's suggestions in opposition to AMPI's motion emphasized that the obvious conflict in the testimony "can only be resolved by an evidentiary hearing in open court where credibility and demeanor can be assessed by the trier of the fact." (*Id.* at 2. See similar statements to that effect on pages 8 and 18).

The parties, however, in the agreed order of May 31, 1984, stated the following in regard to the issues presented by AMPI's motion for sanctions against NFO:

3. *SANCTIONS—AMPI's Motion Against NFO*—The record on this issue is closed, it has been fully briefed and argued. The counterclaim defendant

AMPI has sought adverse inferences and an as yet unquantified amount of attorney's fees and expenses as sanctions in conjunction with its motion. If the Court rules the motion in AMPI's favor, counterclaim defendant AMPI shall be permitted to submit, within a reasonable period of time, a cost petition setting forth the precise fees and costs it claims.

Exhibit D attached to AMPI's memorandum and suggestions is a copy of AMPI's April 27, 1976 response to a reply brief filed by NFO in regard to one of AMPI's motions for an order declaring NFO in contempt. On page 3 of that April 27, 1976 response AMPI candidly stated that "it is fair to say that if there had been no NFO Rule 37 motion AMPI might have been more willing to follow Mid-Am counsel's course when it learned of the 'clean-out' from them for the first time in early 1974, and might not have followed this matter up with as much vigor." AMPI added, we think quite properly, that: "Nevertheless AMPI's motion should be judged on its substance and merits."

 As noted above, paragraph 3 of the agreed order of May 31, 1984 advised the Court that the parties consider that the record on the issue presented by AMPI's motion for sanctions against NFO is "closed." On the basis of the present record, however, we are satisfied that although AMPI certainly made an appropriate showing of untimely, and in some narrow instances, a total failure of document production on the part of NFO, discretion should not be exercised in favor of AMPI to the extent that we enter an order that NFO's market penetration claims should be dismissed.

We recognize, of course, that the Court of Appeals took an extremely dim view of what it described as AMPI's "egregious" and "outrageous" conduct in connection with its treatment of what it called "the suppression and destruction of evidence by AMPI." *Alexander v. NFO, supra,* 687 F.2d at 1205. We must also recognize that the Court of Appeals, unlike this Court, apparently was not in the least concerned

with whether, after all was said and done, NFO suffered any real prejudice as a result of the delay, for example, of the production of the San Antonio grand jury documents.

We cannot, however, believe that the Court of Appeals intended to lay down any general rule that the most severe sanction of dismissal or default should routinely be imposed, regardless of the nature of the documents involved and regardless of their relevance or materiality to a particular case. While the Court of Appeals apparently was not concerned about the relevancy of all the documents involved in NFO's Rule 37 motion, we cannot ignore the fact that we know enough about the documents involved in AMPI's motion for sanctions to conclude that in our judgment, subject to what the Court of Appeals may later have to say, AMPI should be entitled to its costs and attorneys fees for deposing the witnesses listed on page 6, footnote 5, of AMPI's memorandum and suggestions filed in this Court after remand.

Those costs and attorney's fees, of course, would be limited to the depositions taken, or the parts of other depositions taken, solely on the issue of NFO's alleged concealment and destruction of documents.

Accordingly, it is

ORDERED that AMPI shall, within a reasonable period of time to be established by the Court on recommendation of the parties, prepare, serve and file a cost petition setting forth the precise fees and costs it claims in accordance with what we have above stated.

### ISSUE NO. 4—PRECLUSION OF NFO'S EXPERT WITNESS

### ISSUE NO. 5—CAUSATION

### ISSUE NO. 6—DAMAGES MEASUREMENT

#### I.

All three of the issues stated in the above heading are directly related and will be so treated. In the course of our discus-

sion we shall set forth the basic arguments made in the various briefs filed by the parties in sufficient detail so that it will be understood that we have given those arguments appropriate consideration in making our determination of the questions presented in regard to all three issues.

## II.

### NFO's Motion for Damages

The Court of Appeals in *Alexander v. National Farmers Organization, supra,* 687 F.2d at 1210, remanded this case with directions that this Court, "in its discretion, conduct such further proceedings and make such new findings as may be appropriate to ensure that the determination of damages and other relief can be made consistent with this opinion." Following that remand, NFO and the NFO class claimants filed a motion for an order of this Court that would award them damages against AMPI, Mid-Am and CMPC as follows: (1) NFO market-penetration damages in the amount of $12,947,034, trebled to $38,841,102, and (2) NFO claimant price-reduction damages in the amount of $1,075,383, trebled to $3,226,149.

Although afforded the opportunity to do so, NFO elected not to adduce any new or additional evidence. Plaintiffs expressly stated on page 1 of their brief in support of their motion for damages that "plaintiffs have not introduced any new damage evidence nor new damage theories, but instead rely upon the evidence adduced and the theories originally advanced at trial."[2]

Compliance with the Court of Appeals' directions on remand has been an extremely difficult task for the reason that the parties radically disagree in regard to how the opinion of the Court of Appeals should be read. NFO stated that its brief in sup-

port of its motion was "submitted to aid the Court in quantifying the recoverable damages by indicating the impact of the Eighth Circuit's decision ... and by providing a 'road map' (Appendix A attached hereto) which outlines and condenses the damage proofs already presented." (NFO's Brief in Support of Mot. for Damages at 1).

Describing the Eighth Circuit's opinion in 687 F.2d 1173, NFO stated that "[t]he Eighth Circuit held that assessment of damages may be based on inferences drawn 'from the circumstances and evidence as a whole.' *Id.* at 1210." NFO then stated that "the evidence shows, and the Eighth Circuit found, that the defendants were the 'major marketers of milk produced in the Midwest,' *id.* at 1192, and that, among other findings, 'NFO's marketing efforts became a serious problem for Mid-Am, AMPI and CMPC.' *Id.* at 1194;" that " 'NFO and AMPI were in full scale competition,' *id.* at 1189, and 'Mid-Am viewed NFO as a substantial threat.' *Id.*"; and that "[t]hese 'major marketers' engaged in a 'broad pattern,' *id.* at 1200, of concerted predation throughout a 'ten state region,' *id.* at 1193, specifically intended to 'eliminate NFO as a competitor.' *Id.*" (NFO's Brief in Support at 1).

NFO further stated that "[t]he Eighth Circuit found that 'the fact of injury is unmistakable on this record' and specifically instructed this Court that it has 'broad latitude in assessing the amount of damages which NFO *shall* recover.' *Id.* at 1210 (emphasis added [by NFO])" and that "[i]n light of this instruction, and in view of the 'circumstances and evidence as a whole,' only one inference can be drawn: NFO, virtually from the beginning in 'full scale competition' with the defendant 'ma-

---

**2.** Although no order had been entered designating a NFO dairy farmer class as parties plaintiff, the brief filed in support of the motion for an order awarding damages described the "plaintiffs" in this case as "NFO and the NFO farmer class claimants."

NFO, of course, claims for itself all the damages it claimed at trial except the "price-reduction" damages which it concedes the Court of

Appeals held it was not entitled to recover. Recovery, however, is still sought for the "price-reduction" damages by seeking to have a class of NFO dairy farmers certified at this time. Our references to the arguments made by NFO should be read to include arguments made on behalf of both NFO and the alleged NFO dairy farmer class.

jor marketers,' had the potential to achieve a substantial share of the ten state milk market." *Id.* at 2.

Based on that reading of the Court of Appeals' opinion, NFO argued that "[t]he only substantive antitrust issue that remains in this proceeding under Section 4 of the Clayton Act is the quantification of damages suffered by the plaintiffs" and that "[u]nder the Eighth Circuit's decision, NFO is entitled to the marketing fees and membership dues it would have received had there been no antitrust violation." *Id.* at 2–3.

In support of its claim for damages NFO relies on the same market structure theory and the same test market theory which it presented at trial through the testimony of Dr. Robert A. Nathan (Nathan). The first theory, according to NFO, would be established by paragraphs 2268–74 and paragraphs 2331–58 of NFO's proposed findings of fact and by pages 9635–54 of Nathan's direct examination. NFO states that its second theory would be established by paragraphs 2261–67 and paragraph 2275–2330 of NFO's proposed findings of fact and pages 9585–93 of Nathan's direct testimony.[3]

NFO states that the price-reduction damages now claimed on behalf of "the NFO class claimants," is supported by an analysis prepared by NFO counsel, and is based on paragraphs 2018–62 of the findings of fact proposed by NFO at trial. NFO argues that the Court of Appeals recognizes "that these price reduction damages belonged to the individual NFO dairy farmers." NFO cites and relies upon the familiar antitrust cases of *Zenith v. Hazeltine Research, Inc.*, 395 U.S. 100, 123–34, 89 S.Ct. 1562, 1576–82, 23 L.Ed.2d 129 (1969); *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 264, 66 S.Ct. 574, 579, 90 L.Ed. 652 (1946); *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 561–66, 51 S.Ct. 248, 250–52, 75 L.Ed. 544

(1931); and *Eastman Kodak Co. v. Southern Photo Materials Co.*, 273 U.S. 359, 377–79, 47 S.Ct. 400, 404–05, 71 L.Ed. 684 (1927), and the progeny of those cases. NFO, however, has directed attention to a relatively small number of its proposed findings of fact or to the portions of the record which they contend would support those proposed findings of fact.

Rather, NFO quoted the latter portion of a sentence of the Court of Appeals' opinion which stated that: "It was error, however, [for the district court] not to draw factual inferences adverse to AMPI on matters undertaken in or through offices and individuals involved in the destruction of documents." NFO therefore argued that "NFO is at least entitled to the very strongest adverse inferences that can be drawn from the wholesale destruction" of the Little Rock documents and that "[a] reasonable adverse inference is that the destroyed evidence would have reinforced the admission that when the defendants honestly analyzed NFO's potential, they too concluded that NFO was capable of becoming a major milk pooling firm, and would do so unless they conspired to force it out of the market." (NFO's Brief in Supp. of Mot. for Damages at 16–17.)

### III.

Defendants filed two separate briefs in opposition to NFO's motion for damages, one brief directed to the question of "causation"; the other brief directed to the question of "measurement of damages."

### IV.

#### *Defendants' Causation Brief*

Defendants' causation brief, as did NFO's brief in support of its motion for damages, focused on particular portions of the Court of Appeals' opinion to support its reading of that opinion. Defendants make reference to a substantial number of statements in the Court of Appeals' opinion to

---

**3.** NFO, of course, also argues that its two theories of damages are supported by NFO Exhibits 826; 896; 860; 1001 to 1014, inclusive; 1014a; 1015 to 1041, inclusive, 1220 to 1225, inclusive; 1622; and 1666, all of which were included in Appendix E attached to plaintiffs' brief in support of its motion for an order awarding damages.

support their argument that a " 'threshold factual issue [of] causation' [687 F.2d at 1208] is very much alive." (Brief in Opposition: Causation at 2.) For example, defendants noted that the Court of Appeals, after holding that NFO was not entitled to recover any alleged "price-reduction" damages stated that "[l]osses of such dues and fees, *to the extent attributable* to the defendants' unlawful conduct, represent direct injury to NFO in its 'business or property.' *Id.* at 1209 (emphasis added by defendants)" and that the Court of Appeals added in a footnote that "[u]nder these circumstances, lost membership dues are not indirect injuries and NFO is entitled to recover such dues *to the extent such losses are reasonably shown to be caused by the antitrust conspiracy. Id.* at 1209 n. 42 (emphasis added by defendants)." (Brief in Opp: Causation at 2–3). Defendants argue that the Court of Appeals "defined the standard" to be applied on remand "for the third time" when it stated that " . . . NFO has a right to recover the fees and dues that *it reasonably shows it would have derived in such markets but for the effect of the unlawful conduct. Id.* at 1210 (emphasis added and footnote omitted by defendants)." (Brief in Opp. at 3).

Defendants contend that the Court of Appeals "provided guideposts for application of the standard" which defendants contend is applicable on remand in connection with its discussion of specific overt acts which the Court of Appeals found to be in violation of the antitrust laws. *Id.* at 3. Defendants point to the Court of Appeals discussion of Gandy Dairy, located in San Angelo, Texas, (in connection with which NFO presently claims no damages), and to the footnote appended to the discussion of that dairy's refusal to purchase NFO milk which stated that " '[o]f course, in assessing damages, the district court may consider *the extent to which NFO's harm is attributable to AMPI's conduct.'* 687 F.2d at 1196 n. 21 (emphasis added by defendants)." (Brief in Opp. at 4). Defendants also directed attention to another footnote to the Court of Appeals' discussion of defendants' litigation and threats of

litigation against actual or potential customers of NFO which stated that "[i]mplicit in the [district court's] findings may be determinations as to the *extent to which NFO was harmed* by this aspect of defendants' conduct. *Such questions can be fully considered on remand. Id.* at 1203 n. 35 (emphasis added by defendants)." (Brief in Opp. at 4).

Defendants further contend that the Court of Appeals made clear that it anticipated that factual questions might be presented on remand in connection with certain of the defendants' mergers and acquisitions. Defendants note that after the Court of Appeals concluded that it could not say that "it was clearly erroneous for the district court to reject findings that the acquisitions, mergers and related milk pooling practices were part of an unlawful conspiracy," (*Alexander v. NFO, supra,* 687 F.2d at 1206) it went on to say that:

> In instances where acquisitions of independent dairies resulted in actual displacement of preexisting NFO sales, however, the district court, on remand, should consider whether such conduct following acquisition reflects an intent to block NFO *rather than a legitimate business decision based upon price, quality or similar factors.* Where post-acquisition terminations of NFO sales are found to be part of a scheme to eliminate NFO, such lost sales would form a basis for NFO's damage claim. *Id.* at 1206–07 (emphasis added by defendants)." (Brief in Opp. at 4–5)

Defendants concede that the Court of Appeals' determination that NFO could not recover "price reduction *damages* " did not completely remove the "price reduction *issue* " from factual consideration on remand. Defendants directed attention to the fact that after the Court of Appeals determined that "NFO's net revenues were . . . tied to the volume of its marketing, not to the *price* it earned," the Court of Appeals stated that "[t]he price reduction issue *may* be relevant to NFO's damages in that, by virtue of selling at lower prices, NFO *may* have lost members or, in turn,

marketing volume. The measure of such harm, however, would be the lost fees and dues *from those who stopped marketing through NFO*, not the price differential. 687 F.2d at 1208–09 (emphasis added by defendants)." (Brief in Opp. at 7).

Defendants contend that under the directions provided by the Court of Appeals as above quoted, NFO must not only prove it lost sales to handlers such as Beatrice, Gandy, Wanger and Foremost, but that it has the burden of proving that NFO thereby lost "member milk marketings and members" of NFO. (Brief in Opp. at 7). Defendants contend that such "particularized proof" is mandated by the Court of Appeals' conclusion that:

> Here, there is no doubt that the unlawful conspiracy was the material cause, for example, of Beatrice's cutoff decision in March of 1971 and of Foremost's subsequent rejection of the same shipments. [citations omitted]. *The extent to which rejections of NFO milk by these dairies in other periods (or by other dairies in the face of similar conduct) were also due to defendants' conspiracy is a factual question for the district court. Id.* at 1210 (emphasis added by defendants).

(Brief in Opp. at 7–8).

Defendants further pointed to what it described as "the appellate court's repeated admonitions concerning the effect of NFO's mismanagement and bungling upon the 'harm' sustained by NFO, Inc." (Brief in Opp. at 11). Defendants noted that the Court of Appeals quoted with apparent approval this Court's observation, *In re Midwest Milk Monopolization Litigation*, 510 F.Supp. 381, at 420 (1981), which stated that "the record would come closer to supporting a set of findings that NFO became a victim of its own propaganda and that its ignorance and inexperience in the dairy field required it to experiment with one unsound idea after another.... *Id.* at 1188." (Brief in Opp. at 11). Defendants' causation brief also directed attention to that portion of the Court of Appeals' opinion which stated that:

The defendants also attack NFO's right to recover membership dues and check-off fees on the ground such *damages are speculative, present impossible tracing problems, and ultimately reflect self-inflicted harm rather than damage causally linked to defendants' unlawful conduct. These arguments largely raise factual questions for the district court,* but the fundamental legal guidelines are clear. 687 F.2d at 1209 (emphasis added by defendants).

(Brief in Opp. at 11–12).

And finally, in the same regard, defendants quote the following passage of the Court of Appeals:

> *We also recognize that NFO's entry into the business of milk marketing was not conceived or managed as effectively as the efforts of the co-ops and that NFO cannot recover for losses clearly attributable to its own failures.* On the other hand, NFO correctly argues that "defendants are really trying to clip NFO's wings and then escape liability on the grounds that NFO 'cannot fly.'" [citations omitted] We note only that *the district court must weigh these factors,* mindful that the legal standard permits recovery where defendant's unlawful conduct is "a material cause of injury; a plaintiff need not exhaust all possible alternative sources of injury in fulfilling his burden of proving compensable injury." [citation omitted] 687 F.2d at 1210 (emphasis added by defendants).

(Brief in Opp. at 12).

Defendants state that the voluminous findings of fact proposed in Appendix A attached to defendants' causation brief to NFO's motion to award damage "clearly establishes" that:

> o NFO's "dragnet" damage theory, indiscriminately attributing *all* of NFO's alleged losses to defendants' conduct, fails to account for the effects on NFO of *lawful* competition by defendants *and* third parties. It is therefore fatally defective as a matter of law.

o NFO's milk quality problems were monumental, unprecedented and caused NFO to be unattractive to customers and members.

o NFO's reputation as a militant, radical organization and its misguided policies and gross mismanagement caused losses of customers and members alike.

o NFO's experimentation with one unsound marketing "gimmick" after another and incessant appeals ("crisis drives") for money alienated dairy farmers.

o NFO's internal record-keeping, particularly its financial records, were in such disarray that reasoned management decision-making was impossible; NFO could not even determine whether the dairy program was losing money.

o NFO's sales "efforts" were feeble indeed. NFO failed to even contact a number of potential customers in the "damage" area. Even when NFO representatives made pro forma "get-acquainted" calls and received indications of handler interest, NFO did not follow up.

o NFO's mismanagement was not confined to the Midwest but permeated NFO's dairy program throughout the country. Indeed, NFO's performance was *better* in the area allegedly subject to conspiratorial conduct than it was in the "non-conspiracy" areas.

o NFO's ineffectiveness was not confined to its dairy program. NFO's blunders in other commodities, such as the cull cow program, and millions of dollars of losses in its grain program caused widespread membership defection.

o NFO repeatedly imposed one mandatory deduction after another on dairy farmers marketing through NFO until its dairy deductions became the highest in the industry. This tactic alienated existing as well as potential members.

o NFO's asserted "loyal" membership base was illusory. NFO's own records indicate that scores of those "die-hard" members hadn't paid their dues for years. Indeed, NFO carried on its books millions of dollars of unpaid dues, a significant portion of which had been delinquent for over 10 years.

(Brief in Opp. at 13–14).

In addition, defendants contend that NFO has ignored the fact that this Court has rejected any number of findings of fact which NFO proposed at the time of trial and the fact that the Court of Appeals did not disturb those rejected findings on appeal.[4] The defendants, for example, state that "this Court has already rejected NFO's proposed findings of its alleged capability in dairy marketing and its alleged ability to draw dairy farmers" and direct attention to this Court's treatment of those particular paragraphs in 510 F.Supp. at 454, which shows rejection of paragraphs 346–47, 349–50, 352, and 354 of NFO proposed findings of fact. (Brief in Opp. at 20). We shall illustrate the thrust of defendants' argument in the next section of this memorandum opinion.

## V.

To understand the present significance of this Court's rejection of particular findings of fact proposed by NFO at trial, we set forth all of the paragraphs which NFO proposed that we should have found in regard to "NFO's Recruiting Efforts". NFO proposed findings of fact in that re-

---

**4.** In footnote 28 on page 442 of 510 F.Supp. we stated the following in regard to what we meant by the use of "[Rejected]" when used in regard to a particular finding of fact as proposed by NFO: "The use of '[Rejected]' in regard to paragraph 97 above and in regard to many, many of the paragraphs of findings of fact proposed by NFO reflect an explicit finding and conclusion that NFO failed to prove the particular finding of fact proposed and that the weight of all the evidence adduced in the case is likewise insufficient to support the particular finding proposed by NFO."

gard were stated in paragraphs 345 to 354 in its trial proposed findings of fact:[5]

345. Once NFO decided in 1958 to alter its purpose and start bargaining instead of protesting, NFO began soliciting dairy, meat and grain farmers to sign the NFO membership agreement.

346. [Rejected] Dairy farmers were as interested in joining NFO as were meat and grain farmers.

347. [Rejected] NFO solicited new members at meetings by focusing on the primary commodities that they produced.

348. From 1958 to 1965, NFO's primary activity was soliciting farmers to join NFO.

349. [Rejected] The percentage of all NFO members in an area who are dairy farmers generally corresponds to the percentage of all farmers in that area who are dairy farmers.

350. [Rejected] Most of the farmers that NFO enrolled as members in Minnesota and Wisconsin were dairy farmers.

351. NFO is the only farm organization in the United States that markets milk, meat and grain.

352. [Rejected] NFO's multi-commodity program was attractive to farmers.

353. NFO emphasized its cull-cow program when it attempted to enlist dairy farmers to market milk through NFO.

354. [Rejected] Generally, farmers received more money for cows marketed through the NFO cull-cow program than they did for those sold through local auctions.

Examination of our treatment of those ten proposed findings of fact on 510 F.Supp. at 454 shows that we adopted only paragraphs 348 and 351 as proposed.

Paragraphs 345 and 353, were modified in accordance with our view of the weight of the credible evidence.

In considering the significance of this Court's determination at trial that NFO had not adduced sufficient credible evidence to support NFO's proposed findings of fact as contained in paragraphs 346, 347, 349, 350, 352, and 354, as above quoted, it must be understood that paragraph 2215 of NFO's proposed damage finding of fact, (which would reflect an acceptance of the data reflected in NFO Exhibit No. 1023) is based on the assumption that NFO was, in fact, entitled to all five findings of fact proposed in paragraphs 345–50 of its proposed findings of fact.[6]

The thrust of defendants' argument in regard to the impact of this Court's rejection of NFO's proposed findings of fact is thus made clear when it is understood that this Court expressly rejected paragraph 349 of NFO's proposed findings of fact which stated: "349. The percentage of all NFO members in an area who are dairy farmers generally corresponds to the percentage of all farmers in that area who are dairy farmers." NFO contended at trial that its proposed finding of fact in paragraph 349 was supported by the following cited testimony: "Staley, Tr. at 1651–59; Berkhahn, Tr. at 6468–70; Scott, Tr. at 2541–43, 3076." Although a small number of the pages of the testimony of Staley, Berkhahn or Scott were included in Appendix G which NFO filed in support of its motion for damages, the particular pages cited in support of paragraph 349 were not reproduced for inclusion in that appendix. Examination of the conclusory testimony of each of those three witnesses in the complete transcript of their testimony establishes the reasons why this Court conclud-

**5.** We have added the word "[Rejected]" immediately after the particular paragraph number of NFO's proposed findings of fact so that it can be understood what this Court refused to find as a matter of fact at trial.

**6.** NFO cited the following data to support paragraph 2215 of its proposed finding of fact "(Nathan, Tr. at 9603–08; NFO Exh. 1023; F. 345–50,

2213–14)." The five pages of Dr. Nathan's testimony cited by NFO did no more than describe the manner in which NFO Exh. Nos. 1022 and 1023 were prepared. Exh. No. 1023 simply sets out the same data included in paragraph 2215 in more detailed form. The proposed findings in paragraphs 2213–14 do the same thing in regard to NFO Exh. 1022.

ed that NFO had not adduced sufficient credible evidence to support the finding of fact as proposed in paragraph 349.

In regard to Staley's testimony, for example, the pages cited by NFO to support paragraph 349, Tr. at 1651–1659, show that Staley was permitted to testify in response to leading questions, subject, however, to the defendants' objections, that NFO's recruiting efforts established that "the breakdown of farmers who joined NFO on the basis of commodity produced was the same as for all farmers in that state" (Tr. 1655–56).

On page 1860 of the transcript the Court noted that Staley's testimony on direct examination in regard to NFO membership had been given "in very, very conclusory language, based upon no factual data that I know anything about" and that "I am at a complete loss of knowing what actual membership, so far as milk participation is concerned, that NFO has any place in the United States up to this point."

Berkhahn testified on direct examination that NFO membership "tended to parallel very closely the type of agricultural production that was produced in that area" (Tr. 6468) and that he thought he could "estimate how many dairy producers you had who were interested in marketing through NFO" (Tr. 6470). When cross-examined about the testimony he had given on direct examination he conceded that neither he nor any one he knew had any idea about how many dairy farmers in the United States were members of NFO.

Berkhahn was being specifically examined about his testimony given on page 6470 of his direct examination, see Tr. 6687, when he gave the following testimony on cross-examination at Tr. 6689:

Q (By Mr. Park) Mr. Berkhahn, in the year 1970, how many dairy farmers in the United States were members of the NFO?

A I don't know.

Q Do you know who knows?

A No, I don't.

Q Do you know whether that figure is ascertainable from within NFO's records?

A No, I do not.

Q If I were to ask you the same question for every year for 1971, 1972, and 1973, and 1974, would your answer be the same?

A Yes, it would.

Q Are you aware of any system or procedure within the NFO today from which one could ascertain how many of the total NFO membership are dairy farmers?

A No, I am not aware of any.

Scott testified on direct examination on the pages cited by NFO to support the proposed finding stated in paragraph 349 that "if the dairy farmers in the area, the majority of them were dairy farmers, then we tended to have a majority of our members as dairy farmers" (Tr. 2541); that "in that area [Southwest Missouri] there were a lot of dairy farmers and we had a high percentage of the dairy farmers in that area as members of NFO" (Tr. 2542); and that "the membership tended to break down the same way wherever [he had] worked for NFO" (Tr. 2543).

Defendants' cross-examination of Scott, however, established that his conclusion that "about fifty percent of the producers in Southwest Missouri were members of the National Farmers Organization" was based on what "someone had told" him and that he had only been told that those producers "had signed at some time and paid their dues at some time" (Tr. 3074). Tr. 3077 of Scott's cross-examination shows that he confirmed the testimony he had given at a damage deposition in October 1975 that he knew of no way that he could determine the number of NFO members who were dairy farmers by checking any NFO record.

Scott further testified, Tr. 3081, that the following testimony given at his October 1975 damage deposition was true and correct at the time of trial:

"Q As a matter of fact, from what you know in the way of NFO records, it will be impossible to do it, wouldn't it, as far as you know?

"A As far as I know, yes.

"Q Now, how about the State of Oklahoma, do you have any opinion as to the total number of dairy farmers who are members of NFO in the State of Oklahoma?

"A No, sir.

. . . . .

"Q Again, based on your knowledge, would it be impossible from NFO records to determine the number of dairy farmers in the State of Oklahoma or who were members of NFO at any point in time?

"A To get a complete list, yes.

"Q The same question with regard to the State of Kansas, do you have any judgment or opinion as to the total number of dairy farmers who are members of NFO who are physically located in the State of Kansas?

"A The same answer, I would not be able to say."

. . . . .

"Q Do you know the number of members in the State of Missouri?

"A No, not—I couldn't give you the specific number of members."

Scott further testified that:

"Q And you have never known the number of NFO members for any period of time, is that right?

"A That is correct.

"Q So that if I were to ask you, Mr. Scott, sitting here today to make some kind of a comparison between, say, NFO's membership as of December 31, 1974 and December 31st of any other year, you would just be wholly incapable of doing that, isn't that right?

"A That is correct.

"Q Because the basic data, the underlying percentage, just doesn't exist on which you can form an opinion, is that right?

"A That is right."

The problem created by NFO's election to stand on the findings of facts it proposed at trial and its attempted reliance upon proposed findings of fact which have been expressly rejected by this Court is not confined to paragraph 349 which we used as an example and which we have discussed in detail. For it is clear, again by way of example, that NFO's proposed findings of fact in paragraphs 2298 to 2312 in regard to "NFO's minimum performance, absent restraints" is based on the assumption that all of the findings of fact proposed by NFO in paragraphs 128–340 and paragraphs 469–2017 were, in fact, supported by the greater weight of the credible evidence. A glance at NFO's "[Rejected]" proposed findings of fact in 510 F.Supp. at 443 to 454 and 458 to 501 in regard to those particular paragraphs will show the large number of proposed findings of fact which this Court concluded were not supported by the greater weight of the credible evidence.

## VI.

### Defendants' Measurement Brief

Defendants' measurement brief filed in opposition to NFO's motion for an order to award damages was solely directed toward the propriety of NFO's measures of damages for alleged lost membership dues and checkoff fees.

Defendants argued that "NFO's damage evidence is even more speculative and inadmissible on this remand than it was at the trial, inasmuch as NFO has failed to prevail on most of the acts of alleged illegality which it asserted at the trial as the predicate for its damage theories and computations." (Brief in Opp.: Measurement of Damages at 5.)[7] Defendants contend that

---

7. Defendants accurately state that paragraphs 128–349 and 469–2017 of NFO's proposed find- ings of fact set forth the factual contentions that NFO sought to establish at trial and that such

the "Eighth Circuit affirmed this Court's findings of the legality of many of the acts and practices challenged by NFO on appeal, including charges relating to mergers and acquisitions of independent cooperatives (687 F.2d at 1206); pool loading (*Id.*); standby pools (ARSPC) (*Id.* at 1206–07); alleged bad faith litigation (*Id.*, at 1200); attempts to. block NFO's USDA qualification (*Id.* at 1199); and the alleged conspiracy with AMDI (*Id.* at 1199). (Measurement Brief at 5–6)." [8]

Defendants further argue that the "only unlawful conduct found by the Court of Appeals—all occurring in 1970–71—related to certain specific handlers, Gandy Dairy, Wanzer Dairy, Beatrice-Fort Worth, and Foremost-Dallas, threats of suits against handlers that could be shown to have resulted in the rejection of NFO milk, and the acquisition of independent proprietary dairies insofar as they were designed to, and did, foreclose NFO milk. (687 F.2d at 1196–1204, 1206–07)" and that "the appellate court specifically directed this Court on the remand to weigh and consider the extent to which NFO was injured and 'harmed' thereby." (Measurement Brief at 6–7).

Defendants argued that Dr. Nathan's opinions are not credible because those opinions were based on unsupported assumptions given him by NFO and because he lacked the expertise required by Rules 702 and 703 of the Federal Rules of Evidence. Defendants contend that "Rule 702 imposes two threshold requirements for the admissibility of expert testimony: (1) the testimony must be helpful to the trier of fact to understand the evidence or to determine a fact in issue, and (2) the expert

must be qualified to express opinions that are relevant to the inquiry." (Measurement Brief at 13). Defendants further argued that Rule 703 must be given appropriate consideration for the reason that the "purpose of Rule 703 is to make certain that the expert's opinion has sufficient basis without reference to unsupported assumptions and theoretical speculation." (Measurement Brief at 15).

On the facts, defendants argued in their measurement brief that "[a]t the trial, Nathan admitted that he was not, and did not purport to be, an expert in the dairy marketing industry. (Nathan, Tr. 10314, 10317, 10712–22, 10740, 10760–61, 11135; DF.1)." (Measurement Brief at 18). Defendants contend, on the facts, that Nathan disclaimed having any expertise in the dairy industry or in raw milk marketing and that he relied almost entirely upon assumptions provided by NFO counsel without investigation or knowledge of that validity of the assumptions which had been given him by counsel.

The questions of whether Nathan could properly assume that NFO had the capabilities to be what Nathan described as a "major" marketer of raw milk and whether NFO could have penetrated each of the ten "damage" orders but for the assumed wrongful conduct of the defendants were in sharp factual dispute. Defendants' measurement brief pointed out that on direct examination, Nathan testified that he considered that the most important factor to take into account in regard to NFO's capability had to do with NFO's membership base (Tr. 9593–94) and that he had also testified on direct examination that NFO could be considered as a prospective major

proposed findings of fact "provided the express predicate for Mr. Nathan's assumption from NFO counsel of defendants' alleged illegal conduct in performance of Nathan's commission from NFO counsel to 'measure' NFO's purported damages for lost dues and checkoffs from such assumed wrongful conduct." (Brief in Opp.: Measurement of Damages at 5).

**8.** Defendants further stated that this Court's findings of fact in regard to NFO's charges relating to "defendants' full supply contacts, base

plans, CMPC retroactive credits and alleged predatory conduct directed by defendants, or one or more of them, against specific handlers, such as Midwest Creamery, Gilt Edge, Hiland Dairy, Turner Dairy, Foremost-Springfield, Steffen Dairy, Hyde Park Dairy, Ewald Dairy, Page Milk Co., Marigold Foods, Carnation, Schepps Dairy, Hawthorne-Mellody and Fairmont Foods" were not disturbed by the Court of Appeals' decision on appeal. (Measurement Brief at 6).

pooling firm because of "NFO's experience in organization, its general status as a major farming organization in the middlewest, given its membership throughout that area, in varying degrees, [and] given its experience—some experience in milk marketing prior to this major thrust in 1969–1970" (Tr. 9638).

In regard to NFO's prior experience in milk marketing, in defendants' measurement brief, defendants directed attention to testimony given by Nathan as he had testified as follows on cross-examination:

Q. (By Mr. Peterson) What did NFO counsel tell you, if anything, about NFO's prior experience in milk marketing?

A. They told me no details as to how extensive it was nor how long. They told me to assume that NFO had had experience in milk marketing.

Q. Well, did they tell you to assume whether those experiences were successful or unsuccessful?

A. No, sir, they did not.

. . . . .

Q. Well, do you know anything about the nature of those experiences?

A. I do not.

Q. So when NFO in 1970 decided to engage in direct milk marketing, a direct marketing program, you don't know whether NFO had a successful or unsuccessful past history as far as milk marketing efforts are concerned?

A. That is correct. (Nathan, Tr. 10601–02).

(Measurement Brief at 27–28).

For a further example of Nathan's cross-examination in regard to the manner in which he had accepted the assumption of NFO's capability, defendants' measurement brief noted that Nathan had testified as follows:

Q. You are assuming that NFO had the full capacity to be a major marketer and there were no restrictions or limitations on their obtaining that capability?

A. I did not go into the limitations, nor did I assume whether these limitations were balanced equally or more than balanced or more than offset by advantages.

Q. You didn't even consider whether there were limitations, did you?

A. That is correct.

Q. If there were limitations, wouldn't that cause some readjustment in your theory?

A. Depends on what the advantages are, the pluses that would balance off with the minuses.

Q. But that is nothing that you can tell us about here today?

A. That is correct, sir. (Nathan, Tr. 10182–83).

(Measurement Brief at 29).

Defendants noted that Nathan conceded on cross-examination that he had no "personal knowledge of the capabilities of NFO's management" and that consideration of that factor was "purely an assumption" (Tr. 10593). Nathan testified as follows:

Q. And who does that assumption [of the capabilities of NFO's management] come from, or what is it based upon, if anything?

A. As I recall, this was an assumption given to me by NFO counsel.

Q. Would this assumption include an adequate staff, integrity of management, a good level of payroll and experience, as far as capability is concerned?

A. *I don't know really what the counsel has in mind. I was told to assume that NFO had managerial capabilities and resources to achieve—to become a significant factor. I don't recall any discussion about the components.*

Q. *You didn't discuss the components, they told you to assume that NFO has whatever capability is neces-*

*sary to penetrate these markets, am I stating it fairly?*

A. *Yes, I think that is correct.* (Nathan, Tr. 10593; emphasis added by defendants).

(Measurement Brief at 30).

Defendants contended in their measurement brief that Nathan's lack of experience in regard to the milk marketing industry causes him to focus on inappropriate factors in his attempt to project NFO's assumed capability and expected performance and thus argued that his testimony should not be accepted.

Defendants relied upon and urge that this Court accept the testimony of Dr. Emerson Babb, a member of the Department of Agricultural Economics at Purdue University since 1960, called by defendants, who they state was "well qualified to testify as an economic expert in dairy marketing and to assist the Court as the trier of fact on these matters." (Measurement Brief at 31). Defendants argued that "Dr. Babb articulated most fully and convincingly the errors contained in Nathan's basic assumption that NFO possessed the capability to become a major factor in the business of marketing raw milk." (Meas. Brief at 32).

Defendants further contended in their measurement brief that Dr. Babb demonstrated that "Nathan's reliance in his direct testimony in making his projections of NFO's expected penetration of the 10 Midwest federal milk orders upon assumptions of NFO's estimated membership among Midwest dairy farmers, its milk marketing experience prior to 1970, its focus upon the Midwest area in milk marketing and its experience in other agricultural commodities, was totally misplaced." *Id.* at 32–33.

Defendants, of course, contend that the disputed issues of fact created by the testimony of Dr. Nathan and Dr. Babb should be resolved in favor of the defendants.

## VII.

Defendants further argued in its measurement brief that NFO, by its election to rely solely on the proposed findings of fact presented at trial, attempts on remand to recover damages which were occasioned by acts of lawful, rather than unlawful competition. Defendants rely on cases such as *MCI Communications v. American Tel. & Tel. Co.*, 708 F.2d 1081 (7th Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 234, 78 L.Ed.2d 226 (1983). Defendants argued that the Court of Appeals directed this Court on remand to consider and weigh the extent to which NFO's "harm" was attributable to the specific conduct found by it to be illegal, including the circumstances that might be said to be established in regard to Gandy Dairy (687 F.2d at 1196 n. 21), Wanzer Dairy (*id.* at 1199 n. 29), threats of suits against handlers which resulted in rejections of NFO milk (*id.* at 1203 n. 35), Beatrice-Fort Worth and Foremost Dairy-Dallas rejection of NFO milk (*id.* at 1210) and how the acquisitions of independent proprietary dairies may have been part of a scheme to eliminate NFO (*id.* at 1207).

Defendants' measurement brief directed particular attention to various findings of fact and conclusions of law which the Court of Appeals affirmed. In that regard, defendants stated that the Court of Appeals "upheld this Court's findings and conclusions that NFO did not prove the offenses of attempt to monopolize and monopolization. (*Id.* at 1191) [and] ... affirmed this Court's dismissal of NFO's claims against ARSPC. (*Id.*)" (Meas. Brief at 47). Defendants added that the Court of Appeals also affirmed this Court's findings "relating to the legality of (1) mergers and acquisitions of independent cooperatives (687 F.2d at 1206); (2) pool loading (*Id.*); (3) standby pools (ARSPC) (*Id.* at 1206–07); (4) alleged bad faith litigation (*Id.* at 1200); (5) attempts to block NFO's qualification by the USDA (*Id.* at 1195); and (6) the alleged conspiracy with AMDI (*Id.* at 1199)." (Meas. Brief at 47).

Defendants thus argued that NFO failed to prevail in regard to particular alleged unlawful acts and conduct for the reason the Court of Appeals left undisturbed this Court's findings of fact and conclusions of

law in regard to the claims made by NFO in regard to "conduct related to (1) full supply contracts (NFO Proposed Fdgs. 592–596, 828, 907–08, 1102, 1661, 1678, 1680, 1688, 1725, 1751, 1775, 1777, 1823, 1835, rejected by this Court, 510 F.Supp. at 462, 469–70, 475, 492–94, 497); (2) base plans (NFO Proposed Fdgs. 591, 791–793, 1952, rejected by this Court, 510 F.Supp. at 460, 467, 499); (3) CMPC retroactive competitive credits (NFO Proposed Fdgs. 1472–73, rejected by this Court, 510 F.Supp. at 486–87; and (4) alleged predatory acts against fourteen specific handlers."[9] (Footnotes omitted). (Meas. Brief at 48).

Defendants point out that a substantial number of NFO's proposed findings of fact, resubmitted on remand in exactly the same form as originally submitted at trial, were predicated on the conduct of defendants described in NFO's proposed trial findings 128–340, 469–2017. See, for example, NFO proposed damage findings of fact, paragraphs 2298–2312, 2323–25, 2331–44, 2355–58, 2360, 2362, 2364, 2366, 2368.[10]

The fourth major contention made in defendants' measurement brief was stated as follows: "Nathan's damage theories and projections are predicated upon assumptions not supported by the trial record which renders them speculative and inadmissible." Defendants do not repeat in this part of their brief their earlier discussion of what they earlier described as the "two major assumptions" that they contend NFO and Dr. Nathan relied upon in fashioning and presenting NFO's damage theories and calculations.[11] Rather, defendants argue that in "addition to his major assumptions related to defendants' alleged restrictive practices and NFO's capability, Nathan also relied upon a host of other assumptions in projecting NFO's expected 'but for' performance, all of which were crucial to his damage calculations but were not proved at trial." (Meas. Brief at 74). Defendants stated that the additional assumptions relied upon by NFO and Dr. Nathan included the following assumptions:

1. That a major milk marketing organization is one with 5% or more of the milk pooled on a particular federal order. *Id.* at 75.

2. That NFO would have entered each of the ten damage orders on the dates assumed by Nathan as given to him by NFO counsel but for the defendants' as-

---

**9.** The fourteen handlers were identified in a footnote as follows: "These handlers are: (1) Midwest Creamery-Oklahoma (NFO Proposed Fdg. 663, rejected, 510 F.Supp. at 464); (2) Gilt Edge (NFO Proposed Fdg. 708, rejected, 510 F.Supp. at 465); (3) Hiland Dairy-Springfield (NFO Proposed Fdgs. 886, 895–97, 903, rejected, 510 F.Supp. at 470); (4) Turner Dairy-Tenn. and Ky. (NFO Proposed Fdg. 1068, rejected, 510 F.Supp. at 475); (5) Foremost-Springfield (NFO Proposed Fdg. 1132, rejected, 510 F.Supp. at 476); (6) Ewald Dairy-Minn. (NFO Proposed Fdgs. 1607–08, rejected, 510 F.Supp. at 490); (7) Steffen Dairy-Kansas (NFO Proposed Fdgs. 1875–76, 1879, rejected, 510 F.Supp. at 497); (8) Page Milk Co.-Kansas (NFO Proposed Fdgs. 1926–27, 1930–31, rejected 510 F.Supp. at 499); (9) Hyde Park Dairy-Kansas (NFO Proposed Fdgs. 1886–88, rejected, 510 F.Supp. at 497); (10) Hawthorne-Mellody-Missouri (NFO Proposed Fdgs. 1940–41, rejected, 510 F.Supp. at 499); (11) Carnation-Texas and Oklahoma (NFO Proposed Fdgs. 492, 539, 541, 545–46, 567, 748–750, 755, rejected, 510 F.Supp. at 459, 461–62, 466); (12) Schepps-IDC-Jere Dairy (NFO Proposed Fdgs. 535–36, 556–57, 568, rejected, 510 F.Supp. at 461–62); (13) Fairmont Foods-Okla.

(NFO Proposed Fdgs. 767–69, rejected, 510 F.Supp. at 467); and (14) Marigold Foods-Minn. (NFO Proposed Fdg. 1712, rejected, 510 F.Supp. at 493)."

**10.** Defendants stated in a footnote to its citation of the above paragraphs of NFO's proposed damage findings that: "It is also significant that in its Responses to Defendants' Joint Proposed Phase II Findings of Facts and Conclusions of Law, at p. 209, filed June 2, 1980, NFO further asserted that *Nathan's 'assumption of anticompetitive conduct is supported by [NFO proposed findings] 128–340, 469–2017.'* (Emphasis added by defendants)." (Meas. Brief at 49, n. 9.).

**11.** The two "major assumptions," according to defendants' contentions were that "(1) the defendants engaged in illegal restrictive practices against NFO that precluded NFO from obtaining ten to twenty percent of the milk volumes and producers pooled on the ten damage orders, and (2) NFO had the capability of marketing raw milk to the extent projected by Nathan but for the assumed restrictive practices." (Meas. Brief at 73–74).

sumed wrongful acts and practices. *Id.* at 75.

3. That NFO would achieve its projected market shares in equal annual increments within three years of its assumed date of entry in each of the ten damage orders.[12] *Id.* at 75.

4. That once NFO attained its projected shares in the ten damage orders, it would thereafter maintain them. *Id.* at 76.

5. That individual federal milk orders are separate economic markets.[13] *Id.* at 77.

6. That the ten damage orders are comparable based solely upon the degree of "concentration" in them in 1969, which "concentration" would not vary thereafter. *Id.* at 78.

7. That old Order 68 (Twin Cities) is reasonably comparable to the other nine damage orders so that NFO's experiences on Order 68 were properly transferable to the other damage orders. *Id.* at 79.

8. That NFO's net dues receipts were $60.83—$62.20 per member and its net checkoff fees were three cents per hundredweight. *Id.* at 80.

9. That NFO members regularly paid their NFO membership dues. *Id.* at 84.

10. That no NFO producers located in the ten damage order area marketed their milk on orders outside of that area, that no NFO dairy farmers marketed their milk through other organizations, and that NFO's membership and milk volume data were accurate. *Id.* at 85.

11. That but for the alleged restrictive acts and practices of the defendants, NFO would have imposed a 2¢ per cwt. dairy bargaining expense checkoff in January, 1972, and a 6¢ per cwt. dairy bargaining expense checkoff in early 1976. *Id.* at 87–88.

The major thrust of defendants' arguments in support of their fourth major contention are based on the general proposition that NFO's and Nathan's reliance upon assumptions which are not supported by the record destroys all of NFO's damage computations.

Defendants' arguments, of course, are founded on their view that the testimony of defendants' witnesses, particularly that of Dr. Babb, should be accepted rather than the testimony of NFO's witnesses, particularly that of Nathan. Defendants, of course, also argue that principles of law stated in cases such as *MCI Communications, supra,* should be applied to the factual circumstances which defendants contend are established by the record in this case.

The fifth and final major contention made in defendants' measurement brief was stated as follows: "NFO's damage theories for recovery of alleged lost dues and checkoff fees are speculative and based on guesswork." *Id.* at 92. The final part of defendants' brief again attacks NFO's "market structure" theory on the ground that the average poolings to the ten damage orders "is not a legally permissible damage theory"; that such theory "is predicated solely upon unsupported and speculative assumptions"; that the theory "produces absurd results not to be expected in the real world"; and that such theory is therefore "illegally speculative and conjectural." *Id.* at 93, 94, 96 and 100.

NFO's "test market" theory was again attacked on the ground that NFO's attempt to base that theory on its 1973 performance on Old Order 68 "is not a legally permissible damage theory." Defendants argue, in general, that experience on a single federal

---

**12.** Defendants point out that throughout the pretrial phase of the case, Dr. Nathan assumed that it would take five, rather than three years for NFO to achieve its projected market shares. Defendants also direct attention to the fact that Dr. Nathan did not know who made the decision to use the shorter three-year period that was used at trial.

**13.** Defendants state, among other things, in connection with this point that "[t]his Court found and concluded that federal milk orders are not economic markets for purposes of antitrust market analysis (510 F.Supp. at 502)" and "[t]his finding was affirmed on appeal. (687 F.2d at 1192)." (Meas. Brief at 77).

milk order may not properly be used to determine expected performance on other federal milk orders and defendants further argue, in particular, that Old Order 68 could not be used in any event for the reason that NFO failed to establish that Old Order 68 was reasonably comparable to the other nine damage orders. Defendants further argued that NFO's 1971–1973 poolings on Old Order 68 were unique to that order and that NFO failed to consider any of its experience on that order after 1973.

Defendants final argument in its measurement brief was based on a comparison of NFO's performance in the ten damage orders with NFO's performance on other market orders which NFO entered but where damages are not claimed. Defendants rely on the analysis made by defendants' witnesses Dr. Babb and George Hansen of NFO's 1970–1977 experience on every market order that NFO entered during those years. Defendants contend, on the facts, that the Babb-Hansen analysis "shows that NFO did much better in the damage orders in terms of percentages of milk volumes pooled than it did in the other orders during the period 1970 through 1977." [14] Defendants thus argue that "NFO's superior performance in the damage orders shows that if predatory practices existed there, they did not impair NFO's ability to obtain customers and producers" and that "[t]he hypothesis that NFO was injured by predatory practices in the damage orders in failing to obtain dairy farmer members or customers must therefore be rejected." (Meas. Brief at 134).

### NFO's Reply Causation Brief

NFO's reply brief, filed in response to defendants' causation brief, also responded to the portions of defendants' measurement brief which NFO believed to relate to causation issues. The basic thrust of NFO's causation reply brief is set forth in the first paragraph of that brief. NFO there stated that, under its view of this case on remand, NFO, as a private antitrust plaintiff, "is required to establish three elements; (1) a violation of the antitrust laws (violation); (2) cognizable injury attributable to the violation (fact of injury); and (3) the approximate amount of the damage (amount of damage)." (NFO's Causation Reply Brief at 1–2). NFO then argued that the "Eighth Circuit's August 31, 1982 liability decision conclusively establishes that NFO has already satisfied the first two elements of its three part burden" and that "[o]nly one task remains: a reasonable estimation of NFO's damages." (Causation Reply Brief at 2).

In a footnote on page 2 of its causation reply brief NFO makes clear its view of the impact of the Court of Appeals' directions on remand by stating that "[c]ontrary to defendants' assertion that the 'threshold factual issue [of] causation is very much alive', causation was an integral aspect of the Eighth Circuit's liability decision" and that "[t]hus, Defendants' 98 page causation brief is just one more futile chapter in their long line of attempts to relitigate issues already conclusively determined by the Eighth Circuit." *Id.* at 2, n. 4.

Although NFO quoted as a text at the outset of its causation reply brief that portion of the Court of Appeals' opinion which stated that "the case is remanded for a determination of the amount of damages NFO *may* recover," (emphasis ours) 687 F.2d at 1179, it is clear that NFO places much greater reliance upon that portion of the Court of Appeals' opinion which stated,

**14.** Defendants, in reliance upon that testimony attached Table I to its proposed measurement of damages findings of fact, and argue that NFO's annual poolings on the 10 damage orders and on the 17 non-damage orders during 1970–77 may be summarized as follows:

During the period 1970–77, inclusive, NFO's percentages of milk volumes pooled annually in the damage and non-damage orders were as follows:

| Year | Damage Orders | Non-Damage Orders |
|------|---------------|-------------------|
| 1970 | 0.623% | 0.073% |
| 1971 | 1.914% | 0.333% |
| 1972 | 3.008% | 1.428% |
| 1973 | 3.637% | 2.225% |
| 1974 | 3.368% | 2.432% |
| 1975 | 3.185% | 2.257% |
| 1976 | 3.205% | 2.165% |
| 1977 | 2.701% | 1.782% |

on remand, "the district court has rather broad latitude in assessing the amount of damages which NFO *shall* recover," (emphasis ours) 687 F.2d at 1210.

NFO cited *Zenith* and *Bigelow* numerous times in its reply causation brief and, indeed, in all of its briefs filed after remand. NFO basically contends that when the Court of Appeals cited those two cases in support of its statement that "the district court has rather broad latitude in assessing the amount of damages which NFO shall recover" that the Court of Appeals made an "explicit holding" that NFO was entitled to recover damages on the basis of the evidence NFO adduced at trial and that the only task that this Court must perform on remand is to make what NFO calls a "reasonable estimation" of NFO's damages.

NFO argued on pages 6 and 7 of its causation reply brief that "in order to recover on the basis of an estimate of its damages, a plaintiff need only establish 'some causal connection' between defendants' unlawful acts and plaintiffs' injuries, and this causal relationship 'may properly be a matter of inference from the circumstances and evidence as a whole.' " [15] After properly noting that the Court of Appeals found the "fact of injury" in regard to Wanzer Dairy, the Beatrice cutoff, and Foremost's subsequent rejection of particular shipments, NFO argued on page 12 of its causation reply brief that "[o]nce the 'fact of injury' is established, an antitrust plaintiff need only show 'some causal connection' between the defendants' violation and the amount of plaintiff's damages."

NFO's causation reply brief argued that the arguments made in defendants' causation brief were "based solely on a tortured mischaracterization of the Eighth Circuit's opinion" and that defendants "have misconstrued the Eighth Circuit's decision." NFO

suggested that it has always "proposed to measure its lost market penetration damages using the general test market/market structure approach" and that the "Eighth Circuit never said that such approach could not be used to measure 'the extent [NFO's] losses are reasonably shown to be caused by the antitrust conspiracy.' " "To the contrary," NFO's reply brief argument continued, "the Eighth Circuit affirmatively *endorsed* NFO's damage theory by directing this court's attention to *Zenith, supra* and *Bigelow, supra*, as the cases governing NFO's damages measurement proof. (687 F.2d at 1210.)" [Emphasis in the original].

Part V of NFO's causation reply brief contains 80 pages of discussion under a heading which stated that "NFO's inability to achieve its projected market penetration was the direct and intended result of defendants' illegal predation." *Id.* at 63. Although NFO stated on page 71 of its causation reply brief that it had made a full reply to defendants' factual contentions in its response to defendants' proposed findings of fact relating to causation, that brief contains but a lengthy discussion of "added examples of predation."

NFO's detailed discussion of what it contends was established by the evidence in the case was made in response to what NFO argued was the defendants' "final acknowledgement" that defendants have the burden of proof on remand to establish that "NFO's inability to prosper was '*solely attributable*' to causes other than defendants' illegal conduct" and that because "defendants have fallen far short of proving that NFO's losses were 'clearly' or 'solely' attributable to NFO's alleged ineptitude," NFO is accordingly entitled to recover all of the damages it has claimed. *Id.* at 64.[16]

---

**15.** NFO cited "687 F.2d at 1209–10" of the Court of Appeals' opinion to support the quotations within the quotation this Court has made from pages 6–7 of NFO reply brief. We find that no language on the cited pages of the Court of Appeals' opinion may properly be said to support NFO partial quotations. Indeed, what the Court of Appeals said on both the cited pages of

its opinion can be read to point out various factual questions in regard to NFO's damages that were open for consideration and decision by this Court on remand.

**16.** NFO's "burden of proof" argument is reiterated on page 68 of its reply brief. NFO there stated that "in order to establish that NFO's loss

NFO's reply brief (page 69) also purported to state the reason why NFO elected to stand on the record made at trial rather than electing to have the record reopened after remand. NFO first stated that the "Eighth Circuit has already found that the fact of NFO's injury is 'unmistakable' and that this injury took the form of lost membership dues and check off fees stemming from market foreclosure. (687 F.2d at 1210)" and that, thus, "the Eighth Circuit has already found the existence of 'some' injury, *i.e.*, 'some' market foreclosure." NFO then states that the "only question remaining is the extent of that market foreclosure." NFO flatly stated "[t]hat question is answered by NFO's damage analyses."

NFO's causation reply brief made clear that NFO rests its entire damage case on "NFO's damage analyses" adduced at trial. The basic theory stated in NFO's causation reply brief is that the extent that NFO, in fact, lost membership dues and the extent that NFO, in fact, lost check off fees was reasonably shown by the damage analyses adduced at trial.

NFO's detailed discussion of "defendants' concerted predation" on the various market orders was focused solely on whether defendants had carried the burden of proof which NFO contends that defendants must carry in order to prevent NFO from recovering all of the damages claimed by it under the "damage analyses" that NFO advanced through Nathan at trial.

### NFO'S Measurement Reply Brief

NFO introduced the arguments made in its measurement reply brief with the statement, based as usual on a citation of *Zenith* and *Bigelow*, that the "essential point that the defendants miss in opposing NFO's measurement of its lost market penetration damages is that an antitrust plaintiff who has been unlawfully excluded from the market in whole or in part need only prove his damages by a *reasonable* estimate." (Emphasis in the original).[17] (Measurement Reply Brief at 1–2). NFO concluded the introduction section of that brief with the statement that "the defendants have said nothing that refutes [the] reasonableness [of NFO's damage measurements.]" (Measurement Reply Brief at 5).

Part II of NFO's measurement reply brief is captioned "NFO properly relied upon the expertise of economic expert Robert Nathan in measuring its lost market penetration damages." (*Id.* at 5). NFO conceded, as it must, that "Nathan operated on the basis of assumptions supplied to him by others." (*Id.* at 7). Specifically, NFO stated that "Dr. Nathan did unquestionably assume that NFO was injured by defendants' antitrust conspiracy, and that NFO had the capability to become a major milk marketer." (*Id.* at 10).

NFO argues that the correctness of the first assumption was established by the Court of Appeals' determination that the "fact of NFO's injury" was established by trial record. In regard to Nathan's second assumption, NFO argued that "NFO's capability in dairy—is fully supported in the record, by NFO's witnesses and, most con-

---

of dues and fees was *'solely attributable'* to NFO's alleged ineptitude, defendants would have to establish that their coercion, discriminatory pricing, harassing litigation, etc.—conduct they have been convicted of—had *no* impact on NFO's access to markets or ability to recruit producers." NFO contends that it is entitled to recover all the damages it has claimed because "[t]his is a burden that defendants can not satisfy." See also page 97 of NFO's reply brief where NFO states in a footnote that: "Defendants of course recognize that only by proving that NFO was the *sole* cause of its injury can they avoid paying substantial damages." (Emphasis in the original).

17. NFO reiterated that argument numerous times in its measurement reply brief and other briefs filed after remand. See for example, NFO's repeated argument on page 4 of its measurement reply brief: "the Supreme Court in *Zenith* and *Bigelow* directed that the proper standard for measuring antitrust damages be one of reasonableness. What is most apparent about defendants' opposition to NFO's damage measurements is their total disregard for the teachings of *Zenith* and *Bigelow*."

vincingly, by the undeniable fact that, in addition to the test market Order 68, NFO *did* succeed remarkably well in Chicago and the Southwest—until, as specifically found by the Court of Appeals, the defendants decimated the NFO program." (Footnote omitted). (Emphasis in the original).[18] (Measurement Reply Brief at 10–11).

NFO conceded that Dr. Nathan made "certain judgments" when he formulated "NFO's market-structure method for measuring damages" (*Id.* at 12). NFO argued that "[t]hese judgments, however, were all reasonable." (*Id.* at 12). NFO specifically argued that Nathan's "judgments" were reasonable because "[h]e relied upon Messrs. Hammond and Dahl," described by NFO as "well respected agricultural marketing analysts," and that he reasonably used a "rounded-off 5% standard" for determining whether a supplier had crossed the "major" market share threshold. (*Id.* at 13). NFO further argued that the three-year growth period Nathan elected to use, was not "plucked out of thin air; it had an actual empirical basis, i.e., NFO's experience in old Order 68." (*Id.* at 13).

NFO implicitly conceded that defendants have what NFO called "the empty, abstract opinion of Mr. Babb" in opposition to NFO's ability to grow as projected by Nathan, but NFO suggests that Babb's testimony should be totally disregarded because "Mr. Babb's view is worse than mere speculation because his opinion collides squarely with NFO's history." (Measurement Reply Brief at 14–15).

In response to defendants' arguments that Nathan should have considered various other "economic factors" in his evaluation of NFO's potential growth, such as NFO's "ability to attract producers and handlers, experiences in other areas, and the like," NFO conceded that "Nathan did not examine these 'economic factors.'" NFO argued, however, that such "economic factors" are "in reality only components of NFO's capacity in dairy" and that Nathan did not need to examine those factors for the reason that he had, properly according to NFO, "assumed that NFO was capable of becoming a major milk marketer."[19] (Measurement Reply Brief at 18).

As would be anticipated, in the section of NFO's measurement reply brief devoted to "The Test-Market Method" (p. 26) it is argued that "[t]he selection of old Order 68 as NFO's test market was proper in all respects" and that the "record evidence on comparability in fact establishes that Order 68 was a valid test market for projecting losses in other damage markets."[20] (*Id.* at 7).

NFO contends that all of defendants' arguments made in regard to NFO's test market method wander "from the accepted standard, which is the use of a reasonable basis for estimating damages." (*Id.* at 34). NFO argued that because "[f]ederal orders are regulated and have government-gathered and collated statistics" those federal orders "are thus reliable economic units providing a reasonable basis for estimating NFO's damages; this is all that is necessary." (Measurement Reply Brief at 35).

In the "conclusion" portion of its measurement reply brief NFO reiterates the basic argument stated in the first sentence of that brief by stating that what "defendants have most consistently done throughout 238 pages of briefs is to completely ignore both the reasonableness standard

---

18. NFO also argued that "Dr. Nathan's assumptions of injury and capability" were also established by defendants' recognition of "NFO's capability to become a major marketer—that is exactly why they went to such lengths to throw NFO out of the market."

19. NFO repeated its argument that "[t]his assumption is, of course, fully supported in the record and by NFO's track record in Chicago, the Southwest, and Order 68." NFO added an additional argument that suggested that Nathan had reasonably relied on "NFO's membership base [as] the most important factor in evaluating NFO's capability" and that "he determined the facts on that point himself." *Id.* at 18.

20. NFO cites pages 23–24 of its original damage brief to support its statement that "[t]he record on comparability in fact establishes that Order 68 was a valid test market." Examination of those pages of that brief reveals very little citation of the record.

enunciated in the controlling cases of *Zenith* and *Bigelow,* and the 'broad latitude,' as the Eighth Circuit put it, that this Court has 'in assessing the amount of damages NFO *shall* recover.' 687 F.2d at 1210 (emphasis added by NFO)." (Measurement Reply Brief at 45). NFO's brief concluded with the following sentence: "To prevent defendants from profiting from their years of concerted predation, and to compensate NFO and its dairy farmer members for the devastation defendants have wantonly inflicted upon them, NFO prays for damages in the amount of $12,947,034, trebled to $38,841,102, and the undersigned NFO class claimants pray for damages in the amount of $1,075,383, trebled to $3,226,-149." (*Id.* at 46).

Having covered the arguments made by the parties in their briefs filed in connection with the issues under discussion, we turn now to a more detailed discussion of NFO's lost market penetration damage computation theories.

## NFO'S LOST MARKET—PENETRATION DAMAGE COMPUTATION THEORIES

### I.

By way of introduction, it is appropriate to note that in the conclusion portion of its brief in support of its motion for damages NFO directed attention to what the Court of Appeals had to say about the familiar cases of *Eastman Kodak* and *Story Parchment* in *Arthur Murray, Inc. v. Oliver,* 364 F.2d 28 (8th Cir.1966). As the record shows, this Court has been frequently reminded of the *Arthur Murray* litigation a number of times during the trial and determination of this case.

This Court's determination of the defendants' liability in *Arthur Murray* and the reasons this Court believed that the appointment of a Special Master was necessary in determination of the amount of plaintiff's damages was published in *Reserve Plan, Inc. v. Arthur Murray,* 38 F.R.D. 23 (W.D. Mo.1965).[21] After finding the defendants to be liable for antitrust violations and after a detailed review of all pretrial orders entered by both judges and of plaintiff's failure to comply with those pretrial orders, we stated that "[s]ince 1961 the two judges who have had the responsibility for seeing that this case be tried have been spectacularly unsuccessful in their efforts to get the plaintiff to prepare and present its case on damages in a manner that can be judicially understood."[22] The Court of Appeals partially approved the appointment of a Special Master in *Arthur Murray I* but vacated a portion of this Court's order of reference which would have enabled the Special Master to reopen the record and to review additional available relevant factual data on the issue of the amount of plaintiff's damages which had not been offered in evidence by either side during the trial of the case.

This Court applied principles established by the Court of Appeals in *Arthur Murray I* when we made repeated and exhaustive inquiry as to whether NFO wished to have the record in this case reopened for the purpose of adducing additional evidence consistent with the Court of Appeals discussion of damages and its statement that further proceedings might be appropriate.

*Arthur Murray I* required the consideration by the Court of Appeals of a record which showed that the district court had already made a finding that "the record

---

**21.** Later opinions of this Court, all written on the question of the amount of plaintiffs' damages are reported in 262 F.Supp. 565 (W.D.Mo. 1967) and 301 F.Supp. 621 (W.D.Mo.1969). There is no need to make any further reference to those later opinions. Nor is it necessary that any detailed reference be made to the Court of Appeals decision in *Arthur Murray II,* 406 F.2d 1138 (8th Cir.1969), other than to state that the Court of Appeals appropriately noted the "thorny history" of the case and the "most vexatious problem" created by plaintiffs' failure to comply

with pretrial orders in regard to a consistent theory of damages.

**22.** *Reserve Plan, Inc. v. Arthur Murray, Inc.,* 38 F.R.D. 23, 35 (W.D.Mo.1965). We further stated that as a result of plaintiff's failure properly to prepare its damage evidence, that "[p]laintiff's accounting evidence on damages, as a practical matter, was assembled in final form during the trial itself." *Id.* at 33.

contained such evidence of damages as could afford the basis for the rendering of a substantial verdict in plaintiff's favor." *Arthur Murray, Inc. v. Oliver, supra,* 364 F.2d at 30. The purpose of this Court's initial order appointing a Special Master was to reopen the record to receive *additional* accounting books and records that its study of the record established were in existence.

The Court of Appeals in *Arthur Murray I* recognized that a trial court has "the general power to reopen a case, either on motion of a party or on its own motion, while the matter is still under advisement, for the receipt of further evidence." *Id.* at 34. It concluded, however, that recognition of that power "may not be taken to imply that a court is entitled to engage freehandedly in adding evidence to a record on its own motion" and firmly stated that "it is not the business of a court to make additions of evidence in a submitted case on its own motion other than as there may be some element of such probative importance that its addition will prevent a miscarriage of justice from occurring in the situation."[23] (*Id.* at 34).

■ The primary lesson taught in *Arthur Murray I* was that a district court must refrain from reopening a case on its own motion in all but highly exceptional cases and that it should not consider doing so except to prevent a miscarriage of justice. Application of that principle in the circumstances of this case requires a finding that NFO must be held to its election to rely on the record made at trial and on the findings of fact which NFO initially proposed on the damage issues discussed in the Court of Appeals' opinion in this case.

We now turn to a detailed analysis of NFO's lost market penetration damage computation theories upon which NFO bases its claim that it should recover millions upon millions of dollars from the defendants.

## II.

In the conclusion portion of its supporting brief NFO stated that the amount of damages claimed by NFO "represents the average damage amount arising from two reasonable methods of estimating NFO's lost market penetration damages." (Brief in Support of Mot. for Damages at 46). The summary of NFO's damage computations, which was attached to its supporting brief as Appendix A, set forth NFO's claim that "the total average amount of NFO's lost-market penetration damages is $12,947,034, which must be trebled to $38,841,102."

Although Part XV of NFO's original proposed findings of fact, entitled "NFO lost penetration damages," contained 390 separate proposed findings of fact set forth on 132 legal size pages, the summary contained in Appendix A attached to its supporting brief makes reference to a substantially smaller number of proposed findings of fact upon which NFO presently bases its damage claim. We have carefully reviewed all of NFO's original 390 proposed findings, compared them with those cited in the Appendix A summary, and conclude that the proposed findings cited in the Appendix A summary set forth NFO's theories of its alleged lost market penetration damages in sufficient detail to confine our discussion and analysis of NFO's theories as reflected by the proposed findings of fact contained in NFO's Appendix A summary.

Appendix A, for example, accurately states that NFO's alleged lost market penetration damages as claimed under NFO's test-market (10.5%) method were calculated under NFO proposed findings of fact paragraphs 2299–2312 (NFO P.F. 2299–2312),[24]

---

**23.** The Court of Appeals further stated that while it could "sympathize with the Court's conscientious desire here to have as full a probative basis as possible for arriving at the damages involved" that it nevertheless "is not given to a judge to engage in a prospecting quest for other

evidence possibility to add to a record." *Arthur Murray I, supra,* 364 F.2d at 34 and 35.

**24.** We adopt NFO's system of citing the paragraphs of the findings of fact proposed by NFO at trial. "NFO. P.F. 2299–2312," as illustrated

that its market-share method of damage calculation was made in accordance with NFO P.F. 2331–44, and that the estimated volumes of milk that would have been pooled by NFO and other data are summarized by various NFO exhibits cited in connection with those proposed findings of fact.

We turn now to NFO's proposed calculations of its alleged market penetration damages.

## III.

NFO cited only nine pages of Nathan's testimony on direct examination (Tr. 9660–69) and NFO Exhibits 1015 and 1019 to support the thirteen proposed findings of fact which set forth NFO's "test-market (10.5%) method" (NFO P.F. 2299–2312) and its "market-share method" (NFO P.F. 2331–44) under which NFO would have this Court "estimate the volume of milk that NFO would have pooled in the absence of market restraints." NFO recognized that such a factual finding represents an essential first step in NFO's proposed calculation of its "lost marketing expense checkoff fees."

NFO also cited and relied on the six additional paragraphs of its originally proposed findings of fact, NFO P.F. 2264–65, 2286, and 2287 (test-market) and 2273 and 2275 (market-share) to support various paragraphs of the same thirteen proposed findings.

As will be noted later, each of those additionally cited proposed findings of fact, in turn, cited a number of other of NFO's original proposed findings of fact. The cited pages of Nathan's testimony reflect no more than Nathan's description of NFO Exhibits 1015 and 1019.[25]

As noted above, paragraphs 2264–65, 2286, and 2287 of NFO's proposed findings of fact are cited to support NFO's test-mar-

ket (10.5%) method. Paragraph 2264 of NFO's proposed findings of fact would have this Court find as a matter of fact that "[t]he penetration (in terms of volume of milk pooled) achieved by NFO in Federal Milk Market Order 68 in 1973 (10.5%) is an appropriate measure of the minimum penetration which NFO would be expected to have made, with comparable effort, in comparable markets, but for the conduct of the defendants described in P.F. 128–340, 469–2017."

NFO cited Nathan's direct testimony on pages 9584–99 and 9629–35 of the transcript to support that key proposed finding of fact. Nathan gave a negative answer to the question "Do you consider yourself an expert in milk marketing, Mr. Nathan"? (Tr. 9629). On page 9584 of the transcript, Nathan made clear that it was "NFO counsel," rather than he, who had initially proposed the use of the yardstick or test market method of calculating NFO's damages. And on page 9633 of the transcript, Nathan testified as follows in regard to Order 68, the market order which had been selected as the "test market":

> Q. Where did you get your understanding about the existence of any exclusionary or restrictive practices in Order 68?
>
> A. NFO counsel.
>
> Q. And have you checked that?
>
> A. No, sir.

(Tr. 9633).

In regard to the assumption that must be made in regard to NFO's efforts to penetrate the various damage markets, Nathan testified as follows:

> Q. Is there anything that you must assume about that point, about the effort?
>
> A. Well, certainly you must assume that either the company did make a

---

above, is a short hand reference to "NFO Proposed Findings of Fact, paragraphs 2299–2312," as made by NFO at trial.

25. NFO Exhibit Nos. 1014(a), 1016, 1017, and 1020, all of which are related to NFO Exhibit Nos. 1015 and 1019, were also mentioned on some of the nine pages of Nathan's testimony.

similar or identical effort or reasonably identical effort or it would have but for the restrictive practices.

(Tr. 9591).

The assumption actually made by Nathan in regard to the efforts made by NFO was stated as follows:

Q. Have you made any assumptions about the comparability of NFO's efforts in markets other than the test market?

A. The only assumption that it did or would have made the same effort had it not been for the constraints. That is an assumption, yes, sir.

(Tr. 9592–93).

Nathan further testified that the "most important" factor which he took into account to justify the assumption of NFO's capability in the various markets was NFO's membership in the various damage markets. (Tr. 9594). Pages 9595–99 reflect the fact that NFO was unable to adduce any credible evidence in regard to NFO's membership in general and in regard to how many dairy farmers may have actually been active members of NFO at any particular time. Accordingly, those pages of the transcript outlined the method that Nathan used to "analyze" (Tr. 9595) the NFO dairy farmer membership. (Tr. 9595–99). Pages 9629–35 of the transcript of Nathan's direct testimony was devoted to a general discussion of NFO's Exhibit Nos. 1014(a), 1015–21, 1024–39, 1040, 1041, and 1225. All of those exhibits, together with a number of other NFO damage exhibits are included in Appendix E attached to NFO's brief in support of its motion for damages.[26]

NFO cites F. 105–6, 2211–2212, 2215–16, 2239, 2260–61, and 2265 to support paragraph 2264 of its proposed findings of fact. This Court has heretofore expressly rejected paragraphs 105 and 106 of NFO's proposed findings of fact. Those proposed findings of fact will be set out in the next part of this opinion and will be discussed in connection with NFO's market share theory.

While we believe it is generally true that a "new entrant in a market with an undifferentiated product will generally seek to make sales through price competition" (NFO P.F. 2211) and that "[m]arket entry in a concentrated market with an undifferentiated product will generally be facilitated by the desire of customers to have competing supplies" (NFO P.F. 2212), we do not believe that those general propositions either support NFO P.F. 2264 or NFO's test market theory.

The other proposed findings cited to support NFO P.F. 2264 (NFO P.F. Nos. 2211–12, 2215–16, 2239, 2260–61 and 2265), with one exception, were based solely on Nathan's direct testimony in which he described NFO Exhibit Nos. 1014, 1222, and 1223.

The exception related to citation of other data to support NFO P.F. 2265 which proposed that this Court find that on all the damage market orders (other than Order 68) "NFO either: exerted efforts to penetrate comparable to those it exerted in Order 68; or would have exerted such efforts but for the defendants' conduct described in F. 128–340, 469–2017." NFO cited particular pages of testimony given by Staley, Scott, and Berkhahn and "F.

---

**26.** We have considered all the NFO exhibits included in NFO's Appendix E, together with a great many other exhibits introduced by both NFO and the defendants in our effort to find some reasonable method of calculating the damages which the Court of Appeals assumed that NFO was entitled to recover.

That effort was made consistent with *Bigelow*'s established standard that "where the defendant by his own wrong has prevented a more

precise computation," the finder of fact "may make a just and reasonable estimate of the damage based on relevant data, and render its verdict accordingly." 327 U.S. at 264, 66 S.Ct. at 579. *Bigelow,* however, also established that the finder of fact "may not render a verdict based on speculation or guesswork." *Id.* The ultimate determination of the NFO's alleged lost market penetration damage claim presents the

436–43, 1598, 1830, 2276–85" to support that proposed finding of fact.[27]

Reference to 510 F.Supp. at 454 establishes that we have heretofore refused to find most of the facts proposed in paragraphs 436–43 of NFO's proposed findings in the form originally proposed by NFO. Indeed, reference to NFO's proposed findings and to the findings made by this Court in 510 F.Supp. at 454 shows that NFO relied upon the same testimony from Staley, Scott, and Berkhahn but that this Court either rejected outright or substantially modified all of NFO's proposed findings.

NFO's proposed paragraphs 436–443 were under a general heading entitled "NFO Focuses Grade A Dairy Program in Midwest." We refused to accept the testimony of Staley, Scott, Berkhahn, and Avila cited by NFO to support the following proposed findings:

436. After starting its Grade A milk marketing program in southwest Missouri and Wisconsin, NFO planned to expand that program to cover the heart of the Midwest, where NFO was the strongest. [Rejected]

437. For NFO, the heart of the Midwest included Wisconsin, Minnesota, Iowa, Missouri, Illinois, Kansas and Nebraska. [Rejected]

439. NFO expected to be able to begin marketing throughout the Midwest within about six months from the time it began marketing milk in southwest Missouri and Wisconsin. [Rejected]

442. NFO's dairy program was focused on the Midwest, i.e., Wisconsin, Minnesota, Iowa, Missouri, Illinois, Kansas and Nebraska. [Rejected]

443. All three assistant directors in the NFO Dairy Department focused their attention on the Midwest through 1971. [Rejected]

We modified NFO's proposed findings in paragraphs 438, 440, and 441 to read as follows:

question of which of the two principles stated in *Bigelow* is applicable to this case.

438. After starting out in southwest Missouri and Wisconsin, NFO planned [hoped] to expand its Grade A milk marketing program into Minnesota, Iowa, Illinois, Kansas and Nebraska as soon as it found buyers there.

440. NFO expected [hoped] that its Grade A milk marketing program would spread from southwest Missouri and Wisconsin through the Midwest within about six months because its programs for other commodities had done so.

441. NFO began establishing [established] milk reloads in southwest Missouri and Wisconsin in 1969.

The record in this case, see 510 F.Supp. at 490, establishes that we refused to accept Berkhahn's cited testimony as supporting of NFO P.F. 1598, which NFO has cited to support NFO P.F. 2265. NFO P.F. 1598 proposed that we find that "[i]n 1970–1971, any NFO attempt at starting up a dairy program in the Fergus Falls, Minnesota, area was foreclosed by lack of manufacturing outlets." 510 F.Supp. 496 shows that we did find, in accordance with NFO P.F. 1830, that "[m]arketing problems in Minnesota, Wisconsin, and elsewhere diverted Berkhahn's efforts from the Nebraska Order 65 during 1971 through 1975." That finding of fact, however, can not be said to support NFO P.F. 2265.

NFO P.F. 2286, which merely states the fact that a new Upper Midwest Order 68 was established effective June 1, 1976, is cited as additional support for NFO P.F. 2301 and 2303 which proposed that we find that had old Orders 60 and 61, respectively, continued to exist, NFO would have pooled exactly the same volume of milk in each of the years 1976 through 1982 that it would have pooled on each of those orders in the year 1976. NFO P.F. 2312 cited NFO 2287 to support the same sort of proposed finding in regard to old Order 126 which, together with five other market orders, was merged into new Texas Order 126.

27. NFO P.F.'s 2276–85 were based solely on Nathan's reiteration of the figures contained in NFO Exhibit 1016 and needs no further discussion.

The figures which reflect the projections adopted by Nathan in his testimony are reflected in NFO Exhibits No. 1015 and 1019 but no evidence other than Nathan's testimony and the other data discussed above was adduced by NFO to support the reasonableness of that sort of an assumption.

IV.

Appendix A to NFO's supporting brief identifies NFO P.F. 2331–44 as its proposed findings that purport to establish the validity and reasonableness of its market share method of calculating NFO's alleged loss of marketing expense checkoff fees. Each of those proposed findings, however, rest solely on NFO Exhibit Nos. 1015 and 1019, Nathan's description of those exhibits on direct examination, and NFO's P.F. 2273 and 2275. NFO P.F. 2273 proposed that we find that NFO had the potential, as a new entrant in each damage order to achieve in three years after it entered each such order, the "shares of milk pooled" on each of those market orders that are set forth on NFO Exhibit 1014(a). NFO P.F. 2275 would have this Court find that it took three years from the time NFO entered Order 68 for it to obtain an annual 10.5% of all milk pooled on that market.

As was true in regard to the findings proposed in regard to NFO's test market theory, NFO cited additional proposed damage findings to support NFO P.F. 2273 and 2275, which, in their turn, had been cited to support the findings proposed in regard to NFO's market share theory. The additional proposed findings cited to support NFO P.F. 2273 and 2275 were, for the most part, set forth in the section of NFO's capability to obtain major market shares.

NFO followed the same bootstrap method of citing one proposed damage finding to support another proposed damage finding in regard to the findings proposed to establish the validity and reasonableness of its market structure theory as it did in regard to its test market theory. The pat-

tern of reliance upon Nathan's description of NFO's damage exhibits was the same in regard to both of NFO's theories. As was true in regard to its presentation of its test market theory, NFO did cite a few additional of its proposed findings which had been proposed outside those proposed solely in regard to the damage issues presented. But, as was true in regard to its test market theory, NFO's reliance upon findings it proposed on the issue of liability have in large part already been rejected by this Court.

For example, NFO P.F. 105 and 106, both of which are secondarily relied upon to support both NFO's test market theory and its market share theory, were as follows:

105. Most of the milk pooled in each of Federal Orders 30, 60, 61, 62, 64, 65, 68, 73, 106 and 126 comes from farms either within the respective order or in counties contiguous to the order. (NFO Exhs. 1046, 1475–768.)

106. Almost all of the milk pooled in each of Federal Orders 30, 60, 61, 62, 64, 65, 68, 73, 106 and 126 comes from states which are, at least partially, within the geographic area of the respective orders. (NFO Exhs. 1048, 1475–78.)

We concluded after trial, see 510 F.Supp. at 442, that NFO Exhibits 1046, 1475–78 did not support findings of fact proposed in NFO P.F. 105 and 106; that NFO had not adduced any additional credible evidence to support those proposed findings; and that, accordingly, we were required to reject both of those proposed findings.

For further example, it must further be noted that NFO cited and relied on its proposed finding as contained in paragraphs 341–468 to support its key proposed finding contained in NFO P.F. 2271 that "NFO had the capability and experience to become a major firm in Federal Marketing Orders 30, 60, 61, 62, 64, 65, 68, 73, 106 and 126." NFO P.F. 341–468 were contained in Part IV of NFO's proposed findings of fact which was entitled NFO's Capability in Dairy.[28]

28. Part IV of NFO's proposed findings was di- vided into the following subparts: A—NFO For-

Examination of pages 454 to 458 of 510 F.Supp. establishes that while this Court agreed that the greater weight of the credible evidence adduced at trial supported a relatively limited number of the findings of fact in the language proposed by NFO, and that a substantial number of additional NFO's proposed findings should be made in a modified form, it is clear that this Court also expressly rejected a large number of the findings of fact proposed by NFO in regard to NFO's alleged Capability in Dairy.

Because NFO P.F. 2271 proposes that we find that NFO, in fact, "had the capability and experience to become a major firm" in each of the damage market orders, it is of paramount importance to set forth the relevant findings of fact proposed in NFO's Part IV which we expressly determined were not supported by the greater weight of the credible evidence adduced at trial.

Examination of the findings of fact proposed by NFO in Part IV (pages 62 to 76, inclusive, of NFO's proposed findings of fact) and review of the findings rejected on pages 454 to 458 of 510 F.Supp. shows that numerous paragraphs proposed in NFO's Part IV have been already expressly rejected by this Court. The following list of proposed rejected findings fairly reflects this Court's view of what the greater weight of the credible evidence failed to establish at trial: [29]

346. Dairy farmers were as interested in joining NFO as were meat and grain farmers. [Rejected]

349. The percentage of all NFO members in an area who are dairy farmers generally corresponds to the percentage of all farmers in that area who are dairy farmers. [Rejected]

380. NFO county organizations helped NFO to negotiate master contracts in milk. [Rejected]

398. Because of the NFO supply contract program, NFO had established truck routes of farmers in the Midwest by 1969. [Rejected]

407. By 1969, NFO had attracted significant dairy farmer membership throughout the Midwest. [Rejected]

421. The distribution systems for milk, grain, cattle, hogs and all other agricultural commodities are substantially the same. [Rejected]

422. NFO's experience in marketing livestock and grain gave NFO the capacity to be a major factor in the dairy industry. [Rejected]

425. By making sales to high Class I utilization bottlers, NFO, even though it sold milk cheaper than AMPI, Mid-Am and CMPC, could still return as much money as or more than AMPI, Mid-Am and CMPC to dairy farmers. [Rejected]

426. NFO had the capacity to become a major factor in the dairy industry, both in sales to handlers and in providing services to farmers, because of its willingness to sell below prevailing market prices until it had established itself in those markets. [Rejected]

435. Because NFO did not operate bottling plants, it had the capacity to

mation and Purpose; B—NFO's Recruiting Efforts; C—NFO Membership Structure; D—NFO Marketing Structure; E—Master Contracts; F—The Holding Action; G—NFO Revamps Dairy Department; H—Supply Contracts; I—NFO Decides to Enter Direct Marketing of Milk; J—NFO Calls Upon Experience Marketing Hogs, Cattle, Grain; K—NFO Milk Attractive to Handlers; L—NFO Focuses Grade A Dairy Program in Midwest; M—NFO Preaches Gospel to Non-Members; N—Interest in NFO Grade A Milk Marketing Grows; O—NFO's Well And Trying to Get It to Join the Club; and P—Conclusion.

**29.** It is not necessary that we list all of NFO's Part IV proposed findings of fact that have been rejected. We have selected and listed only those

which clearly reflected our view of what the evidence failed to establish in regard to NFO's actual capability in dairy.

It should also be stated that a number of NFO's Part IV proposed findings were rejected on grounds of relevancy. For example, we rejected the NFO P.F. 358 and 370–376, which proposed very general findings in regard to various NFO bargaining committees because the evidence established that a bargaining committee for meat and grain simply knew nothing about the complicated way milk is marketed. Proposed findings rejected for that type of reason are not included in the list of rejected findings stated in the text.

become a major factor insofar as sales to bottling plants were concerned. [Rejected]

468. Beginning no later than 1969, NFO has had the capability to become a major milk marketing association in each of Federal Orders 30, 60, 61, 62, 64, 65, 68, 73, 106 and 126. [Rejected]

NFO P.F. 2275, cited to support all of NFO's market structure proposed findings, in its turn cited NFO P.F. 2263, 2282, and 2298 to support a proposed finding that "[i]t took three years from the time NFO entered Federal Milk Market Order 68 for it to obtain an annual 10.5% share of all the milk pooled on that order." NFO P.F. 2263 and 2282 cited only NFO Exhibits 1016 and 1225 and Nathan's testimony which generally described those exhibits to support those two proposed findings.

NFO P.F. 2298, however, cited a number of findings proposed on the issue of liability to support its proposed finding that "NFO either entered (pooled milk) or would have entered each of the below listed Federal Milk Market Orders in the years indicated but for the conduct of the defendants described in F. 128–340, 469–2017." NFO Exhibits 191 and 1015 and the list included in NFO P.F. 2298 proposed the findings that NFO would have entered Orders 30, 62, 64, 106 and 126 in 1970; that NFO would have entered Orders 60, 61, 68 and 73 in 1971; and that NFO would have entered Order 65 in 1972.

Specifically, NFO cited NFO 846–66 and 878–909 to support NFO P.F. 2298. Those findings were among a large number of findings that NFO proposed in Part V, C, 4 and 5 of its proposed liability findings entitled "NFO's entry in milk marketing in Missouri" and NFO's "Response to the Midwest marketing."

We accepted, modified, and rejected a number of those proposed findings after trial. It is sufficient for present purposes to state that we rejected NFO P.F. 903 which stated that the "conduct of Mid-Am, AMPI, and their co-conspirators, as generally described in F. 874–902, materially contributed to Hiland's refusal to purchase raw milk from NFO beginning in early 1970."

NFO also cited NFO P.F. 878–909 to support NFO P.F. 2298. Those findings were initially proposed in Part V, C, 6 of NFO proposed liability findings entitled NFO's "Attempts to develop other markets for Missouri milk." The only rejected finding that need be detailed is our rejection of NFO P.F. 908 which stated that "Mid-Am's known policy of imposing additional charges on partial supply purchasers caused Sealtest—St. Louis to refuse to buy milk from NFO."

Our treatment of NFO P.F. 1587 and 1588 will illustrate why those proposed liability findings and the other liability findings cannot be said to support the extremely broad finding proposed in NFO P.F. 2298 which proposed that we find that NFO either entered or would have entered each of the ten orders at sometime during the years 1970, 1971, and 1972. NFO P.F. 1587 proposed that we find that "[i]n 1970 or early 1971, there were at least 200 Grade A producers in the Order 61 area interested in marketing their milk production through NFO." NFO P.F. 1588 proposed that we find "[i]n 1970 or early 1971, there were at least 200 Grade A producers in the Order 60 area interested in marketing their milk production through NFO."

510 F.Supp. at 490 shows that we modified both those proposed findings by striking the language "at least 200" and by substituting instead the words "a number of" Grade A milk producers in Order 61 and 60 that were interested in marketing their milk through NFO. The modification of NFO's proposed findings reflected a rejection of the credibility of Berkhahn's testimony (Tr. 6470–71), allegedly based on his "experience and knowledge of the area" that at least 200 producers might have been interested in marketing through NFO in 1970 or 1971 in those two marketing orders.

That rejection of the number of producers is confirmed by NFO Exhibit 1024, which purported to state the "estimated

numbers of producers who would have been pooled by NFO 1970–80." For that exhibit, the validity of which we do not accept, shows that it assumed that in Order 61 NFO in 1971 would pool only 35 producers under NFO's 10.5% theory and only 49 under its market structure theory. NFO Exhibit 1024 also assumed that in Order 60 in 1971 that NFO would pool 68 producers under its 10.5% theory and 73 under its market structure theory.

We are satisfied by our exhaustive review of the record and careful consideration of the voluminous briefs filed after remand that, in the final analysis, the question of whether NFO may properly be awarded any of its claimed lost market penetration damages turns on the question of whether Nathan's testimony and the damage exhibits relied on by NFO to support its test market (10.5%) and market share theories may properly be considered as credible relevant evidence upon which a just and reasonable estimate of damage may be based or whether a damage award based in large part on Nathan's testimony and NFO's damage exhibits would be based on speculation or guesswork.

We turn to defendants' arguments in regard to Nathan's testimony and NFO's lost market penetration damage exhibits in the next part of this opinion.

### CREDIBILITY OF NFO'S LOST MARKET PENETRATION DAMAGE COMPUTATIONS

#### I.

Defendants have consistently and vigorously objected to and moved to preclude and strike, both at trial and after remand,

Nathan's lost market penetration damage evidence. The grounds upon which defendants have in the past and presently base their efforts to preclude Nathan's testimony were accurately stated by Mr. Peterson in his oral argument on behalf of the defendants on Issue No. 4, Preclusion of NFO's Expert Witness. The factual circumstances upon which defendants base their preclusion arguments are accurately set forth in defendants' joint proposed findings of fact relating to preclusion of NFO's new damage theories at the trial and to strike Nathan's trial testimony.

The accurate factual data set forth in those proposed findings of fact were also stated at trial to support defendants' objections to NFO's proposed findings of fact 2098–2488 ("lost penetration damages") as stated on the seven pages immediately preceding defendants' joint response to paragraph 2098 of NFO's proposed findings of fact.[30] When we initially determined the liability issues in this case we found that it was unnecessary to reach the questions of "(3) whether NFO should be precluded from asserting its claims for damages for various alleged losses because of alleged violations of Pretrial Orders Nos. 10, 11, and 12; and (4) whether, in any event, NFO's damage evidence was so conjectural and speculative as to be inadmissible." 510 F.Supp. at 435.

█ Both those questions are again presented as issues after remand. Consistent with our long held view that cases should be decided on the merits rather than on procedural grounds, we have concluded that our determination of the question of Nathan's credibility moots the necessity of

---

**30.** NFO does not raise any substantial question about the accuracy of defendants' reiteration of the factual circumstances as stated in defendants' proposed findings of fact on this issue. Rather, NFO's contentions in opposition to defendants' preclusion motions were based on the legal arguments that "a motion to preclude cannot be granted without proof of prejudice" and that "the defendants' failure to show any harm resulting from NFO's alleged non-compliance vitiates their preclusion motion." (NFO's Sugg. in Oppos. to Deft's Joint Mot. to Preclude, p. 2).

NFO also presents an argument that the record can somehow support the notion that the positions taken by the defendants in regard to NFO's failure to comply with pretrial orders somehow "engineered the acceleration of the experts' depositions" and that defendants "now seek to bootstrap NFO's acquiscence to this request into a preclusion trap." *Id.* at 21. We expressly reject NFO's contention as being totally unsupported by a fair reading of the record.

ruling the preclusion question. It is therefore

ORDERED that defendants' various motions to preclude and to strike the testimony of NFO's expert witness Nathan should be and are hereby denied as moot.

## II.

The question of whether NFO's lost market penetration damage theories may be said to be based on credible evidence must be viewed in light of NFO's recognition at trial that Nathan's testimony was presented as an "economic analysis by an expert economist." NFO's Reply to Deft's Responses to Part XV of NFO's Prop. Findings of Fact, p. 214. That question must also be decided in light of NFO's recognition that the testimony and evidence introduced through Nathan which defendants seek to preclude "are the heart of NFO's damage case." We thus turn to the ultimate factual question of whether, on the merits, NFO's lost market penetration damage computation claim as primarily presented by Nathan's testimony and NFO's damage exhibits adduced during the course of that testimony can be said to constitute "a just and reasonable estimate of the damage based on relevant evidence" or whether an award based on such evidence would, on the facts, be based "on speculation or guesswork." *Bigelow, supra*, 327 U.S. at 264, 66 S.Ct. at 579.

Our detailed examination of NFO's replies to defendants' original responses to NFO's proposed lost market penetration findings of fact put into appropriate focus the respective positions taken by the parties in regard to the factual issues presented by the evidence adduced by both sides in connection with the two methods that NFO has proposed in regard to how NFO's alleged lost market penetration damages may be calculated.

We noted in an earlier part of our opinion that NFO PF 2264 proposes that we make the key finding, in accordance with Nathan's cited testimony, that "[t]he penetration (in terms of volume of milk pooled) achieved by NFO in Federal Milk Market Order 68 in 1973 (10.5%) is an appropriate measure of the minimum penetration which NFO would be expected to have made, with comparable effort, in comparable markets, but for the conduct of the defendants described in F. 128–340, 469–2017." We have also noted that NFO P.F. 2266, again in reliance upon Nathan's testimony, proposes that we make the key finding of fact that "Federal Milk Market Orders 30, 60, 61, 62, 64, 65, 73, 106 and 126 are comparable to Federal Milk Market Order 68."

Defendants argue in regard to NFO P.F. 2264, in reliance upon Babb's testimony, that NFO's attempted use of Old Order 68 as a test market was neither appropriate nor proper. Defendants also argue, quite independent of Babb's testimony, that no factual basis was ever established by NFO which would entitle it to use Order 68 as a test market. Defendants pointed out that Nathan had at one time dropped consideration of any test market theory in accordance with instructions he received from NFO's counsel and argue that Nathan thereafter used Old Order 68 solely because that order had been selected by NFO counsel. NFO, in its turn, attacks the credibility of Babb's testimony and argues that Nathan's testimony should be accepted. In regard to NFO P.F. 2266, defendants again rely upon Babb's testimony to support their factual arguments that the federal orders selected by NFO were not in fact comparable to Old Order 68; that there was no credible evidence to establish comparability; and that it may not properly be assumed that the various individual federal market orders are to be considered as economic markets for the purpose of predicting market penetration. Defendants also argue that no proper foundation had been established for Nathan's testimony in that regard.

Acceptance of NFO's test market theory would require that this Court make the factual findings as proposed in NFO's P.F. 2275 and 2276. NFO P.F. 2275, based primarily on NFO Exhibit 1225 and Nathan's testimony in regard to the exhibit, proposes that this Court find that "[i]t took three

years from the time NFO entered Federal Milk Market Order 68 for it to obtain an annual 10.5% share of all the milk pooled on that order." NFO P.F. 2276–2285 proposed that we find the figures set out on NFO Exhibit 1016 and Nathan's testimony in regard to that exhibit as NFO's "actual" penetration.

The pattern of defendants' arguments in opposition to NFO's market share method proposed findings of fact follows the same general pattern as defendants' factual arguments presented in opposition to NFO's test market (10.5%) method proposed findings of fact. Defendants' arguments in opposition to those NFO proposed findings are based, in part, on Babb's testimony that it was a myth to suggest that NFO, or any milk marketing organization, would achieve some mature market share which, when reached, would be maintained over any specific period of time; his testimony that Nathan's definition of a "major" as a marketing organization having a 5% or more share of a particular federal order was arbitrary and capricious; and his testimony that Nathan's acceptance of the assumption that NFO would achieve a uniform growth rate of $33\frac{1}{3}\%$ in each of the orders selected by NFO in a three-year period was incredible.

Defendants further argued in opposition to NFO's proposed damage findings of fact that the assumptions relied upon by Nathan with respect to NFO's capabilities and its efforts had not been established by the trial record and that his testimony and the data contained in NFO Exhibit Nos. 1014(a), 1015, 1017, 1019 and 1020 were based on conjecture and speculation.

We believe it appropriate to state in substantial detail the reasons why we reject NFO's effort to bootstrap its damage exhibits, one upon another, and its attempt to have its only expert witness bootstrap one assumption upon another. NFO's alleged loss of membership dues and checkoff fees must obviously rest upon a finding, supported by the greater weight of the credible evidence rather than speculation and conjecture, that NFO, in fact, lost members

during the relevant periods of time covered by NFO's damage claims. We therefore turn to a specific group of NFO's proposed findings of fact to illustrate in detail why we reject other similar bootstrap efforts on the part of NFO.

### III.

The section of NFO's proposed findings of fact entitled "Membership Dues Lost by NFO" contained a subheading entitled "Number of Producers Pooled by NFO." Paragraphs 2359 through 2378 of the finding proposed under that subhead relied solely on NFO Exhibit Nos. 1023, 1025 through 1034 and the testimony given by Nathan in regard to those exhibits.

NFO Exhibit No. 1023 was entitled "Estimated active NFO members among producers pooled on indicated federal milk marketing orders by state of source, December 1969." The key column of that exhibit incorporated the percentage figures derived from NFO Exhibit No. 1022 which was entitled "NFO membership factor—estimated active NFO members as percentage of farmers in indicated states." NFO Exhibit Nos. 1025 through 1034 reflected NFO's proportion of alleged losses of membership dues for the ten "damage" market orders. Each of those exhibits were based on NFO Exhibit No. 1024 entitled "Estimated number of producers who would have been pooled by NFO."

Each of NFO Exhibit Nos. 1025 through 1034, in the column entitled "NFO membership base," reflected that NFO was also relying on NFO Exhibit 1023, which purported to estimate NFO's active members who were pooled on ten "damage" orders, to support its assumption that the "NFO membership base" as of December 1969 would be exactly the same NFO membership base for each year stated on each exhibit, all of which contained projections through the year 1980.

Defendants' response to NFO's proposed paragraphs 2359 through 2378 denied that the figures set forth in those exhibits were accurate and that NFO's series of proposed findings contained in those paragraphs con-

stituted sheer speculation and conjecture without any foundation. Defendants directed general attention to the various assumptions that NFO had provided Nathan and particular attention to the assumption that market conditions would not change over a period of time. Specific attention was directed to Babb's testimony (Tr. 14,-444–45) in regard to the changes that should be expected in regard to the number of producers in a particular market. The testimony of Babb cited by defendants was as follows:

Q ... Are you aware that NFO has utilized certain assumptions as to its efforts and capabilities to penetrate the Midwest Federal Milk Marketing Orders as a major participant based on its membership base experience in other commodities, et cetera, that we discussed previously?

A Yes.

Q In your opinion does the use of these assumptions as to capability and effort constitute a satisfactory basis for predicting or projecting NFO's performance as a major participant in the Federal Milk Marketing Orders in the Midwest?

A No, I wouldn't consider some of the assumptions sufficient in and of themselves. I would really want to know more about the assumptions and whether or not the assumptions fitted reality.

For example, one of the assumptions involving their membership base being constant from 1970, that is, the number of producers in the membership base being constant between 1970 and 1983, or the number of producers being the same after 1977 through 1980.

That assumption I think is contrary to fact, at least for the period 1970 through 1977, and further I expect that there will be declines in producers' numbers on through 1982.

NFO attempted to counter defendants' argument by stating that "Babb did not state that the number of Grade A dairy farmers was declining." (P. 270 of NFO replies to Defendants' response to NFO's proposed findings of fact). NFO then quoted some data from the Federal Milk Order Market Statistics, Annual Summary for the Years 1970, 1974, and 1975 in regard to Orders 30, 60, 65, 68, and 126 and contended that "the data indicate that between 1970 and 1975 (1974 for Order 126) the average number of producers in all ten damage markets increased 1,279." NFO accordingly argued that "NFO's damages are [thus] understated to the extent that NFO computed its percentage share from a static rather than an expanding universe of producers." (*Id.* at p. 271).

We find that NFO's assumption that the number of producers in its NFO's assumed membership base would remain constant between 1970 and 1983 is, to use and accept Babb's language "contrary to fact." (Tr. 14445). We are satisfied by our examination of the available data in the record that there has been a substantial and steady decline in the number of dairy farmers in the United States since the peak period of 1961. We further find that the decline in the number of producers that commenced in 1962 continued during the relevant periods of time involved in this case and that Babb's testimony that "there will be declines in producers' numbers on through 1982" (Tr. 14,445) must be accepted.

Although NFO's Exhibit No. 1024 indicated that producer figures used on that exhibit were those reported in "Federal Milk Order Market Statistics, Annual Summary for the years 1970–1976 and those contained in the monthly issue for August 1977," NFO did not make any reference to the 1977 figures to support its argument that there was an "expanding universe of producers." Indeed, NFO simply used the monthly average number of producers reported for the years 1970 and 1975 (1974 figures were used for Order 126) for five market orders it selected to support its argument.

Because NFO Exhibit No. 1024 suggests that NFO, in fact, considered the Department of Agriculture's 1977 data it should

have been apparent to NFO that three of the market orders it selected, Minnesota-St. Paul (former Order 68), Minnesota-North Dakota (former Order 60), and North Texas (former Order 126), were no longer in existence in 1977. Indeed, NFO Exhibit No. 1016 establishes that NFO knew that Minneapolis-St. Paul (old Order 68), Minnesota-North Dakota (old Order 60), together with S.E. Minnesota-N. Iowa (old Order 61), were all merged into the new and large Upper Midwest Order No. 68, effective June 1, 1976. That exhibit also shows that NFO knew North Texas (old Order 126) had been merged into a new and large Texas Order 126, effective July 1, 1975. It must be noted that NFO did not mention what was happening to the number of producers in S.E. Minnesota-Northern Iowa (Order 61) during the 1969 to 1975 period of time that data is available for that alleged damage market. NFO Exhibits Nos. 1217, T. 7, 8; 1219, T. 7; 1487, T. 7; 1487, T. 6, 7, show that the number of producers in old Order 61 was as follows: 1969—1451; 1970—1048; 1971—910; 1972—919; 1973—818; 1974—720; and 1975—703. [The figures are for October of each year].

Those figures obviously do not support NFO's "expanding universe of producers" argument. Indeed, those figures establish that very substantial changes were taking place in regard to the pattern of milk supply and the number of producers in the geographic area covered by old Order 61. Old Order 61, of course, was located immediately south of old Order 68 and was a very short distance from the Twin Cities of Minneapolis and St. Paul.

When the new Upper Midwest Order 68 was established in 1976, not only were old orders Minneapolis-St. Paul, Minnesota-North Dakota, and S.E. Minnesota-N. Iowa included in the new Upper Midwest Order, Duluth-Superior was also merged into that new order. The new Upper Midwest order also included a large block of counties located in the northwest part of Wisconsin and a large block of counties in Minnesota that had not theretofore been included in any market order.

The fact that the new Upper Midwest order was created in 1976 to cover the State of Minnesota (except four counties in the southeast portion of that state), the northwest quarter of Wisconsin, together with substantial portions of the states of North Dakota (16 of that State's eastern tier of counties), South Dakota (8 northeastern counties) and Iowa (6 northern tier of counties) must be given appropriate consideration in the determination of whether one year's experience on the old Minneapolis-St. Paul Market Order 68 may properly be considered as a "test market".

When the comparable month of October 1970 is compared to the comparable month of October 1977, it is apparent that in the number of producers in two other market orders selected by NFO to support its "expanding universe" argument, in fact, followed the pattern of decline in accordance with Babb's testimony.

The following table includes the average figures used by NFO in its argument, and shows the October 1970 and October 1977 figures in the only two market orders, Chicago Regional (Order 30) and Nebraska-Western Iowa (Order 65), where comparable 1970 and 1977 figures are available. [The October 1970 figures are from NFO Exh. No. 1217, Table 8 and the October 1977 figures are from NFO Exhibit No. 1742, Table 4].

NUMBER OF PRODUCERS

| Marketing Area | Average 1970* | October 1970 | October 1977 | Decline 1970–1977 |
|---|---|---|---|---|
| Chicago Regional (Order 30) | 16,888 | 16,927 | 16,673 | 252 |
| Nebraska–N. Iowa (Order 65) | 1,756 | 1,787 | 1,548 | 239 |

\* The figures used in this column were the figures used by NFO to support its "expanding universe" argument.

The decline in the number of producers in the only two market orders for which comparable 1970 and 1977 figures are available must be considered in light of the fact that the average daily deliveries of milk per pound per producer steadily increased during the seven-year period from 1970 to 1977. The average daily delivery per producer increased in the Chicago Regional Order 30 from 1,150 pounds in October 1970 to 1,503 pounds in October 1977. The increase in Nebraska-Western Iowa Order 65 was from 1,323 pounds in October 1970 to 1,773 pounds in October 1977. See NFO Exhibit No. 1217, Table 10, for the October 1970 figures and NFO Exhibit No. 1742, Table 4, for the October 1977 figures.

A more comprehensive view of the changing pattern in the supply of milk from dairy farm producers to federal market orders and the decline in the number of those producers may be obtained by looking at the national picture and the portion of NFO's alleged damage orders that have not been merged with other orders during the period of time that data are available from the record in this case.

Appropriate consideration of that data is directly related to whether NFO's proposed findings of fact which are based on the data set forth on NFO's various exhibits and Nathan's testimony in regard to that data, all of which purport to estimate and project NFO's membership factor, to estimate the number of NFO's active members who purportedly would have marketed their milk through NFO, and to calculate whether NFO's alleged loss of membership dues on the ten "damage" orders should be accepted or rejected. We therefore turn to the national and regional data.

Table 2, page 9, of The Federal Milk Order Market Statistics: Annual Summary for 1975 (NFO Exhibit No. 1489) is entitled Measures of Growth in Federal milk order markets, 1947–75. Similar data for the months of October 1976 and October 1977 is reported in Federal Milk Order Market Statistics: October 1977 Summary (NFO Exhibit No. 1742).

The following table sets forth the national data relating to the number of markets, the number of producers, and the daily deliveries of pounds of milk made by the producers that appears on Table 2. The data for 1947 is set forth to show the first year covered by Table 2. The data for 1961 is stated because that year reflected the greatest number of producers for any year between 1947 and 1975. The years 1969 through 1975 are from Table 2. The data for October 1976 and October 1977 are from Table 4 of the NFO Exhibit No. 1742.

NATIONAL MARKETS

| Year | Number of Markets | Number of Producers | Producer Deliveries | Daily Deliveries per Producer |
|------|------|------|------|------|
| | Number | Number | Million Lbs. | Pounds |
| 1947 | 29 | 135,830 | 14,980 | 302 |
| 1961 | 81 | 192,947 | 48,803 | 704 |
| 1969 | 67 | 144,275 | 61,026 | 1,164 |
| 1970 | 62 | 143,411 | 65,104 | 1,244 |
| 1971 | 62 | 141,347 | 67,872 | 1,316 |
| 1972 | 62 | 136,881 | 68,719 | 1,372 |
| 1973 | 61 | 131,565 | 66,229 | 1,386 |
| 1974 | 56 | 126,094 | 67,778 | 1,473 |
| 1975 | 56 | 124,540 | 69,251 | 1,523 |
| Oct. 1976 | 50 | 124,329 | * | 1,578 |
| Oct. 1977 | 42 | 121,767 | * | 1,652 |

* Similar data not reported in NFO Exhibit No. 1742.

The above table makes clear that the number of milk order markets have declined over the years, that the number of producers has steadily and sharply declined from the top number of 192,947 in 1961 to 121,767 in October 1977 and that the volume of milk has increased because the daily deliveries of the pounds of milk per producer have dramatically increased over the years.

The steady consolidation of the various milk order markets from the 1962 high of 83 (two more than in 1961) to only 42 in October 1977 makes it difficult to set forth the dates for any particular market order. The Department of Agriculture, however, has established various groups of market orders and the Western Group and the Southern Group of the West North Central area remained the same for the years 1969 to 1977.

The Western Group of markets includes (1) Michigan Upper Penisula (Order 44), (2) Chicago Regional (Order 30), (3) Louisville, Lexington, Evansville (Order 46), (4) Indiana (Order 49), (5) Southern Illinois (Order 32), and (6) Central Illinois (Order 50). The geographic area covered by those market orders includes the Upper Peninsula of Michigan, Wisconsin (except the northwest portion of that state), substantially all of Illinois and Indiana and the central portion of Kentucky.

The following table shows that the number of producers declined in a manner consistent with the national pattern. The number of pounds delivered daily per producer likewise increased, consistent with the national pattern. [The source of this data is stated in the final column of the table; the daily delivery data is reported for Order 30.]

WESTERN GROUP OF MARKETS

| October of Year | Number of Markets | Number of Producers | Daily Deliveries Pounds Per Producer | NFO Exhibit Nos.—Tables |
|---|---|---|---|---|
| 1969 | 67 | 28,094 | 1,046 | 1217, T. 7, 9 |
| 1970 | 62 | 27,634 | 1,150 | 1217, T. 8, 10 |
| 1971 | 62 | 27,087 | 1,168 | 1218, T. 7, 9 |
| 1972 | 62 | 27,415 | 1,169 | 1219, T. 7, 9 |
| 1973 | 61 | 26,282 | 1,156 | 1487, T. 7, 9 |
| 1974 | 56 | 26,368 | 1,215 | 1488, T. 7, 9 |
| 1975 | 56 | 27,104 | 1,260 | 1489, T. 7, 9 |
| 1976 | 50 | 26,044 | 1,425 | 1742, T. 4 |
| 1977 | 42 | 24,599 | 1,503 | 1742, T. 4 |

The Southern Group of the West North Central Group of Markets includes (1) St. Louis-Ozarks (Order 62), (2) Kansas City (Order 64), (3) Neosho Valley (Order 71), and (4) Wichita (Order 73). The geographic area covered by those markets includes substantially all of Missouri and Kansas (except the four northwest counties) and four counties located in the northwest corner of Arkansas. A substantial number of counties in Missouri and a few counties in Kansas are not regulated under any market order.

The following table again shows that the pattern of decline in Missouri and Kansas was consistent with the national decline and that the increase in the number of pounds of milk delivered per producer was consistent with the national pattern. [The source of the data is stated in the final column of the table; the daily delivery data is reported for St. Louis-Ozark Order 64].

SOUTHERN GROUP OF WEST NORTH CENTRAL MARKETS

| October of Year | Number of Markets | Number of Producers | Daily Deliveries Pounds Per Producer | NFO Exhibit Nos.—Tables |
|---|---|---|---|---|
| 1969 | 67 | 6,764 | 1,056 | 1217, T. 7, 9 |
| 1970 | 62 | 6,271 | 1,157 | 1217, T. 8, 10 |
| 1971 | 62 | 6,107 | 1,278 | 1218, T. 7, 9 |
| 1972 | 62 | 6,035 | 1,383 | 1219, T. 7, 9 |
| 1973 | 61 | 5,878 | 1,283 | 1487, T. 7, 9 |
| 1974 | 56 | 5,519 | 1,421 | 1488, T. 7, 9 |
| 1975 | 56 | 5,272 | 1,426 | 1489, T. 7, 9 |
| 1976 | 50 | 5,162 | 1,551 | 1742, T. 4 |
| 1977 | 42 | 5,088 | 1,548 | 1742, T. 4 |

The data reported by the Department of Agriculture that we have set forth in the above tables support our determination that Babb's testimony in regard to the decline in the number of producers must be accepted. We accordingly find that the assumption given Nathan by NFO counsel is not supported by the record. We expressly find that NFO's notion that it could compute its claimed "percentage share from a static ... universe of producers" is untenable.

We add a final word in regard to the changing milk supply patterns for Federal order markets. The fact that the changes in the supply pattern has been substantial over the years must be taken into consideration in determining whether damage

claims that are based on assumptions that no substantial changes have taken place in the past and that no substantial changes will occur in the future should be accepted.

The Department of Agriculture's publication, Sources of Milk for Federal Order Markets by State and County: AMS–565 (1976), page 3, (NFO Exhibit 1478), contains a Historical Summary for the years 1957 to 1974. The first table included in that historical summary reflects the national decline in the number of producers from 182,551 in 1957 to 126,919 in 1974. The summary noted, however, that although the number of markets, like the number of producers, decreased from 1957 to 1974, the volume of milk received nevertheless increased. The summary stated that the delivery of 33.5 billion pounds of milk to 68 market orders in 1957 increased to 67.8 billion pounds of milk to 61 market orders in 1974. The historical summary then stated:

"A closer look at total marketings and deliveries to Federal orders by producers in the leading milk producing States provides further insight into the changing milk supply patterns for Federal order markets. These States are ranked in two ways: Rank I, according to deliveries to Federal orders; and Rank II, according to total milk marketed in the United States.

The following table shows the leading States delivering to Federal orders; deliveries to Federal orders as a percentage of total deliveries to Federal orders; and relationship to total United States marketings 1960, 1967, and 1974."

| State | Rank I | 1960 Percent of total delivs. to FO | Rank II | Rank I | 1967 Percent of total delivs. to FO | Rank II | Rank I | 1974 Percent of total delivs. to FO | Rank II |
|---|---|---|---|---|---|---|---|---|---|
| Wisc. | 2 | 12.1 | 1 | 2 | 11.2 | 1 | 1 | 14.5 | 1 |
| N.Y. | 1 | 17.9 | 2 | 1 | 16.0 | 2 | 2 | 12.1 | 3 |
| Penn. | 3 | 8.5 | 5 | 3 | 8.5 | 5 | 3 | 8.5 | 5 |
| Mich. | 4 | 7.9 | 7 | 4 | 7.0 | 7 | 4 | 5.9 | 6 |
| Ohio | 5 | 6.8 | 6 | 5 | 6.7 | 8 | 5 | 5.5 | 7 |
| Minn. | 17 | 1.6 | 3 | 15 | 1.8 | 3 | 6 | 5.0 | 4 |
| Tex. | 7 | 3.6 | 12 | 6 | 4.0 | 11 | 7 | 4.8 | 9 |
| Wash. | 9 | 2.7 | 16 | 10 | 2.6 | 15 | 8 | 3.1 | 14 |
| Ill. | 6 | 4.0 | 8 | 8 | 3.4 | 9 | 9 | 2.8 | 11 |
| Ind. | 11 | 2.4 | 11 | 7 | 3.5 | 12 | 10 | 2.7 | 12 |
| Vt. | 8 | 3.6 | 14 | 9 | 3.0 | 16 | 12 | 2.6 | 15 |
| Md. | 10 | 2.5 | 19 | 13 | 2.4 | 19 | 16 | 2.1 | 20 |
| Total Top 10 | | 69.9 | | | 66.2 | | | 64.9 | |

The comment on the data reflected in the table prepared to reflect the "changing milk supply patterns for Federal market order markets" stated that "[o]ver the period 1960–1974, the order of the top 10 States delivering milk to Federal orders has changed" and added that "[n]otably, Minnesota has jumped from 17th to 6th." The historical summary suggests that the notable jump of Minnesota from 17th rank in 1960 and from its 15th rank in 1967 to 6th rank in 1974 does not support the selection of Order 68 as a test market for any purpose.

IV.

All parties' recognized at trial that the damage evidence adduced by NFO and that adduced by the defendants was in sharp conflict. The arguments presented in the voluminous post-remand briefs establishes that NFO's lost market penetration damage theories cannot be said to be supported by adequate substantial evidence unless

this Court is able to accept Nathan as a credible witness. For we believe it to be obvious that NFO's alleged lost market penetration damage theories cannot be said to be supported by sufficient evidence unless the evidence adduced by NFO through Nathan is found to be credible under all of the circumstances of the case.

The ultimate factual question presented is not whether we determine that Babb's testimony is more credible and is more persuasive than that given by Nathan. The decisive question is whether Nathan's testimony and the reasons given by him in support of his opinions can be said to be sufficiently credible to support a determination that NFO has carried the burden of proving by a greater weight of credible evidence that the damage theories presented by Nathan and by the NFO damage exhibits adduced during his testimony established a fair and reasonable method of estimating NFO's alleged lost market penetration damages. We find that question must be answered in the negative.

■ In cases tried by a jury, the trier of fact is instructed to consider and weigh the testimony and to consider the reasons given by the expert in support of the opinion. The trier of the fact is instructed that if it is concluded that the reasons given in support of the opinion are not sound, or that the opinion is outweighed by other evidence, the trier of the fact may disregard the opinion entirely.[31]

■ We believe that the standards applicable to the trier of facts in a jury case are equally applicable to the trier of the facts in a nonjury case. Nathan's opinions and

reasons he gave in support of those opinions necessarily rested in large part upon a substantial number of assumptions given him by NFO counsel. The Economic Analysis of Damages prepared by Professors Dahl and Hammond and Manring, an associate with Nathan's firm, (AMPI Exhibit 5475, p. 57), in express reliance upon *Herman Schwabe, Inc. v. United Shoe Machinery Corp.*, 297 F.2d 906 (2d Cir.1962), stated in its concluding paragraph the following: "The primary limitation on the market share theory is the fact that some or all of the computations involving the market share approach require plaintiff to make a certain number of factual assumptions regarding the ability to penetrate specific markets. Difficult problems arise with this theory when assumptions of this nature are unsupported."[32]

Unlike the district court in *Herman Schwabe v. United Shoe Machinery Corp.*, we elected not to preclude Nathan as an expert witness. Nor have we ordered that his testimony be stricken. We are compelled to find, however, that Nathan's testimony and NFO's damage exhibits adduced in connection therewith cannot be accepted as credible under all the circumstances of this case. We therefore reject NFO's proposed findings of fact submitted in support of NFO's lost market penetration damage theories because, in the final analysis, those proposed findings of fact are fundamentally dependent upon the credibility of Nathan's testimony.

■ We therefore find and conclude that a just and reasonable estimate of NFO's alleged lost market penetration damages cannot be made on any credible relevant

---

**31.** This Court, before it knew whether the case would be tried with or without a jury, attempted to require that all expert witnesses, in accordance with Rule 705 of the Federal Rules of Evidence, make a prior disclosure of all underlying facts and data so that the reasons upon which the expert witnesses would base their opinions would be revealed before trial. It cannot fairly be said that the prior disclosure of the underlying facts and data upon which Nathan's opinions were based were made in a manner that satisfied the obvious objective of Rule 705.

**32.** *Herman Schwabe, Inc. v. United Shoe Machinery Corp.*, in an opinion written by Judge Friendly, presented the question of whether the district court had properly excluded expert testimony as to damages and various exhibits tendered in connection therewith. The Second Circuit discussed the familiar Supreme Court cases, including but not limited to *Bigelow*, examined the assumptions upon which the proffered expert testimony was based and concluded that the evidence offered by the plaintiff was insufficient to warrant submission of the damage issues to the jury.

data adduced by NFO and that any award of damages based on such a theory would necessarily be based on speculation and conjecture. It is accordingly

ORDERED that the portion of NFO's motion for damages under which NFO seeks to recover lost market penetration damages should be and the same is hereby denied.

## RESOLUTION OF QUESTIONS LEFT OPEN BY COURT OF APPEALS

### March 1971 Beatrice Cutoff

Although the Court of Appeals definitely held that NFO, the corporation, could not "recover its asserted 'price reduction damages' ", 687 F.2d at 1208, that Court nevertheless stated that the "price reduction issue may be relevant to NFO's damages in that, by virtue of selling at lower prices, NFO may have lost members or, in turn, marketing volume." (*Id.* at 1208). The Court of Appeals further stated generally that all arguments concerning "NFO's right to recover membership dues and checkoff fees ... largely raise factual questions for the district court...." (*Id.* at 1209).

NFO recognized in its brief in support of its motion for damages that the Court of Appeals had expressly held that NFO could not recover for any price reduction damages. That brief directed attention to the motion that had been filed to have the "directly injured individual NFO dairy farmer" certified as a class "for purposes of collecting and distributing these damages."

NFO's brief in support of its motion for damages, however, contains a number of arguments much broader than a claim for price reduction damage. For example, NFO stated in regard to the March 1971 Beatrice cutoff that "[t]he three-month time frame simply reflects the fact that thereafter the producers, losing hope that the lost market would ever be replaced, *were driven out of the NFO program.*" (Emphasis ours). (Brief in Supp. of Mot. at 38) NFO also argued "[t]he defendants'

conspiracy reduced the volume of milk NFO was able to market, *thereby reducing the corporation's checkoff fees and membership dues revenues.*" (Emphasis ours). (*Id.* at 29).

Although NFO made little effort to develop the arguments just stated, we believe the Court of Appeals intended that this Court make an appropriate inquiry as to whether the record could be said to support a claim that, for example, as a result of the March 1971 Beatrice cutoff, NFO dairy farmers were, in fact, "driven out of the NFO program," with the result that NFO must have "lost fees and dues from those who stopped marketing through NFO," to use the Court of Appeals' words, 687 F.2d at 1209. Accordingly, we make the inquiry we believe was mandated by the Court of Appeals in regard to the dues and fees aspect of the price reduction claims made by NFO during the trial of the case.

NFO cited three pages (pp. 2595–96, and 3157) of the testimony of Scott to support its specific argument that during the three-month period of April, May and June 1971 following the Beatrice cutoff a substantial number of NFO producers "were driven out of the NFO program." (*Id.* at 38).

It is true that Scott testified on direct examination on pages 2595–96 of the transcript as follows:

Q. What happened to the program after the cutoff at Beatrice? ...

A. Our producers were very disillusioned, those that had requested Texas inspection, and those that we had anticipated coming with us did not do so. Our pay prices fell in the area. It was a general down feeling among all the producers.

Q. Did you lose any producers?

A. Yes, some.

Q. How about at Mountain Grove?

A. At one time in Mountain Grove we lost about half the producers that we had had.

. . . . .

Q. How about your organizing effort in Missouri after the cutoff at Beatrice,

what kind of success were you meeting with?

A. We had very little success in getting any additional producers to come on and ship with NFO.

Scott, however, had earlier made clear on page 2582 of his direct examination that the volume of NFO milk that had gone to Beatrice-Fort Worth during February and March of 1971 simply went to other buyers after the Beatrice cutoff in March 1971. He there testified on direct examination as follows:

Q How long did Beatrice continue buying NFO milk at Fort Worth?

A Until about March, 1971.

Q What happened then?

A They ceased buying milk from the NFO.

. . . . .

Q Well, when you lost the Beatrice account, what did you do with the milk?

A Most of the milk went to cheese plants in the Southwestern Missouri area. There were some that went to Marigold in Texas, but most of it went to the cheese plants.[33]

On cross-examination Scott testified on page 2728 as follows:

Q (By Mr. Leonard) Mr. Scott, can you tell the Court as you sit here today of anyway that NFO, Inc. did not receive as much income after Boswell ceased receiving the milk as it had before?

A As long as the volumes remained the same, the check-off to NFO would have been the same.

In specific regard to whether there is any decrease in the number of NFO producers in the three-month period following the Beatrice cutoff, Scott testified as follows:

Q And of your own knowledge, you know that after the Boswell relationship terminated, the number of producers did not decrease that were shipping to the three reloads in the month of April 1971, did it?

A As best I can recall, in April they did not decrease.

Q In May 1971 the number of producers shipping to the three reloads did not decrease, did it?

A As far as I can recall, it did not. . . .

Q In the month of June 1971 the number of producers shipping to the three reloads did not decrease, did it?

A I don't know. I just don't recall.

Q The records would show, wouldn't they?

A Yes.

(Tr. at 2728, 2729).

Scott also testified on pages 3159–60 of his cross-examination as follows:

Q At this time or at any time were you ever able to identify any producers who had been marketing through the NFO Jeff City, Mountain Grove, Springfield Reloads who you lost because of a lower pay price?

A I cannot.

The only records which would have shown whether NFO producers were "driven out of the NFO program" were the meager hauling records of Whitmore Transport Co. (NFO Exhibit 1622).

We have prepared the following table from pages 160,071 to 160,091 of that exhibit in order to show that Whitmore hauled a great deal more milk to and from the three NFO reload stations in Southwest Missouri in the months of April, May, and June 1971 than Whitmore had hauled in March of that year.

---

**33.** The names of the various cheese plants were stated on pages 2583–84 of the transcript which located the cheese plants in West Plains, Branson and Greenfield, Missouri and a cheese plant in Salem, Arkansas. He also testified that some milk was sent to Marigold in the Dallas-Fort Worth area. See also pages 3139, 3145, and 3147–48 for additional testimony in regard to where the milk went after the March 1971 Beatrice cutoff.

TABLE SHOWING POUNDS OF MILK OF NFO PRODUCERS
HAULED BY WHITMORE TRANSPORT CO.

| 1971 | Farm Hauling | Over Road Hauling | Total Hauling |
|------|-------------|-------------------|---------------|
| March | 1,791,136 | 3,103,714 | 4,894,850 |
| April | 1,864,645 | 5,045,027 | 6,909,672 |
| May | 1,969,557 | 5,449,164 | 7,418,721 |
| June | 1,773,018 | 5,100,003 | 6,873,021 |

It is obvious from the only records kept by anyone that Scott's testimony cited by NFO to support its argument that NFO producers "were driven out of the NFO program" and that NFO's checkoff fees and membership dues revenue could have accordingly been reduced simply cannot be accepted as credible. Rather, the only contemporaneous records in evidence fully support his testimony on cross-examination that he could not identify a single NFO producer that left the NFO program after the March 1971 Beatrice cutoff. We so find.

We are therefore required to find that NFO did not lose any producers as a result of the Beatrice cutoff.

### Chicago Order 30

NFO claimed at trial that it suffered price reduction damages in Chicago Order 30. Although NFO class claimants now seek to recover exactly the same price reduction damages claimed by NFO at trial, NFO nevertheless makes substantially the same loss of dues and fees argument in regard to the Chicago Order 30 that it made in regard to the March 1971 Beatrice cutoff—namely that "[t]he defendants' conspiracy reduced the volume of milk NFO was able to market, thereby reducing the corporation's checkoff fees and membership dues revenues."

We discuss the Chicago Order 30 price reduction damage claim only in regard to that argument and the specific arguments made by NFO in regard to Chicago Order 30 to the effect that after Wanzer signed its CMPC supply contract, NFO was virtually foreclosed from selling any milk to any Chicago dairy except Kraml and that in regard to Kraml, NFO was either to sell at Kraml's terms or "dump the milk on the ground."

It is therefore necessary to determine from the record whether the volume of milk that NFO put through its reloads, first for sale to Wanzer and later, in large, but not in entire part, to Kraml, did in fact, reduce "the volume of milk NFO was able to market, thereby reducing the corporation's checkoff fees and membership dues revenues" as NFO contends in its argument.

We have already made a substantial number of findings of fact in regard to the Chicago market and how NFO shifted the total volume of milk that went through its reload stations from one buyer to another. The Court of Appeals in no way suggested that those findings of fact, most of which were virtually undisputed, were clearly erroneous. As a background for further discussion we direct attention to the findings of fact we made after trial in regard to the Chicago market as set forth in 510 F.Supp. at 476 and following pages. We found then and we again find the facts in regard to Order 30 as stated in paragraphs 1136, 1170, 1174 to 1176, 1178, 1181, 1190, 1191, 1237, 1238, 1240, 1299, 1305, 1306, 1309, 1312, 1344, 1351, 1370, 1374, 1377, 1378, 1393, 1398, 1424, 1427, 1432, and 1434 of 510 F.Supp. at 476 and notes.

We particularly reiterate and quote our finding in paragraph 1375 which states that:

> 1375. Any Wisconsin Grade A milk that NFO did not deliver to Order 30 bottling plants, including Wanzer, was sold to Wisconsin manufacturing plants generally, at prices which returned more

money per cwt. to the NFO dairy farmer member than if that milk had been sold to Wanzer.

Focusing again on the volume, rather than the price received for the NFO milk that went through NFO's Order 30 reloads, it should be noted that Avila, who was identified in NFO's June 30, 1975 Narrative Damage Statement as one of the witnesses who would testify in support of NFO's Chicago damage claim, testified at length in regard to Chicago Order 30.

Avila testified on redirect examination in regard to the total volume of milk NFO was marketing on Chicago Order 30 in the years 1971 and 1972 as follows:

Q. How much milk were you marketing in Order 30 in 1971?

A. Approximately 25 million pounds of milk per month.

Q. So it would come to about 300 million pounds a year?

A. Yes.

Q. How about in 1972?

A. It would have been in excess of 350 million pounds in 1972.

(Tr. 5396–97).

The Court, in an effort to determine the significance, if any, of a rumor reported in the Chicago Administrator's April 26, 1971 Report (CMPC Exh. 343) to the effect that "Wanzer was going to shut them [NFO] completely," and the significance, if any, of the 1971 CMPC-Wanzer contract, made particular inquiry of Avila in regard to what was happening to the volume of milk NFO was sending to Chicago from its reload stations in the years 1971 and 1972. The Court asked the following questions and received the following answers from the witness:

THE COURT: May I make inquiry ... NFO Exhibit 112 shows that NFO supplied Wanzer with a greater total volume of milk in August, 1971 than at any other time during that year, namely, 6,936,066 pounds, all of which was classified as Class II. The very next month, however, NFO supplied Wanzer only 541,380 pounds, which was classified as Class I.

I simply cannot believe that NFO had somehow lost control of over six million pounds of milk in a single month.

THE WITNESS: We didn't, Your Honor.

THE COURT: My question is, where did that six million pounds of milk that had gone to Wanzer in August, 1971, the equivalent quantity or about that in September, 1971, was that sold to cheese plants in Wisconsin or had you begun your movement of Wisconsin milk to Ponca City at that time?

THE WITNESS: No. We negotiated the Kraml contract effective in September, and we moved the milk from Wanzer to Kraml to meet our contractual commitments with Kraml. That is where that volume was.

(Tr. 5578).

Consideration of where the volume of milk from NFO's Wisconsin reload stations and its Harvard, Illinois reload station went must also take into account that a substantial volume of NFO milk that went through those reloads never went to a Chicago handler. AMPI Exhibit No. 5150, for example, corroborated Avila's testimony in regard to total volume of NFO milk that went to Wanzer, Kraml and other Chicago handlers. That exhibit also shows that the milk handled by some of the NFO reload stations was never sold to a Chicago handler.

AMPI Exhibit No. 5150 shows, for further example, that none of the milk from NFO's Taylor, Wisconsin reload went to Chicago during the period from August 1970 through August 1972 and that all went to unregulated plants in Arcadia, Marshfield, Pigeon Falls, Wisconsin and Fredricksburg, Iowa. That exhibit also shows that during the same period of time some of the milk from NFO's Menasha, Wisconsin plant went to Wanzer and Kraml in Chicago and some went to unregulated plants in a number of small Wisconsin towns.

The part of the exhibit relating to NFO's Stoughton, Wisconsin reload corroborates Avila's testimony concerning the shift of

NFO milk from Wanzer to Kraml beginning in September 1971. The Exhibit shows that from June 1970 through August 1971 practically all the milk from the Stoughton reload went to Wanzer.[34] The NFO milk from the Stoughton reload was shifted from Wanzer to Kraml beginning in September 1971. The exhibit shows that in April and May 1971, before any milk was sold to unregulated plants in June and July 1971, Wanzer purchased 3,301,000 pounds and 2,737,000 pounds, respectively, that went through the Stoughton reload.[35] The exhibit shows that as a result of the shift from Wanzer to Kraml, Kraml purchased 3,393,000 pounds of NFO milk that went through the Stoughton reload, an obvious increase in volume as compared to Wanzer's April, May, and August 1971 purchases of NFO milk that went through the Stoughton reload. It would be most unreasonable to infer that NFO could be losing dues and fees when the volume of milk being handled by it was increasing rather than decreasing.

AMPI Exhibit No. 5150 further shows that the entire volume of NFO milk that went through NFO's reloads at Sauk City, Tomah, Dickeyville, and Marathon, Wisconsin, was sold to unregulated plants in Wisconsin, except 2,224,000 pounds that went from Dickeyville to Borden in Lexington, Kentucky in September, October, and November, 1971.[36]

The pattern in regard to NFO's Harvard, Illinois reload was substantially the same as that stated in regard to the Stoughton reload; Wanzer purchased all NFO milk from August 1970 through August 1971 (except Harvard's July 1971 milk went to an unregulated plant in Brownsville, Wisconsin; 2,369,000 pounds of NFO milk went to Wanzer in August 1971, Kraml purchased 2,378,000 pounds of NFO milk in September 1971.[37]

The pattern in the NFO Hartford, Wisconsin reload, probably because of the complicated NCDC history, was somewhat different from the NFO's other Wisconsin reload stations which were established under different circumstances. AMPI Exhibit No. 5150 establishes that Wanzer purchased all NFO milk that went through Hartford from August 1970 through December 1970; that the entire volume of Hartford went to an unregulated plant in Wisconsin in January 1971; and that all February 1971 NFO milk went to Marietta, Ohio on Order 33. Wanzer made substantial purchases from May through July 1971 and later from March 1972 through August 1972. The Hartford reload milk was shifted to Kraml in September 1971 through November 1971 and Kraml also purchased Hartford's supply in January and February 1972.[38] The shift to Kraml in September 1971, of course, is consistent with the pattern of the other NFO reload stations and with Avila's testimony of where the total volume of NFO milk in Chicago went after the basic shift from Wanzer to Kraml.

There is additional information in the record which provides accurate data in regard to the number of NFO producers and the volume of milk pooled by those producers on Order 30. The record shows that

**34.** In June 1971, 1,284,000 lbs. of Stoughton milk went to an unregulated plant in Wittenberg, Wisconsin and in July 1971, 1,284,000 lbs. of NFO milk went to an unregulated plant in Sherry, Wisconsin.

**35.** The last shipment of NFO Stoughton milk to Wanzer was 2,257,000 lbs. in August, 1971.

**36.** AMPI Exhibit No. 5150 shows that no milk went through NFO's South Wayne, Wisconsin reload until February 1972, all milk that went through from February 1972 through August 1972 was purchased by Kraml, and that none was purchased by Wanzer.

**37.** A substantial amount of NFO milk from the Harvard, Illinois reload was shifted back from Kraml to Wanzer in June, July, and August 1972. The shipments to Kraml from September 1971 through May 1972 and shift of the shipments back to Wanzer for June through August 1972 all exceeded 2,000,000 pounds of milk for each of those months, again in corroboration of Avila's testimony that the total volume of NFO's 1972 sales exceeded the total volume of NFO's 1971 sales.

**38.** Hartford's April and August 1971 volume was sold to unregulated plants in Wisconsin; its December 1971 volume was sold to Sealtest Foods in Chattanooga, Tennessee on Order 90.

NFO, in connection with other matters in issue, introduced various exhibits which reflected the Order 30 Market Administrator's Reports of Receipts and Utilization of NFO's reload stations located at Stoughton, Menasha, South Wayne, Taylor, and Slinger, Wisconsin and at Harvard, Illinois, all of which pooled milk on Order 30. Examination of the Market Administrator's reports for all the NFO reload stations in Wisconsin and the single reload station in Harvard, Illinois that pooled milk on Order 30 in 1972 through 1974 establishes that NFO did not lose any members during the period of time that reports are available. Reports for all five of NFO's reload stations for the months May, July, August, September, and November 1972; for the months of March and April 1973; and for the months of February, March, and July

1974 were admitted in evidence in this case.[39]

Tabulation of data that appears on reports of all of NFO reloads that pooled milk on Order No. 30 gives an accurate factual picture in regard to whether NFO actually lost any producers and whether the volume of milk pooled by NFO on Order 30 was actually reduced during the years 1972 and 1974.[40]

Each of the Market Administrator's reports contains a statement of the number of farms from which NFO milk was received in each particular month. The following table sets forth the number of NFO producers for each reload station and the total number of NFO producers for each month stated:

**39.** Additional reports for the months of October, November, and December 1975 were also admitted in evidence. Those reports, however, included data from the NFO reloads at Taylor and Slinger, Wisconsin in addition to the data reported in regard to the five other NFO reloads

and will, for that reason, be omitted from the table to be set forth in the text.

**40.** The NFO exhibits which provide the information in the two tables that will be set out in the text are listed in the following table:

NFO EXHIBIT NUMBERS

| DATES | HARTFORD | MENASHA | STOUGHTON | HARVARD | SO. WAYNE |
|---|---|---|---|---|---|
| May 1972 | NFO 1299 | NFO 1298 | NFO 1301 | NFO 1300 | NFO 1297 |
| July 1972 | NFO 1234 | NFO 1233 | NFO 1236 | NFO 1235 | NFO 1232 |
| Aug. 1972 | NFO 1239 | NFO 1238 | NFO 1241 | NFO 1240 | NFO 1237 |
| Sept. 1972 | NFO 1244 | NFO 1243 | NFO 1246 | NFO 1245 | NFO 1242 |
| Nov. 1972 | NFO 1304 | NFO 1303 | NFO 1306 | NFO 1305 | NFO 1302 |
| Mar. 1973 | NFO 1249 | NFO 1248 | NFO 1251 | NFO 1250 | NFO 1247 |
| Apr. 1973 | NFO 1309 | NFO 1308 | NFO 1311 | NFO 1310 | NFO 1307 |
| Feb. 1974 | NFO 1255(a) | NFO 1253(a) | NFO 1256(a) | NFO 1254(a) | NFO 1252(a) |
| Mar. 1974 | NFO 1259(a) | NFO 1258(a) | NFO 1261(a) | NFO 1260(b) | NFO 1257(a) |
| July 1974 | NFO 1264(a) | NFO 1263(a) | NFO 1267(a) | NFO 1265(a) & 1266(a) | NFO 1262(a) |

Table 1—Number of NFO Producers

| DATES | HARTFORD | MENASHA | STOUGHTON | HARVARD | SO. WAYNE | TOTAL |
|-------|----------|---------|-----------|---------|-----------|-------|
| May 1972 | 199 | 109 | 91 | 74 | 47 | 520 |
| July 1972 | 190 | 113 | 94 | 74 | 56 | 527 |
| Aug. 1972 | 188 | 109 | 94 | 74 | 57 | 522 |
| Sept. 1972 | 188 | 107 | 94 | 74 | 57 | 520 |
| Nov. 1972 | 186 | 120 | 93 | 74 | 57 | 530 |
| Mar. 1973 | 137 | 172 | 92 | 70 | 105 | 576 |
| Apr. 1973 | 135 | 171 | 93 | 66 | 105 | 570 |
| Feb. 1974 | 134 | 168 | 93 | 61 | 99 | 555 |
| Mar. 1974 | 134 | 163 | 92 | 61 | 94 | 544 |
| July 1974 | ? | ? | 88 | ? | 89 | * |

* The number of farms reported for the reloads at Harvard, Menasha, and Hartford are either illegible or reported in a confusing manner, hence the total number of NFO farms cannot be stated for July 1974. It should be noted, however, that the total volume of 25,262,999 pounds, which is legibly reported, reflects a volume consistent with the total number of farms reported for all the other months. (See Table 2).

Table 2 sets forth the total volume of milk received each month from each of the NFO reload stations and the total volume of milk received each month from all of NFO's reload stations:

Table 2—Volume of NFO Milk

| DATES | HARTFORD | MENASHA | STOUGHTON | HARVARD | SO. WAYNE | TOTAL |
|-------|----------|---------|-----------|---------|-----------|-------|
| May 1972 | 9,200,019 | 4,874,887 | 4,786,071 | 3,208,116 | 3,101,266 | 25,170,359 |
| July 1972 | 8,633,621 | 4,966,110 | 4,729,318 | 3,410,806 | 3,507,848 | 25,247,703 |
| Aug. 1972 | 7,915,715 | 4,627,453 | 4,381,543 | 3,153,307 | 3,272,721 | 23,350,739 |
| Sept. 1972 | 7,334,354 | 4,382,918 | 3,868,985 | 2,837,374 | 3,032,545 | 21,456,176 |
| Nov. 1972 | 6,912,941 | 4,159,927 | 3,361,225 | 2,470,530 | 2,705,170 | 19,609,793 |
| Mar. 1973 | 6,419,916 | 7,055,384 | 4,337,772 | 2,809,598 | 5,005,980 | 25,628,650 |
| Apr. 1973 | 6,431,062 | 7,157,650 | 4,428,514 | 2,777,467 | 5,251,716 | 26,046,409 |
| Feb. 1974 | 5,661,475 | 6,219,054 | 3,708,889 | 2,254,759 | 4,442,518 | 22,286,695 |
| Mar. 1974 | 6,580,682 | 6,934,467 | 4,296,318 | 2,581,744 | 4,735,308 | 25,128,519 |
| July 1974 | 7,886,878 | 6,057,170 | 4,221,565 | 2,471,422 | 4,625,964 | 25,262,999 |

Analysis of the data set forth in both of the above tables establishes that NFO did not, in fact, lose any members during the months reflected by the reports of Order 30's Market Administrator.

Consideration of our findings of fact made after trial and analysis of the evidence in regard to Chicago Order 30 as that evidence relates to any reduction in the number of NFO producers and the volume of NFO milk on that order establishes that NFO's factual argument that the "defendants' conspiracy reduced the volume of milk NFO was able to market, thereby reducing the corporation's checkoff fees and membership dues revenue" is untenable. We find that the greater weight of the credible evidence does not support such a finding.

For the reasons stated, it is

ORDERED that the remaining portion of NFO's motion for damages under which NFO seeks to recover on theories in addition to its lost market penetration damage claim should be and the same is hereby denied.

ISSUE NO. 7—INJUNCTIVE RELIEF

I.

Issue No. 7 presents the question of to what, if any, injunctive relief NFO may be entitled under the circumstances of this case. That question was stated as follows

in the next to the last paragraph of the Court of Appeals' opinion, 687 F.2d at 1210:

> The only other question relates to injunctive relief and the possible mootness effect of the Mid-Am and AMPI consent decrees. NFO is plainly entitled to an injunction against the kind of unlawful conduct identified here. The district court is, of course, free to consider the extent to which the consent decrees provide NFO with sufficient, enforceable relief.[41]

NFO, after remand, therefore filed a motion for injunctive relief under Section 16 of the Clayton Act. Up to that point in this long litigation, NFO was more interested in obtaining legal rather than equitable relief. NFO's memorandum in support of its post-remand motion, placed primary reliance on *Paschall v. Kansas City Star Co.*, 695 F.2d 322 (8th Cir.1982), and argued that this Court is under duty to enter an injunction which would both prohibit a recurrence of past illegal activity and which would also eliminate what NFO contends were the consequences of that past activity.

 NFO attached a proposed form of injunction to its memorandum in support of its motion which it contends is justified and required by Section 16 of the Clayton Act. There is little dispute about the principles of equity that must be applied. We believe that the discussion of the Supreme Court cases in Part IV of *Kansas City Star I*, *supra*, 695 F.2d at 334–36, accurately states the principles to be applied in this case.[42]

Defendants' memorandum in opposition argued that no injunction was warranted for the reason that, on the facts, there is no evidence to support a factual finding that there is any impending or contemplated violation of the antitrust laws. Defendants further argue that the provisions of NFO's proposed injunction entirely duplicates the relief already granted in the AMPI and the Mid-Am consent decrees and that the consent decrees provide NFO with all the relief to which NFO may be entitled. Defendants point to *Hawaii v. Standard Oil Co.*, 405 U.S. 251, 261, 92 S.Ct. 885, 890, 31 L.Ed.2d 184 (1972), in which the Court observed that while the potential of multiple antitrust injunctions must be recognized, "the fact is that one injunction is as effective as 100, and, concomitantly, that 100 injunctions are no more effective than one."

Defendants' opposition memorandum made a detailed analysis of NFO's proposed injunction and attached as Exhibit A to that memorandum a side-by-side comparison of the injunctive relief sought by NFO and the particular paragraphs already contained in the AMPI and Mid-Am consent decrees. Defendants accordingly argued that "the side-by-side analysis indicates, and as NFO has admitted, NFO's Memorandum at 7, the majority of the injunction provisions proposed by NFO have bound Mid-Am, AMPI/CMPC, as well as anyone acting in concert with them, since 1975 and 1977, respectively, and moot NFO's request for injunctive relief herein."[43] (Defendants' Memo. in Opp. at 5).

Defendants also filed an appendix to their opposition brief in which they proposed 141 proposed findings of fact on the injunctive relief question. We will discuss those proposed findings and additional pro-

---

**41.** The Court of Appeals made additional, but passing, reference to the consent decrees and to question of mootness that might be presented in connection with those decrees in 687 F.2d at 1181 n. 5; 1204 n. 38; 1205, n. 39; and 1206 n. 41.

**42.** We do not believe that this Court of Appeals en banc decision in *Paschall v. Kansas City Star Co.*, 727 F.2d 692 (8th Cir.1984), *cert. denied*, —— U.S. ——, 105 S.Ct. 222, 83 L.Ed.2d 152, *reh. denied*, —— U.S. ——, 105 S.Ct. 406, 83 L.Ed.2d 340 (1985), which reversed the district court and

accordingly vacated the injunction approved in *Kansas City Star I*, can be said to have any impact on what was said in the panel opinion in regard to the principles applicable to the formulation of appropriate equitable relief. Those principles, of course, must be applied to the particular factual circumstances of a given case.

**43.** NFO conceded on page 7 of its memorandum in support of its motion that "[m]any of the provisions are based upon or derived from paragraphs of either the Mid-Am or AMPI decrees."

posed findings which defendants filed at the time of oral argument in a later part of this opinion.

NFO's reply to defendants' argument contended that the consent decrees do not provide NFO with sufficient relief in that (a) the consent decrees are not binding on CMPC, (b) that the consent decrees do not provide sufficient relief as to AMPI and Mid-Am, (c) that, somehow, NFO has been *prohibited* from enforcing the consent decrees for the reason those decrees did not provide what NFO calls "enforceable" relief, and (d) that further equitable relief by way of an additional injunction is necessary because defendants are habitual antitrust violators.

NFO's reply memorandum made a detailed response to defendants duplication argument and contended that the provisions of its proposed injunction relating to the prohibition against asserting claims against purchasers (¶ II(1) ); against discrimination, harassment and threats and those proposed in regard to contracts and hauling (¶ II(2) through (10) ); those relating to membership termination (¶ III(a) ); to mandatory purchasing of NFO milk by defendants' manufacturing facilities (¶ III(2) ); to acquisitions (¶ III(3) ); to CMPC surplus milk disposal (¶ III(4) ); to block voting (¶ III(5) ); and to document retention (¶ IV–3) should all be included in the equitable relief which NFO contends was mandated by the Court of Appeals' decision.

## II.

We are satisfied that NFO's argument that it seeks to incorporate and duplicate many of the provisions in the consent decrees "in large part because there are substantial differences between the two de-

crees' prohibitions" (NFO original supporting brief, p. 7), and its argument that the consent decrees are not enforceble against CMPC, its argument that the supplemental enforcement procedures contained in the consent decrees prohibits NFO from seeking enforcement of those decrees are all untenable.

## III.

The question of whether sham litigation is prohibited by the consent decrees presents a close and difficult question in light of the Court of Appeals rejection of this Court's findings of fact in that regard and in light of the independent findings of fact made by the Court of Appeals in regard to that question. Defendants argued both in their opposition brief and at oral argument that the prohibitions contained in paragraphs IV(g) of the AMPI consent decree and VII(D) of the Mid-Am consent decree are broad enough to cover sham litigation.[44]

NFO contended, particularly in oral argument, that the Court of Appeals' independent findings of fact in regard to "sham litigation ... was a centerpiece of the Court of Appeals' decision" (Tr. of oral argument, p. 455), and argued that "[t]he consent decrees do not prohibit sham litigation [which was] a major practice that the Court of Appeals condemned." (*Id.* 450).

Defendants properly recognize that neither of the consent decrees "contain a *specific* provision addressed to the initiation or maintenance of sham litigation or threats of litigation against potential buyers." (Def's Supp. Appendix, p. 1. (Def's emphasis) ).

 We are quite satisfied that if appropriate enforcement proceedings had been commenced for an alleged violation of

---

**44.** Paragraph IV(g) of the AMPI consent decree provides that: "(g) Interfering or attempting to interfere with the exercise of the right of any processor to buy milk from a nonmember-producer at whatever prices, terms, or conditions said processor may chose, except that nothing herein shall limit defendant's rights under the Agricultural Fair Practices Act, 7 U.S.C. § 2301 *et seq.;*

Paragraph VII(D) of the Mid-Am consent decree provides: "(D) discriminating or threatening to discriminate against any buyer of milk on account of its actual or proposed purchase of milk from a competitor of defendant;

Provided, however, nothing in this Paragraph VII shall be construed to limit or affect the application of the antitrust laws to Milk Sales Agreements."

paragraph IV(g) of the AMPI consent decree or paragraphs VII(D) of the Mid-Am consent decree based on an alleged factual claim that either AMPI or Mid-Am had instituted or was threatening to institute some sort of sham litigation after the entry of those decrees, that this Court would not have sustained a defense motion that those paragraphs were not broad enough to cover such a claim.

We do not believe, however, that the sham litigation question can be so easily determined. First, no one, in fact, ever made any claim that the consent decrees had, in fact, been violated by the alleged institution of sham litigation since the consent decrees were entered in 1975 and 1977. The question of how the question should be decided has never actually been presented.

Second, and much more important, we do not believe that a fair reading of the Court of Appeals' decision can fail to recognize the great emphasis that court placed on the sham litigation question. If that be true, and we believe that it is, then the question is whether this Court is under duty to accept the findings of fact made by the Court of Appeals and follow the views so emphatically stated in its decision.

At oral argument, which we heard after a careful study of the briefs filed by the parties, we expressed the tentative feeling that defendants' arguments that NFO was not entitled to any equitable relief whatever could not be sustained "unless you do something about the Court of Appeals' very direct statement that 'NFO is plainly entitled to an injunction against the kind of unlawful conduct identified here.'" We added "[n]ow, what would you say to the Court of Appeals if you get up there ... and they said, 'What particular provision in any existing injunction covers conduct (a) identified here, which isn't even mentioned generally in either of the other decrees.'" This Court has not found a satisfactory answer for that question.

While we are satisfied that it is most likely that this Court would have concluded that the consent decrees were broad enough to cover sham litigation had such a question been presented before the decision of the Court of Appeals, we have, with grave reservations of doubt, decided that the discharge of our duty to follow the decisions of our appellate courts requires that we conclude that the Court of Appeals implicitly directed this Court to find and conclude that NFO is entitled to an injunction that specifically prohibits sham litigation in the form as generally stated in paragraphs II(1) and II(2)(a) of its proposed injunction. We say "in the form as generally stated" because we are confident that much more direct language may be agreed upon. The injunction relief to be granted shall be limited to a prohibition against the institution of threatened sham litigation for the reasons above stated. We turn now to the reasons why no further equitable relief will be granted.

## IV.

NFO's briefs in support of its motion for equitable relief and its briefs in reply to defendants' briefs in opposition are based primarily on its reading of the Court of Appeals' opinion and on legal, rather than factual arguments. NFO, of course, recognized that defendants "have filed scores of proposed factual findings and argued at length that the underlying factual record in this case, even apart from the consent decrees, shows NFO is entitled to no injunctive relief whatsoever." (NFO Reply Brief, p. 2). NFO's basic response to defendants' factual arguments was rhetorically stated as follows:

Each of these arguments is frivolous at best. Defendants have completely ignored both the Eighth Circuit's binding holding that NFO is "plainly entitled to an injunction," *and* the Eighth Circuit's controlling decision in *Paschall v. Kansas City Star Co., supra.* Stripped of these fundamental infirmities, defendants' remaining contentions are reduced to a series of easily met quibbles con-

cerning the specifics of NFO's proposed injunction.[45] (*Id.* at 3).

NFO departed from its general approach of reliance upon legal as distinguished from factual arguments in regard to particular findings of fact proposed by defendants in opposition to the provisions in NFO's proposed injunction that related to "required purchases." NFO properly recognized on page 8 of its most recently filed appendix that the defendants' proposed findings of fact 36 and 104–111 "essentially state that no evidence was adduced at trial that the defendants' acquisitions of proprietary dairies and manufacturing plants displaced any NFO sales."

NFO argued that defendants were "wrong on their underlying facts" and directed attention to findings of fact made by this Court in regard to the acquisition and merger of (1) Five Star Dairyland with AMPI precedessor MPI in 1969, (2) the 1969 AMPI merger with Belle Plaine Dairy, (3) AMPI's 1969 acquisition of New Prague, (4) AMPI's acquisition of St. Charles Condensary Co., (5) AMPI's 1969 acquisition of Farmers Cooperative Creamery in Deer Creek, Minnesota, (6) AMPI's purchase of Grey Eagle Cooperative, (7) Mid-Am's 1970 merger with North Star in St. Paul and with North Star Dairy-Lakes Division, (8) AMPI's 1973 purchase of Theils Milk Products in Wisconsin, and (9) Mid-Am's 1969 purchase of Standard Milk and Major Cheese in Southwest Missouri.

It is appropriate that we examine NFO's contention that defendants were wrong on the underlying facts set forth in their proposed findings of fact. For it is clear that NFO has, for the most part, cited and relied on the relatively small number of findings of fact made by this Court, many in modified form, in response to the NFO's proposed findings of fact as set forth in paragraphs 1478 to 1568 entitled "AMPI/Mid-Am northern mergers 1969–1970."

NFO's contention in regard to who is right and who is wrong in regard to the underlying facts—and for that matter, in regard to the findings of fact independently made by the Court of Appeals—must be considered in light of the Court of Appeals' conclusion that "we cannot say it was clearly erroneous for the district court to reject findings that the acquisitions, mergers and related milk pooling practices were part of an unlawful conspiracy." 687 F.2d at 1206.

The Court of Appeals also stated in regard to acquisitions and mergers that:

> In instances where acquisitions of independent dairies resulted in actual displacement of preexisting NFO sales, however, the district court, on remand, should consider whether such conduct following acquisition reflects an intent to block NFO rather than a legitimate business decision based upon price, quality or similar factors. Where post-acquisition terminations of NFO sales are found to be part of the scheme to eliminate NFO, such lost sales would form a basis for NFO's damage claim.

687 F.2d at 1206–07.

NFO elected not to attempt to adduce any additional evidence after remand in regard to whether any mergers or acquisitions may have resulted "in actual displacement of pre-existing NFO sales" than that adduced at trial. For NFO elected not to have the record reopened. The findings of fact made in regard to the particular mergers and acquisitions presently cited and relied upon by NFO did very little more than recite the undisputed factual circumstances in regard to the dates upon which those mergers and acquisitions took place.

Who is right or wrong in regard to whether the underlying factual circumstances support NFO's claim for additional independent equitable relief in regard to

**45.** See also NFO's introduction to its most recently filed appendix which contained NFO's responses to defendants' supplemental appendix which contained additional proposed findings. NFO there stated that "[t]he defendants raise no objections that can withstand examination, but instead loose a barrage of half-truths, distortions, and irrelevancies in a final desperate effort to fend off the sufficient, enforceable injunctive relief to which the Eighth Circuit has plainly held NFO entitled."

mergers and required purchases must be viewed in light of the findings of fact proposed by NFO at trial which the Court of Appeals concluded had been properly rejected by this Court after trial. It is not necessary that we set forth all of NFO's proposed findings of fact that were rejected by this Court as shown in 510 F.Supp. at 487–89 in regard to Part VII, A, of NFO's proposed findings entitled AMPI-Mid-Am northern mergers, 1969–1970. We need set forth only the paragraphs of NFO's proposed findings of fact which relate directly to the mergers and acquisitions upon which NFO presently relies to support its argument that defendants are wrong in regard to the factual circumstances as proposed in defendants' post-remand proposed findings of fact.

The record in this case shows that the Court of Appeals approved our rejection of the following findings of fact which NFO proposed we find in regard to the mergers and acquisitions under discussion:

### A. AMPI/MID–AM NORTHERN MERGERS, 1969–1970

1478. In early 1969, there were several hundred independent milk manufacturing plants in Minnesota, some operated by farmer cooperatives and some by independent entrepreneurs ("proprietaries"). [Rejected]

1479. AMPI, Mid-Am and ADI believed consolidation of manufacturing facilities in Minnesota was necessary to accomplish their objectives of controlling milk marketing in the Midwest. [Rejected]

1481. The management and officials of Mid-Am and AMPI worked together in their Northern Regions in their acquisition programs, procurement and marketing programs. [Rejected]

1482. One of the goals of AMPI and Mid-Am in their merger programs was to acquire plants with substantial numbers of farmer-suppliers who were NFO members. [Rejected]

1488. In January 1970, AMPI was overpaying its Northern Region produc-

ers at the rate of $500,000 per month. [Rejected]

1489. In 1969 and 1970, AMPI financed its Northern Region losses with profits from the MPI (Southern) Region. [Rejected]

1497. MPI's "game plan in getting Belle Plaine was to eventually get New Prague" (New Prague Dairy Products, Inc., a cooperative plant in New Prague, Minnesota). [Rejected]

1501. MPI acquired Belle Plaine, in part, to procure a large number of producers to be overpaid, thereby increasing economic pressure on competing cooperatives, threatening them with bankruptcy and facilitating their acquisition by MPI. [Rejected]

1502. Belle Plaine provided MPI with a "territorial base" to pressure competing cooperatives to merge with MPI. [Rejected]

1503. All competitors of Belle Plaine were eventually acquired by either AMPI, Mid-Am or Land O'Lakes. [Rejected]

1507. MPI could not accommodate all the Belle Plaine milk at its New Ulm plant but planned to use Belle Plaine's substantial volume of milk as "bait" in order to get other cooperatives to merge. [Rejected]

1512. MPI/AMPI used the Belle Plaine volume to get New Prague to merge with AMPI. [Rejected]

1513. AMPI's acquisition of New Prague was intended to, and did, "seriously set NFO back." [Rejected]

1524. The "primary objective" of the Deer Creek merger "was to exert pressure on North Star" (North Star Dairy, St. Paul, Minnesota). [Rejected]

1527. The "primary objective" of the Grey Eagle acquisition "was to exert pressure on North Star." [Rejected]

1536. Many feeder plants in the North Star system also joined Mid-Am shortly after the North Star merge. [Rejected]

1544. But for Benson's acquisition by Mid-Am, NFO would have been able to sell milk to the Benson Cooperative plant. [Rejected]

1552. But for the Mid-Am acquisition of Pure Milk Winsted, NFO would have been able to sell milk to the plant. [Rejected]

1567. AMPI's and Mid-Am's merger activities in Minnesota and western Wisconsin beginning in 1969 were intended to, and did, substantially limit competition in the purchase and sale of milk for manufacturing purposes in Minnesota. [Rejected]

1568. AMPI's and Mid-Am's merger activities in Minnesota and western Wisconsin were intended to, and did, limit NFO's ability to compete in the procurement and marketing of raw Grade A milk in Minnesota. [Rejected]

The findings of fact proposed by NFO in regard to Mid-Am's 1969 purchases of Major Cheese Company of Ozark, Missouri and Standard Milk Company of Aurora, Missouri were included in the section of NFO's proposed trial findings of fact entitled "Mid-Am mergers" (NFO P.F. 802–822). We set forth the specific findings which we rejected in regard to those acquisitions as shown in 510 F.Supp. at 478:

818. Mid-Am's acquisitions of the Major Cheese Company of Ozark, Missouri, and the Standard Milk Company of Aurora, Missouri, were intended to, and did, eliminate actual and potential competition for the procurement and sale of raw Grade A milk in southern and southwestern Missouri and Federal Order 62. [Rejected]

819. Mid-Am's acquisitions of Major and Standard were intended to, and did, remove Major and Standard as customers for any future competing milk marketing organization in southern and southwestern Missouri. [Rejected]

820. Mid-Am's acquisitions of Major and Standard were intended to, and did, further Mid-Am's monopolization of the procurement and sale of raw Grade A milk in southwest and southern Missouri. [Rejected]

We find and conclude that defendants are right and that NFO is wrong in regard to the factual arguments made in regard to the relief NFO seeks in its proposed injunction as it relates to mergers and acquisitions. The same detailed examination of the record is not possible in regard to other portions of equitable relief proposed by NFO because NFO relies primarily on language in the Court of Appeals' opinion rather than any factual data in the record.

We shall make additional findings of fact in the next part of the memorandum opinion on the injunctive relief issue on the basis of our review of the factual data cited by dependents in support of their proposed findings.[46]

### V.

We make the following additional findings of fact in regard to Issue No. 7—Injunctive Relief:

 1. Paragraph II of NFO's proposed injunction asserts that it seeks to prohibit the defendants from engaging in the same or similar activity found unlawful by the Court of Appeals. NFO, however, concedes that many of the provisions of that proposed injunction are based upon or derived from paragraphs of the Mid-Am and AMPI consent decrees.

2. To the extent the proposed provisions are drawn from the consent decrees this Court finds that such provisions are duplicative of relief heretofore granted in 1975 and 1977, and that NFO failed to present at trial any credible evidence which would establish the threat or likelihood of recurrence of the activities enjoined in those consent decrees.

---

46. We agree with NFO's suggestion that defendants have proposed a great many more proposed findings of fact on the injunctive relief issue than are necessary for the determination of that issue. We believe that the findings of fact which we will make in the following section are sufficient under the circumstances.

3. Appropriate procedures exist for enforcement of any consent decree violation and NFO is not, as it claims, in any way prohibited from utilizing those procedures.

4. NFO's proposed relief as to milk haulers and hauling contracts is duplicative of existing relief in the Mid-Am and AMPI consent decrees. NFO offered no credible evidence that would support a finding that the enjoined activities were threatened or likely to occur in the future.

5. The consent decrees obtained against Mid-Am and AMPI–CMPC contain provisions which permit milk haulers to haul competitively for producers not affiliated with the defendants and enjoin other conduct relating to the sale of milk routes and exclusive hauling contract provisions. NFO adduced no credible evidence that additional equitable relief is necessary under the circumstances.

■ 6. NFO's proposed provision II(10) which seeks to enjoin the defendants from issuing retroactive price reduction credits is impractical in its application, and such relief is unsupported by the credible evidence in this case.

7. NFO sought to establish by evidence adduced at trial which this Court expressly rejected as lacking credibility, that competitive credits issued by CMPC in the Chicago, Federal Milk Order No. 30, were anticompetitive.

■ 8. NFO seeks through proposed paragraph III(1) to require the defendants to allow their dairy farmer members an opportunity to terminate their marketing contracts upon 30 days notice given any time during the 12-month period following entry of any injunctive relief in this case. Appropriate and adequate injunctive relief designed to facilitate producers departure from the defendants organizations was incorporated in the Mid-Am and AMPI consent decrees. The consent decrees entered in *United States v. Mid-Am* and *United States v. AMPI* provided significant and adequate relief to NFO for the purpose of obtaining reasonable and legitimate access to dairy farmers. No further equitable relief is appropriate or necessary under the circumstances.

■ 9. By proposed paragraph III(2) NFO seeks to have this Court force Mid-Am and AMPI to purchase Grade A milk from NFO in unknown and ambiguous amounts at plants chosen from time to time by NFO. Such relief is inappropriate as it is anticompetitive, not supported by credible evidence, impractical, and imposes undue burdens on the Court and the parties not contemplated in injunctive relief formulated to prohibit prior unlawful conduct.

10. NFO's proposed provisions on forced purchases would require this Court to referee for a period of five years the marketing of milk and resolve all disputes between the parties to this case over questions of "NFO's percentage", "geographic proximity", "plants ... requirements", the proper "Class I/Class II ratios", and the "price and all terms and conditions of purchase and delivery." The terminology offered is so vague and indefinite as to be susceptible of untold interpretations, e.g., the right on the part of NFO to deliver milk simultaneously for unloading at the precise time as some other milk truck is unloading.

11. NFO's proposed provision in III(2)(b) seeks to impose an artificial allocation of the purchases upon the defendants contrary to the terms of the applicable federal milk marketing order. NFO's proposal is contrary to the principles of equity which this Court must apply in this case.

■ 12. NFO's proposed injunction paragraph III(3) would require defendants for a period of five years after an acquisition to continue to purchase from NFO the same volume of milk (and on the same use classification) as NFO previously supplied to the plant over the twelve-month period immediately preceding the acquisition. Injunctive relief providing for the orderly relocation of milk previously delivered to any acquired facility and designed to prevent the defendants from foreclosing outlets for the milk of competing organizations are contained in the Mid-Am and AMPI consent

decrees. No further equitable relief is either required or appropriate.

13. Substantially duplicative relief is not justified in this case particularly because NFO failed to establish by any credible evidence that any acquisition or merger resulted in a displacement of NFO milk sales for the reasons we have stated above in detail.

14. NFO introduced no credible evidence at trial that would support a finding that the conduct of Mid-Am or AMPI following the acquisition of independent dairies reflected any intention to block NFO rather than legitimate business decisions based upon price, quality or similar factors.

15. The acquisitions by Mid-Am of independent proprietary dairies did not result in any displacement of preexisting NFO sales and were not undertaken with any intent to block NFO from making sales of Grade A fluid milk.

16. The acquisitions by AMPI of independent proprietary dairies did not result in any displacement of preexisting NFO sales and were not undertaken with any intent to block NFO from making sales of Grade A fluid milk.

17. The *United States v. Mid-Am* consent decree required that Mid-Am divest itself of two milk facilities, one located in Kansas and the other in Missouri. No organization engaged in milk marketing sought to acquire these facilities even though Mid-Am offered them for sale on reasonable terms.

■ 18. In 1970 NFO declined to participate in CMPC and there is no evidence that NFO ever requested thereafter to participate in any CMPC program until the NFO motion for injunctive relief filed in 1983.

19. NFO's request that this Court issue a mandatory injunction requiring that NFO be permitted to participate in the CMPC Surplus Disposal Program is not supported by any credible evidence that such relief is either appropriate or necessary under the circumstances of this case.

20. There has been no showing by NFO that NFO has ever been denied access to the program on equal terms to those offered other CMPC participants in the program.

■ 21. NFO's proposed injunction prohibiting the defendants from exercising their statutory rights under 7 U.S.C. §§ 608c(9)(B), 608c(12) and 608c(16)(B) is not based upon any evidence of unlawful behavior either exercised in the past or threatened or likely to occur in the future. Under the principles of equity governing this Court's remedial power, such relief is unnecessary and unwarranted.

22. We have concluded for the reasons we have above stated that, solely under the command of the Eighth Circuit decision, NFO is entitled to specific injunctive relief against the defendants in regard to sham litigation for the reason that the existing consent decrees in *United States v. AMPI* and *United States v. Mid-Am* do not contain a *specific* provision addressed to the initiation or maintenance of sham litigation and threats of litigation against potential buyers. It is appropriate under the circumstances that we reiterate our prior findings that Beatrice has purchased milk from NFO since at least 1977 and that Foremost has purchased milk from NFO commencing in July of 1975. (510 F.Supp. at 499, ¶ 1951, 510 F.Supp. at 475, ¶¶ 1115, 1117–18). We also reiterate our prior findings that Ewald Brothers Dairy and Cloverleaf Dairy in Minnesota began buying milk from NFO in December 1972 and 1971, respectively. (510 F.Supp. at 491, ¶¶ 1635, 1636, and 510 F.Supp. at 491, ¶¶ 1629, 1631). We further reiterate our prior finding that both Wanzer Dairy and Kraml Dairy in Chicago remained customers of NFO from 1971 until the time of trial of this case. (510 F.Supp. at 485, ¶ 1431).

23. On remand NFO has chosen not to reopen the record and offer any additional evidence with regard to questions raised by the Eighth Circuit as to whether any cessation of purchases of Grade A milk following an acquisition or merger by any of the

counterclaim defendants was done for an anti-competitive reason.

24. In addition to our findings stated in detail above in regard to mergers and acquisitions, we further find that the mergers and acquisitions referred to in NFO Exhibit 915, upon which NFO primarily relies, did not involve bottling plants purchasing Grade A milk for bottling purposes nor manufacturing plants buying surplus Grade A milk for the purpose of making manufactured milk products.

25. We further find that NFO's Exhibit 915 reflects that six (6) of the fifteen (15) acquisitions of AMPI were only receiving stations and that seven (7) out of the fifteen (15) acquisitions contained in NFO Exhibit 915 received only Grade B milk and were identified as having no Grade A milk receipts whatever.

26. We further find that Belle Plaine was a butter-milk powder facility having only Grade B milk producers as its members and all of its milk receipts for manufacturing purposes were Grade B milk.

27. We further find that Grey Eagle Cooperative was a receiving plant that also maintained a creamery. All of the dairy farmer members of Grey Eagle Cooperative produced Grade B milk and all of the receipts of Grey Eagle Cooperative were Grade B milk.

28. NFO failed to adduce at trial and has not sought on this remand to establish, that any milk sales agreement was not honored, that NFO's sales were cut off or that any cessation of business after the merger or acquisition was done for anti-competitive reasons and without valid business justification.

29. In further regard to AMPI's acquisition of Farmers Cooperative in Deer Creek, Minnesota, we find that NFO's evidence, NFO Exhibit 915, reflects that the Farmers Cooperative of Deer Creek was comprised totally of dairy farmers who produced Grade B milk and all of the milk receipts of that cooperative were Grade B milk.

30. In further regard to NFO's claim on remand in regard to North Star Dairy, we find that North Star Dairy was a sales federation selling the manufactured dairy products produced by its member cooperatives. As such, North Star Dairy was never "available" to NFO as it did not buy or sell fluid milk at any time.

31. In further regard to AMPI's purchase in 1973 of Theils Milk Products, a manufacturing plant located in Wisconsin, we find that the evidence in the record fails to disclose whether Theils was in the business of purchasing Grade A milk or Grade B milk or a combination thereof.

For the reasons we have stated in detail, it is

ORDERED (1) that NFO is entitled to an injunction which will specifically prohibit the initiation or maintenance of sham litigation and threats of litigation against potential buyers of NFO milk. It is further

ORDERED (2) that NFO is not entitled to any further equitable relief other than that stated in Order (1) under the factual circumstances and applicable principles of equity. It is further

ORDERED (3) that appropriate further proceedings will later be directed in regard to how the form of injunction shall be settled.

ISSUE NO. 8—COSTS

There is little that can be helpfully said in regard to the issue of costs. Counsel are familiar with the provisions of paragraphs 8 and 10 of the agreed order entered after oral argument. Counsel are also familiar with the report made by Mr. Donohoe in his letter of June 29, 1984 to the Court and with Mr. Barnes' sequel letter of July 10, 1984 to the Court in which he reported that the negotiations which followed oral argument for settlement of the cost petition have reached an impasse.

It is appropriate, however, that in this part of our memorandum opinion we rule NFO's recently filed motion for an order compelling compliance with its Rule 34 request that defendants produce all their bill-

ing record documents. For the question presented in regard to the pending motion is somewhat related to the issue of costs.

 NFO has suggested that its request for production and its pending motion to compel the production of defendants' billing records were filed "as a part of its continuing efforts to foster resolution of the attorneys' fee portion of this case ..." (NFO May 30, 1985 reply memo). The primary difficulty with NFO's position is that "the attorneys' fee portion of this case" simply is not before the Court at this time.

Indeed, paragraph 12 of the agreed order entered after oral argument provides that "[a]t the conclusion of this Court's proceedings on remand, NFO will file its motion for Clayton Act attorneys' fees." The proceedings on remand have not been concluded. NFO has yet to file its motion for attorneys' fees.

The second difficulty with NFO's position is that the premature filing of such motion violates at least the spirit of the admonition of *Hensley v. Eckerhart*, 461 U.S. 424, 437, 103 S.Ct. 1933, 1941, 76 L.Ed.2d 40 (1983) that a "request for attorneys' fees should not result in a second major litigation" and that "[i]deally, of course, litigants will settle the amount of a fee."

NFO counsel stated their agreement with *Hensley* at oral argument. (Tr. of Oral Argument at 458). They also stated their agreement "that the analysis of *Hensley* is certainly significant in resolving the cost question." (Tr. of Oral Argument at 471).[47]

This is not the only case in which this Court has required the parties to comply with *Hensley*'s admonition; indeed, the standard procedures of this Court attempt to require compliance with *Hensley*'s admo-

nition in all cases which pend in this Court. Detailed directions of further proceedings, for example, were made in *Moats v. United States*, 564 F.Supp. 1330, 1346 (W.D.Mo. 1983), for counsel to comply with *Hensley*'s admonition. The later report of that case, published in 576 F.Supp. 1537, 1542 (W.D. Mo.1984), shows that this Court was able to enter judgment for attorneys' fees in an "agreed amount." *See also* page 28 of our unreported opinion in *United States v. Estridge*, No. 82–0455–CV–W–1, decided January 5, 1984, in which substantially the same directions as those ordered in *Moats* were given.

In *Estridge* we further stated that: "The files and records in *Moats II* established that the parties were able to agree upon the amount of attorneys fees to be awarded. We trust that a similar agreement may be reached in this case." (No. 82–0455–CV–W–1 at 30.) Counsel in *Estridge* were able to reach agreement in that case on the amount of fees to be awarded and an appropriate judgment was thereafter entered.

It is appropriate that we direct attention to other orders entered in *Estridge*. For those orders reflect standard procedures which this Court has followed in many other cases involving attorneys' fee awards. The following orders, among others, were entered in that case:

> ORDERED (1) that the Clerk in accordance with Rule 58 of the Federal Rules of Civil Procedure, prepare on separate documents the judgments which we have indicated should eventually be entered in this case. The Clerk shall confer with counsel for the respective parties to obtain a judgment agreeable to counsel as to the form of each of the judgments to be entered. The Clerk shall not, however, enter any of the judgments until further order of the Court.

---

**47.** See also this Court's statement to defendants' counsel when we stated that: "Don't go any further than the *Hensley* case, which you cite and rely upon. The *Hensley* case says there is not to be second major litigation about fees, and I am applying the rationale of that case to no major second litigation about costs, and the burden of working out these problems about which there should be no dispute about the facts is going to be shifted to counsel upon a manner and schedule of negotiation that you will get these things worked out in the manner I indicated when I was talking with Mr. Gerlach." (Tr. of Oral Argument at 494–95).

The reason the Court directs that the Clerk delay entry of any of the judgments on the merits of the various claims and on O'Crowley's counterclaim is to coordinate the time for any appeal from the entry of such judgments with any appeal that may be noticed in connection with the award of any attorneys fees that may be made to O'Crowley under 28 U.S.C. § 2412. *See and compare Obin v. Dist. No. 9 of Intern. Ass'n., Etc.*, 651 F.2d 574 at 584 (8th Cir.1981). (No. 82–0455–CV–W–1 at 30).

The Court of Appeals stated in *Obin v. Dist. No. 9*, 651 F.2d 574, 583 (8th Cir. 1981), that: "This court deems it essential that all district courts follow a consistent practice of promptly hearing and deciding attorney's fees claims in civil rights and other cases so that any appeal by an aggrieved party from the allowance or disallowance of fees can be considered by this court together with any appeal taken from a final judgment on the merits."

The Court of Appeals explained in *Obin* that "the problem of possible piecemeal appeals need not arise where the trial court delays entry of judgment on the merits pending determination of attorney's fee claims and thereafter enters a single final judgment determining all issues." (*Id.* at 583). That admonition of the Court of Appeals will be followed in this case.

The time will come for counsel to resume their negotiations concerning costs. After NFO will have filed its motion for Clayton Act attorneys' fees in accordance with paragraph 12 of the order entered after oral argument, the time will come for counsel to conduct appropriate negotiations concerning those attorneys' fees and to conduct negotiations in regard to all other attorneys' fees for which various awards will be made in connection with other issues decided in this memorandum opinion.

When those negotiations are commenced, the Court suggests that counsel for all parties consider what was said in Part V, *Rainsbarger v. Columbia Glass & Window Co.*, 600 F.Supp. 299 at 304 (W.D.Mo. 1984), in regard to how *Hensley* and the Eighth Circuit cases cited therein are to be applied in the rare cases in this Court in which counsel were not able to meet the ideal stated in *Hensley* that "litigants will settle the amount of a fee."

For the reasons stated it is

ORDERED (1) that the parties will be directed to reopen their negotiations on the issue of costs in accordance with procedures to be established in an order directing further proceedings. It is further

ORDERED (2) that NFO's pending Rule 34 motion to compel production of defendants' billing records, should be and the same is hereby denied.

## ISSUE NO. 9—CERTIFICATION OF NFO DAIRY FARMER CLASS

### I.

The class action issue pends on NFO's class counterclaimants' motion, filed after remand, for certification of a NFO dairy farmer class. Unlike a number of other issues presented after remand, the motion to certify a NFO dairy farmer class was not in any way discussed in the briefs filed in the Court of Appeals. Indeed, counsel for the NFO dairy farmer class concede that "the whole issue of class action just did not come up at any point in the appellate process." (Tr. on Oral Argument at 545). Although the Court of Appeals discussed various damage issues which this Court did not reach, it did not in any way suggest that this Court, on remand, should consider the certification of a class of NFO dairy farmers.

Counsel for the NFO dairy farmer class, however, point to the portion of a single sentence in the Court of Appeals opinion which stated that "[t]hose who directly suffered price reduction damages are individual farmers ...", 687 F.2d at 1209, and suggest that the NFO class claimants "are asking this Court to reconsider its initial decision not to certify a class" (NFO class claimant reply brief at 5).

Indeed, NFO class claimants have suggested that this Court indicated during the

pretrial stages of this case that "its refusal to certify the NFO Dairy Farmer class ... was subject to reconsideration at any time" and that "a fair reading of this Court's statements with respect to the class action issue is ... that certification was denied without prejudice because this Court had formed a 'tentative judgment' that a class was not needed to guard against the possibility that NFO was not entitled to collect all the damages that might ultimately be proven." (*Id.* at 3, 5).

Defendants vigorously dispute NFO's class claimants reading of the record. Defendants direct attention to the long and complicated manner in which the question of NFO's standing to recover any damages was considered in tandem with the positions that were being maintained by both Mid-Am and by NFO in regard to whether class actions should be certified for members of either of those marketing organizations. Defendants also raise substantial questions in regard to whether, under the procedures followed by the parties, the claims of the NFO class claimants have been barred by *res judicata* under the rationale of *Federated Department Stores, Inc. v. Moitie*, 452 U.S. 394, 101 S.Ct. 2424, 69 L.Ed.2d 103 (1981); whether this Court's denial of class certification is the law of the case; whether the claims of the NFO class claimants are time barred; and whether a class certification may properly be made after a judgment on the merits under the circumstances of this case.

NFO class claimants reply to the foregoing questions raised by defendants, by stating that all of the foregoing arguments "proceed from totally erroneous premises as to what has happened in this case." (*Id.* at 1). NFO class claimants argue that the greater portion of defendants' arguments as above outlined rest "on the assumption that a judgment was entered against the

NFO class claimants and that the class claimants then failed to appeal." (*Id.* at 1). It was then argued that "[n]o judgment in fact was ever entered against the class claimants, and, in the absence of such a judgment, the class claimants *could not* appeal." (*Id.* at 1. Emphasis in the brief).

Without any discussion of whether NFO class claimants *could* have appealed this Court's denial of NFO class claimants' class action motion, NFO class claimants would blow defendants' arguments to one side by stating, for example, that defendants know that their "*res judicata* argument is nothing but pure, unadulterated fluff, predicated on the assumption that this Court can be sandbagged by defendants' blithe distortion of the record." [48] (*Id.* at pp. 4–5).

Because the parties radically disagree in how the record should be read, it is necessary that we state the history of the class action positions that were maintained by the parties and the reasons why this Court refused to certify a class of NFO dairy farmers.

II.

The long and complicated history of the NFO class issue commenced with the filing of NFO's first amended complaint filed June 25, 1971. That amended complaint alleged in paragraph 59 that "[t]he class consists of all members of the NFO." Appendix A attached to NFO's amended complaint listed the names of twenty-one farmers who were alleged to represent "all members of NFO."

NFO's class claimants' suggestions in support of their post-remand motion for a certification of a NFO dairy farmer class is based on the untenable notion that the procedural history in regard to the certification of a NFO dairy farmer class commenced with the filing of NFO class claim-

---

**48.** Indulging in similar strong rhetroic, NFO class claimants state that defendants' law of the case argument "attack on the class certification is a first cousin to the *res judicata* argument and is equally moribund"; that defendants' statute of limitations argument is "a nephew of the two arguments analyzed above"; and that defend-

ants' argument that a class may not properly be certified after final judgment "is just some imaginative nonsense to the effect that the NFO class claimants somehow 'positively disclaimed' their class certification efforts by only having them denied twice and by not taking an appeal." (*Id.* at 5, 7, 8).

ants' motion for certification filed February 1, 1974 and that the only relevant discussion of the class action questions presented in this case took place in pretrial conferences convened after that date.

An accurate review of the record establishes that the problems associated with NFO's alleged class action, after it was filed on June 25, 1971 were always considered in tandem with the problems associated with class action alleged in Mid-Am's complaint.

Both Pretrial Conference No. 2, held May 26, 1971, and Pretrial Conference No. 3, held June 17, 1971, were convened and held before NFO filed its first amended counterclaim on June 25, 1971. Although Pretrial Conference No. 2 was convened for additional purposes, the discussion at that conference shows that the problems associated with Mid-Am's class action were discussed as Item 6 on the agenda for that conference. Counsel were directed at Pretrial Conference No. 2 to attempt to find a solution agreeable to all parties, but should they fail to reach agreement, a briefing schedule should be agreed upon under which "all briefs on that [Mid-Am] class action question, ... shall be in the Court's hands not later than June 15, 1971, in order that the Court have an opportunity to become fully acquainted with the positions of the parties and be in a position to make a definitive ruling on those questions at the June 17th pretrial." [49]

Everyone concerned knew by the time Pretrial Conference No. 3 was held on June 17, 1971 that a class action was going to be filed by the NFO class claimants in the very near future.

"Class action problem or problems" was described as "the number one item" on the agenda for Pretrial Conference No. 3.

(Pretrial Conf. No. 3 Tr. at 79). That item was reserved for full discussion on the afternoon of the conference. The Court stated the following in regard to that agenda item:

The discussion in the briefs thus far has not focused upon that portion of Rule 23 (b) which requires as a prerequisite for a class action that the utilization of a class action provides a superior procedure to other available procedural devices that are presently in the rule.

I think all counsel have cited that section, but close attention has not really been given to it, and I have the feeling, consistent with what we discussed at the last pre-trial, that even without agreement on anybody's part, although it would be much safer if there was agreement, that available devices may be available which are most superior to a class action device and which certainly in the exercise of discretion would require an evaluation of the explicit requirement of avoiding the difficulties that are inherent in any class action case.[50]

(Id. at 84).

This Court further stated on June 17, 1971 that "I think counsel are entitled to know that I have to be convinced that there is a real necessity for a class action in this case on either side" and that "I think also that with very little additional cooperation it is completely feasible for each side to guarantee the other that the inevitable appeal of this case, regardless of what happens on the District Court level, that particular questions of procedure are not going to send this case back for retrial...." (Id. at 91). The transcript of Pretrial Conference No. 3 shows that the briefs filed by the parties and the class action problems presented were discussed off the record

---

**49.** The Court added that "[t]he Court expressed the hope off the record and will express it on the record that the desire of all counsel to find a solution to this problem be given very serious consideration and that the suggestions made at the conference as to alternative solution be fully exhausted before they give up on the question of whether we are forced to litigate as a class action." (Id. at 36).

**50.** The Court later added that "I only reiterate that I think it is feasible to protect everybody's rights and to litigate the questions which are coming into focus without the necessity of using a class action on either the plaintiff's side or the defendant's side." (Id. at 90).

during the entire afternoon of June 17, 1971 and again when the conference was reconvened on June 18, 1971. The Court, in accordance with its usual practice stated the following on the record:

THE COURT: Let the record show that a good many hours have gone by since we went off the record to discuss our most difficult problem, namely, to work out effective procedures which will protect all parties in regard to the class action problem or problems item on the agenda.

The very full discussion of this problem established that it would not be appropriate for the Court to enter any order today, but to permit the parties to work further, consistent with their basic agreement reflected during the discussion that the procedural problems as they relate to the plaintiff and the procedural problems which relate to the defendant NFO on its counterclaim present substantially similar problems and that the procedures which would afford an effective solution to those problems would fall in essentially the same pattern.

(*Id.* at 99).

Although NFO had not yet filed its amended counterclaim which would include the NFO class action claim, the record is clear that all of the efforts to find a solution to the class action problems included both Mid-Am's class action claim and the class action which would shortly be asserted on behalf of the NFO class claimants in the amended counterclaim. NFO was granted leave to file and did file its amended counterclaim on June 25, 1971. The records shows that at some time thereafter, the problems created by Mid-Am's and NFO's class action claims were considered as a single problem.

NFO and the NFO class claimants made three filings in opposition to Mid-Am's class action claim before Pretrial Conference No. 4 was convened on August 17, 1971. On June 11, 1971 NFO defendants filed suggestions in opposition to Mid-Am's motion for designation of class action (Exhibit D attached to Defendants' Opposition Suggestions).[51] On June 15, 1971, NFO filed its "Comments on Plaintiff's 'In Camera' brief" (Exhibit C, attached to Def. Oppos. Sug.) and a reply brief in opposition to plaintiffs' motion for class action (Exh. B attached to Def. Opp. Sugg.).

Pretrial Conference No. 4 was held August 17, 1971. NFO's amended counterclaim had long been on file. The transcript of that conference shows that the Court made inquiry whether the parties had been able to find a solution to the class action problem. (Pretrial Conf. No. 4 Tr. at 50). The Court was advised that although considerable progress had been made, the parties were not yet in complete agreement in regard to a solution (*Id.* at 51). Counsel for NFO and the NFO class claimants stated that the class action problems had, to a certain extent, "been partially solved" (*Id.* at 128). Counsel for Mid-Am indicated that Mid-Am might eventually seek leave to file an amended complaint which would not include any class action claims (*Id.* at 127–128).

This Court accordingly granted counsel for the parties additional time to seek a solution to the class action problems that would be agreeable to all parties. The Court observed that the briefs thereto filed in regard to class action questions "make the point that Rule 23 should not be followed as far as designation of classes if there is a superior method" of processing the case. (*Id.* at 132).[52] The Court further

---

**51.** Defendants stated that Exhibit D was filed "on or about August 4, 1972." The files and records show that it was filed June 11, 1971 as stated in text. That filing also shows on its face that it was filed before June 15, 1971.

**52.** That statement, of course, merely directed counsels' attention to the familiar and well established class action principle stated in 7A Wright & Miller, Federal Practice and Proce-

dure, § 1779, p. 57–58 which stated that "[t]he second requirement that must be satisfied before an action may be brought under Rule 23(b)(3) is that the court find the class action to be superior to other available methods for the fair and efficient adjudication of the controversy. It is not enough that the Rule 23(a) prerequisites have been satisfied. The rule requires the court to make a determination that the ob-

advised counsel that "I have indicated that I am yet to be convinced (a) that there is not a superior method to solve the problem, and (b) I am yet to be convinced that there is a necessity for a class action on either side...." (Pretrial Conf. No. 4 Tr. at 132). Counsel were directed that each party should state in writing their views in regard to how the class action problem should be solved on or before August 23, 1971. (*Id.* at 134).

### III.

It was in the context of all of the foregoing circumstances that on August 23, 1971, in compliance with this Court's directions made at Pretrial Conference No. 4, NFO filed its statement on behalf of all counterclaimants entitled "NFO statement of position on pending class action claims" (Appendix A, attached to NFO and NFO class claimants' supporting brief).[53]

The NFO August 23, 1971 statement accurately described "the two pending class action claims" as follows: "These claims are (1) the Mid-Am proposal to represent a plaintiff class composed of all Mid-Am members, excepting those Mid-Am members who are named as co-conspirators in the Mid-Am complaint and also excepting those Mid-Am members who have authorized Mid-Am to make certain marketing deductions in favor of NFO amounting to $0.03 per hundred weight for the milk they market to Mid-Am, and (2) the NFO proposal to represent a counterclaimant class composed of all NFO members." The NFO statement added: "Because there has been

no showing that class actions constitute a superior means to resolve the issues in this litigation, it is NFO's primary position that no classes should be certified by the Court. Accordingly, despite its own class action claims, NFO adheres to the position it has taken in the brief heretofore submitted in opposition to Mid-Am's class action proposals." (App. A, p. 2, of NFO Aug. 23, 1971 statement).

NFO added, however, à qualification to the position it flatly stated by suggesting that "if the Court should certify a Mid-Am plaintiff class, then NFO proposes a class of counterclaimants composed of all NFO members so that this litigation can proceed on a basis which keeps the contending parties on an equal footing." (App. A at 2 of NFO Aug. 23, 1971 statement).

It is important to add that NFO also stated that "NFO does not agree to Mid-Am's proposal that all class action claims be dropped, that all individual plaintiffs and counterclaimants be eliminated from the case, and that the entire litigation proceed on an organization-versus-organization basis." The NFO statement purported to explain its position by stating that "NFO is not willing to litigate the counterclaim by itself, without the named NFO member counterclaimants as parties, because Mid-Am has repeatedly contended that NFO as an organization lacks standing to assert the antitrust claims upon which its case is based."[54]

The files and records in the case show that further efforts to solve the class action problems were unsuccessful. The

jectives of the class action procedure really will be achieved in the particular case."

**53.** The opening sentence of NFO's statement stated that it was being filed "in response to a request the Court made at the pretrial conference held *October* 17 and 18, 1971." The direction to file the statement was made at Pretrial Conference No. 4, held *August* 17 and 18, 1971. NFO and NFO class claimants' supporting brief appropriately acknowledges that the statement was, in fact, filed August 23, 1971.

**54.** The NFO August 23, 1971 statement made clear that unless the defendants agreed to concede that their legal position in regard to NFO's standing to assert the antitrust claims alleged in

NFO's amended counterclaim was untenable, that NFO would insist that a class of "all NFO members" be certified. The NFO statement expressly stated that: "So long as Mid-Am (or any other counterclaim or cross-claim defendant) adheres to this contention, NFO cannot prudently litigate the counterclaim without individual member counterclaimants." (App. A at 2–3 of NFO Aug. 23, 1971 statement).

NFO's statement made it apparent that NFO was going to try to "sandbag", to use one of NFO's words, the defendants to get them to give up their· legal position on NFO's standing to recover damages.

question was the subject of extended discussion at Pretrial Conference No. 12 held July 20, 1972. The Court again expressed the hope that "all of us collectively ought to be smart enough to work out procedures that were not plagued with the procedural problem of class action...." (*Id.* at 73). Counsel agreed to file a memorandum of their views on the class action problem in advance of Pretrial Conference No. 13 which was scheduled to be held on August 10, 1972 (*Id.* at 75).

The class action problems were placed on the agenda and discussed in detail at Pretrial Conference No. 13. The Court stated at that pretrial conference that:

> ... the Court is not satisfied by anyone that any party has made a case which requires this Court at this time to rule and to designate the particular classes which may or may not be necessary for the determination of this case.
>
> I will also state that no one has made any suggestion whatever as to why at the present time it is necessary that a class be designated. I think that by the time you wade through the paperwork, the real question is put in focus by Rule 23(b)(3), which requires this Court's discretion to be controlled by whether or not a class action is "superior to all other available methods for the fair and efficient adjudication of the controversy."

(Tr. of Pretrial Conf. No. 13, p. 59–60).

The Court added, however, that "[i]f designation of classes in here at this time is helpful to anyone, and if this is the only alternative to solve particular problems, I am going to get into that question, but I simply do not see that this is a superior method of solving the problems that presently plague the preparation of this case." (Tr. of Pretrial Conf. No. 13, p. 78.).

Mid-Am's class action was the subject of particular discussion at Pretrial Conference No. 13. Counsel for Mid-Am indicated that under appropriate conditions, Mid-Am could

decide that it would no longer seek the certification of a class action on behalf of Mid-Am. Mid-Am counsel added: "I would suggest then that if the other parties are willing to make the same decision, it would seem to me that all class action problems could be resolved and resolved immediately." (*Id.* at 79).

Counsel for NFO and NFO class claimants made clear that the solution suggested by Mid-Am was not acceptable and that NFO was not willing to change its "sandbag" position:

> We do believe quite firmly that until such time as we get a concession from all adversary parties that they are not going to press the issue of standing, or to contend that NFO cannot recover injuries to its business or property on the ground that those injuries were really inflicted upon the members, that we must insist upon *the protective NFO class*. (Emphasis ours)[55]

(Tr. of Pretrial Conf. No. 13 at 86).

## IV.

The class action problem lay dormant until this Court entered orders on January 10, 1974 "in order to determine the definitive positions of the various parties in regard to all class action questions." (See Appendix B, attached to NFO supporting brief). Order (1) entered that day required all parties to state their respective positions within fifteen days. Order (2) provided that:

> ORDERED (2) that should any party assert that a class action is cognizable by this Court, his brief shall describe with particularity the class he alleges and state the manner in which the alleged class action satisfies the requirements of Rule 23, Federal Rules of Civil Procedure. Should the position of the party be that a complete determination can not be made at this stage of the proceedings, his brief shall describe why further dis-

---

55. NFO and NFO class claimants stated at Pretrial Conference No. 13 held August 10, 1972 that it was insisting on what it called a "protective NFO class." This was, of course, consistent with its August 23, 1971 statement that unless defendants would waive their legal argument that NFO lacked standing, it would continue to seek to have a NFO class certified.

covery is either necessary or proper in order to make that adjudication.

(NFO supporting brief, Appendix B at 1).

NFO and NFO class claimants, as required by this Court's January 10, 1974 order, filed a motion for certification of the NFO dairy farmer class. See Appendix C attached to NFO's supporting brief. That motion sought certification of exactly the same class as that which NFO and NFO class claimants now seek to have certified under their pending post-remand motion. The suggestions in support of that February 1, 1974 (see Appendix D attached to NFO supporting motion) presented substantially the same arguments that are presented in the post-remand brief filed by those parties in support of their pending post-remand motion. Indeed, parts of the post-remand brief are actually copied from the February 1, 1974 brief.

For example, in describing the persons selected as class representatives, the following portion of the post-remand brief was copied from the 1974 brief:

> All nine representatives have served in elected positions in their respective county, district, or state NFO organizations. At the county level seven representatives have served as chairman or members of their county dairy bargaining committees, and the other two have served as treasurers of their county organizations. At the national level two representatives have served on NFO's national board of directors.

(NFO Sug. in Support, Doc. 13 at 13).

In similar fashion, on the superior method issue presented under Rule 23(b)(3), the remand brief copied the following language from the 1974 brief:

Given the large number of the NFO dairy farmer class members, the cohesiveness of this group, the complexity of the litigation, and the fact that class members' damages are insufficient on an individual basis to permit the institution of separate actions, the question here is not whether the class action is a superior method for adjudicating the controversy, but rather whether there is any other method available for adjudicating these claims.

(NFO Sug. in Support, Doc. 13 at 20).

And on the question of whether the class action would present management difficulties [56], the post-remand brief copied the following from the 1974 brief:

> The NFO dairy farmer class is "neither ill-defined nor ephemeral." *Berman v. Narragansett Racing Association*, 414 F.2d 311, 317 (1st Cir.1969), *cert. denied*, 396 U.S. 1037 [90 S.Ct. 682, 24 L.Ed.2d 681] (1970). Indeed, this class has been defined with a view to eliminating management problems. Take the notice requirement, for example. There is a reasonably limited number of class members, and NFO knows where they are. As in *Philadelphia Electric Company v. Anaconda American Brass Co.*, 43 F.R.D. 452, 463–64 (E.D.Pa.1968), these class members share that "pre-existing bond of association," which has been held to be the primary criterion for determining the proper boundaries of a class.

(NFO Sug. in Support, Doc. 13 at 22).

The 1974 NFO and NFO claimants' brief did not in any way suggest that its motion for certification of a NFO dairy farmer class was not ripe for determination.[57] In-

---

**56.** The problem of management stated in 7A Wright & Miller, Federal Practice and Procedure, § 1784, p. 119, had been discussed many times in the continuing efforts to seek a solution to the class action problems presented in this case: "Rule 23(b)(3)(D) obliges the court to consider the management difficulties when determining whether the class suit is the best means of resolving the controversy, and this may encourage a court to refuse to give a case class action treatment. But even when that hurdle is surmounted, problems relating to the judicial administration of the relief take on a special significance in determining the amount of the damages and distributing the recovery among the members of the class.

**57.** This Court's January 10, 1974 order expressly stated that "Should the position of the party [that a class action should be certified] be that a complete determination can not be made at this stage of the proceedings, *his brief shall describe why further discovery is either necessary or prop-*

deed, that 1974 brief made clear that NFO and the NFO class claimants were simply maintaining their "sandbag" position that a "protective NFO class" should be certified.

Pretrial Conference No. 20 was scheduled for February 5, 1974 in order that a definitive ruling be made on the two pending class action motions. Accordingly, "class action status" was placed as the No. 1 item on a 16-item agenda. (See Tr. of Pretrial Conf. No. 20 at 4).[58] Item 10 on that agenda was "Mid-Am motion for leave to file 5th amended complaint in Alexander case."

Item 10 was considered in connection with Item 1 for the reason that if leave was granted for the filing of Mid-Am's proposed 5th amended complaint, all problems relating to Mid-Am's class action would be eliminated from the case.

After full discussion and after having ascertained that NFO had no objection to the filing of Mid-Am's "amended complaint which would eliminate the plaintiffs' [Mid-Am] class," Mid-Am was granted leave to file its 5th amended complaint. (Id. at 7–8).[59]

NFO and NFO class claimants made clear at Pretrial Conference No. 20 that they would not change their position in regard to having a "protective NFO class" certified unless the defendants would concede on the record that their arguments concerning NFO's standing were untenable. (See pages 16–20 of transcript of

Pretrial Conference No. 20.) When NFO and NFO class claimants' counsel suggested that "the matter might not be ripe for ruling," the following occurred:

> THE COURT: Well, I wanted to ask you one additional question. In my order of January 10 I made inquiry of what additional evidence may be necessary and whether any additional discovery was either necessary or proper in order to make the class action adjudication under Rule 23.
>
> Do you anticipate that there would be any necessity for additional discovery as far as you are concerned?
>
> MR. ROWLEY: No, Sir, Your Honor, with one caveat. I do not know what adversary counsel may say in terms of criticism which might require factual investigation by discovery or otherwise, but with that limited exception—

(Id. at 26–27).

The responses on file in response to this Court's January 10, 1974 order did not indicate that defendants had said anything about the need of further factual investigation.[60] The Court accordingly proceeded as follows:

> THE COURT: All right, I am going to indicate my ruling on Item 1 of the agenda.
>
> The Court is not going to designate any class in this litigation, and I do not do so for the reason that Rule 23 requires a finding that a class action is superior to all available methods for a

---

*er in order to make that adjudication.*" (Emphasis ours).

**58.** The Court stated at the outset of that pretrial conference, which was combined with Pretrial Conference No. 5 in the multi-district litigation that "I am prepared to give counsel all the time that it is necessary to clear out the underbrush, direct appropriate proceedings and a schedule which will fix a firm trial date, at least of the Texas cases." The Court added that "[t]he first item on the agenda, and an item of importance, is a final and conclusive determination of whether or not there be any designation of any classes by any party in the Alexander case. I entered an order directing the parties to state their respective positions and views as to the necessity of a class."

**59.** Mid-Am's counsel correctly stated that the purpose of the Court's issuance of its January 10, 1974 and the thrust of the questions addressed to all counsel in regard to the responses filed pursuant to that order was to determine whether "the parties [are] willing to stand upon their contentions; in other words, NFO has contended throughout that NFO was entitled to collect these damages for their members, and I think the Court quite correctly said, 'Stand up and be counted.'" (Id. at 25).

**60.** Counsel for Mid-Am stated: "MR. THOMSON: Judge, I think it obvious that the class proposed by Mr. Rowley, I think the Court could rule this morning that no class exists." (Id. at 30). No one else, including NFO, suggested anything to the contrary.

fair and efficient adjudication of the controversy.

In light of the questions presented, and articulated, and in light of the fears expressed by NFO as to a compelling necessity to be on the safe side, the Court is confident that there are all kinds of procedures that may be resorted to to solve the questions presented.

I cannot find in light of the development of this case that the difficulties likely to be encountered in the management of this case as a class action can be ignored. This case without a class action, I think, can fairly be classified as a difficult case to manage. The addition of the additional complication of class when they are sought by only one party, it seems to me, to outweigh the difficulties of manageability as we proceed as far as the case is concerned.

My denial of the designation is without prejudice to later suggestions as to solve the problems of distribution of damage....

(Tr. of Pretrial Conf. No. 20 at 30–31).

After this Court's definitive ruling that NFO and NFO claimants had not carried the burden of having the "protective NFO class" certified on both superiority and management grounds, the record shows the following:

MR. ROWLEY: If Your Honor please, do I understand that Your Honor is suggesting that we devote our attention to some such procedure as for

example was followed in the Nisely [sic] case?

THE COURT: Yes, and I think, Mr. Rowley, actually this question is also related very, very directly to Item 15 as to the trial plan and how the parties actually are going to try the various cases, and if particular procedures are determined upon, the problem becomes infinitely more simple.[61]

(Tr. of Pretrial Conf. No. 20 at 32).

Counsel were directed to prepare an agreed draft of Pretrial Order No. 7 which would reflect the various rulings made from the bench during the combined Pretrial Conference No. 20. Shortly thereafter the Court received a letter dated March 2, 1974 from NFO counsel, together with a copy of a letter of the same date that NFO counsel wrote Mid-Am counsel. Those letters registered NFO's disagreement with a draft order which had been sent counsel by Mid-Am counsel.

Those letters, among other things, suggested that no ruling should be made on NFO's class action motion "[u]ntil such time as the Court works out effective practical alternatives which will enable NFO to collect its dairy members' economic damages without being subjected to unnecessary appellate risks."[62] NFO counsel's March 2, 1974 letter to the Court concluded with the following paragraph:

If, despite the foregoing, Your Honor should deny NFO's class action motion at this stage, NFO respectfully requests that the question be certified for review by the Eighth Circuit pursuant to the

---

**61.** NFO's Counsel's reference to *"Nisley* case" was a reference to *Union Carbide and Carbon Corporation v. Nisley,* 300 F.2d 561 (10th Cir. 1962), *dismissed,* 371 U.S. 801, 83 S.Ct. 13, 9 L.Ed.2d 46 (1963). That case approved procedures under which the fact of injury was submitted to the jury for determination and the amount of each individual miner's actual damages was left for later determination. Page 74 of transcript of Pretrial Conference No. 12, held July 20, 1972 shows that the Court had discussed the procedures approved in *Nisley, see* 300 F.2d at 587 et n., with counsel at still earlier sessions as a possible superior method of solving the class action problems that plagued this case from the outset. The record shows that

NFO and NFO class claimants were never willing to seriously discuss any agreement that utilized the *Nisley* procedures in this case until after this Court had denied the motion for certification of a "protective NFO class."

**62.** The letter to the Court also suggested that "a *Nisley* procedure [might be followed] after it has been made the binding law of the case either by way of interlocutory appeal or stipulation among the parties," the discussion of which NFO had consistently resisted until its motion for the certification of a "protective NFO class" had been denied.

provisions of 28 USC Section 1292(b), as involving a controlling question of law on which an interlocutory appeal may materially advance the utlimate termination of the litigation.

The Court noted at the outset of Pretrial Conference No. 21, held March 5, 1974 in tandem with Multidistrict Pretrial No. 7, that a problem had arisen in regard to the language of Pretrial Order No. 7 (Tr. at 4). The Court noted that "the greatest problem, in spite of some quite long letters, revolves basically around paragraph one as to the disposition of the class action" (Tr. at 39). The Court suggested that the difficulties in drafting paragraph 1 of Pretrial Order No. 7 might have been due to the fact that "you gentlemen ... seem to be laboring under the impression that the Court's refusal to designate a class for NFO in accordance with your present application in response to an order that I issued, as I recall, in January is somehow a final decision and precludes any subsequent application under the circumstances, and I think in one of your letters you even suggest that it would be appropriate to certify under 1292(b)."

The Court then stated it did not believe that a Section 1292(b) interlocutory appeal should be certified in connection with its denial of NFO and NFO class claimants' motion. The Court further stated that what it had ruled at Pretrial Conference No. 20 was "that the showing made and under the circumstances as I stated them of record in ruling the motion, I did not feel that the designation should be made at that time." (Tr. of Pretrial Conf. 21 at 42). The Court further made clear that "I have not eliminated any possible procedures designed on the *Nisely* [sic] case in the Tenth Circuit." (Tr. at 42). The Court added: "So this is still open and I have the feeling that if Pre-Trial Order No. 7 makes clear that this is simply a refusal without prejudice, subject to renewal at an appropriate time, that you can find language to recite that without difficulty." (Tr. at 42–43). The record then showed the following:

MR. ROWLEY: Would it be within Your Honor's contemplation that Pre-Trial Order No. 7, since it represents no judgment whatever in connection with the class action motion, be silent on the subject.

THE COURT: Well, it does represent a judgment. I stated definitively that the presentation and the absence of a designated class was not sufficient to designate on the showing made. ... I did deny that application and would not hesitate to have the record show that that denial is without prejudice.

MR. ROWLEY: Yes, sir, I appreciate Your Honor's ruling. I hope Your Honor understands our position because it is firmly our position that on the basis of the showing made, we are entitled to a class action, and that being so, we want the record to be sufficiently clear so that if Your Honor will not certify the matter, we will be in a position to have the matter taken up, notwithstanding.

(Tr. at 43–44).

After considerable further discussion, which included Mid-Am counsel's statement that "we will go back and try to redraft paragraph No. 1 [to state] ... that the pending motion of NFO for class designation, is hereby overruled without prejudice" (Tr. at 46) and further references to *Nisley*'s procedures (Tr. at 47) the record then shows that the following occurred:

MR. ROWLEY: Before we close, Your Honor, let me put on the record, NFO's specific request that if Your Honor overrules at this time, even without prejudice, NFO's class motion on the present record, that the matter be the subject of certified interlocutory appeal. Short of that, NFO would be constrained to seek relief under the all writs act, because in our view, this is a matter of extreme importance and we think the record will not support even an adjudication of the order Your Honor has suggested.

THE COURT: Well, I can tell you this, that the ruling I made from the bench

in connection with that motion was denied and it was denied without prejudice and may be renewed at any appropriate time, and I will also state at this time on the record that I will consider your request as a motion to reconsider, unsupported by any additional authority; I will deny that motion and I will refuse to certify either my initial denial or my refusal to reconsider, as an appropriate case to be certified to the Court of Appeals under Section 1292(b) of Title 28 of the United States Code. So you have your record—

MR. ROWLEY: Thank you.

(Tr. at 48–49).

## V.

Pretrial Order No. 7 was thereafter entered on March 8, 1974. Paragraph 1 of that order stated:

1. Any motion of NFO counterclaimants, including that filed February 1, 1974, for certification of a class consisting of NFO dairy farmers is hereby denied, without prejudice to the rights of any party to file subsequent motions, including a class action motion, with respect to the manner of processing claims which may be involved in this litigation. It may be refiled at any time. All other motions seeking a determination of certification of the class action have been withdrawn, and no request by any other party for a class action now pends before this Court.

(Exh. H at 1 attached to Joint Sug. of Counterclaim Defts in Oppos. to Mot. for Cert. of NFO Dairy Farmer Class (Doc. 28) ).

The files and records in this case establish that NFO and NFO class claimants never refiled any class action motion until after this case was remanded by the Court of Appeals. Nor did NFO ever attempt to have this Court give any further consideration to the adoption of the rationale of the *Nisley* procedures to the circumstances of this case. We further find that NFO and NFO class claimant's contention that "a fair reading of this Court's statements with

respect to the class action issue is ... that certification was denied without prejudice because this Court had formed a 'tentative judgment' that a class was not needed to guard against the possibility that NFO was not entitled to collect all damages that might ultimately be proven" is completely unsupported and quite contrary to the full record in this case.

Indeed, a fair reading of the record establishes that NFO, after its unsuccessful effort to obtain the certification of what it called its "protective NFO class," concluded, as did Mid-Am, that it was required to stand or to fall on its legal claim that NFO, the corporation, rather than the NFO dairy farmers, was entitled to recover any and all antitrust damages that might eventually be recovered in this case. It is obviously clear that NFO elected to adopt that legal theory and that it continued to rely on that theory until the Court of Appeals decided that its view, so far as price reduction damages was concerned, was untenable. Then, but only then, did NFO decide to attempt to inject the NFO dairy farmer class issue back into this case.

The record shows that NFO and NFO class claimants never attempted to appeal this Court's March 8, 1974 order denying their class action motion. Indeed, those parties now attempt to argue that no procedure was available under which the NFO class claimants could appeal that order. We turn now to that question.

## VI.

NFO and NFO class claimants may well have concluded that it would have been a waste of time for them to have sought appellate review of this Court's refusal to certify its class action denial for interlocutory appeal pursuant to 28 U.S.C. § 1292(b). For *Pfizer, Inc. v. Lord*, 522 F.2d 612 (8th Cir.), *cert. denied*, 424 U.S. 950, 96 S.Ct. 1421, 47 L.Ed.2d 356 (1976), applied well established principles of law when it refused to consider, in a mandamus proceeding, the question of whether a district court had or had not properly refused to certify an appeal of an interlocutory

order pursuant to Section 1292(b). In footnote 4 on page 614 the Court of Appeals stated the following:

The defendants also challenge the propriety of the district court's refusal to certify this question under § 1292(b). This court is without jurisdiction to review an exercise of the district court's discretion in refusing such certification. *See United States v. 687.30 Acres of Land,* 451 F.2d 667 (8th Cir.1971), *cert. denied sub nom., Winnebago Tribe v. United States,* 405 U.S. 1026, 92 S.Ct. 1291, 31 L.Ed.2d 486 (1972) [additional citations omitted].

*United States v. 687.30 Acres of Land* stated the following in regard to whether the Court of Appeals has jurisdiction over an appeal from a district court's denial of a Section 1292(b) certificate:

Twenty-eight U.S.C.A. § 1292(b) permits the trial court to certify an issue for determination on an interlocutory appeal upon the basis of findings specified by the statute. If such certification is made by the trial court, the Court of Appeals in its discretion may permit an interlocutory appeal. The Tribe sought a § 1292(b) certification which was denied by the trial court in the February 3 order. The Tribe urges that the trial court abused its discretion in denying the certification. *We have no jurisdiction to review the trial court's denial of the § 1292(b) certificate.* (Emphasis ours).

(451 F.2d at 669–670.)

The interlocutory appeal was accordingly denied in *687.30 Acres of Land* for the reason that the record showed that the district court's rulings were "clearly interlocutory and are not appealable," in the absence of a § 1292(b) certification. The Court of Appeals, however, added that "[o]f course all interlocutory rulings are subject to review upon appeal from final judgment." (451 F.2d at 670).

▮ Neither NFO nor NFO class claimants attempted to avail themselves of their right, after final judgment, to seek review of this Court's interlocutory order denying their class action motion. We find and

conclude that their argument that they could not appeal that order is untenable and does not answer defendants' arguments *res judicata* and law of the case arguments.

When the Court of Appeals refused to permit this Court, by writ of mandamus, to reopen the record to receive additional available relevant evidence on the issue of the amount of plaintiff's damages in that relatively simple antitrust case, it stated that:

It may not be inappropriate to recall here the reminder made by the Supreme Court in *Stoll v. Gottlieb,* 305 U.S. 165, 172, 59 S.Ct. 134, 138, 83 L.Ed. 104 [(1938)], that "It is just as important that there should be a place to end as that there should be a place to begin litigation."

(364 F.2d at 35).

▮ NFO tried this case in this Court and argued its appeal in the Court of Appeals on the theory that NFO, rather than the NFO dairy farmers, were entitled to recover any and all damages that may have been suffered as a result of defendants' actions.

It was only after the Court of Appeals sustained defendants' standing argument to the limited extent of stating that it was the individual farmers, and not NFO, that may have "directly suffered price reduction damages" did NFO attempt to revive, after remand, and without any effort to reopen the record, its claim that a NFO dairy farmer class action should be certified.

We are reasonably satisfied that if the Court of Appeals wanted this Court to consider at this late date the question of whether a NFO dairy farmer class should be certified after remand that it would have given reasonably clear and specific directions to this Court to have done so. The Court of Appeals did not do so. The reminder made by the Court of Appeals in *Arthur Murray I* would seem to be appropriate to the efforts made to have a NFO dairy farmer class certified at this late date in this already excessively long litigation.

Even if the place to end this phase of the litigation has not been reached, we state our separate and alternative reasons for our denial of the pending post-remand motion to certify a NFO dairy farmer class in this case in the next section of memorandum opinion.

## VII.

■ The record in this case establishes that NFO did not know, and therefore could not prove what dairy farmers may have been NFO members during the relevant time that price reductions may have occurred. Nor has NFO ever attempted to allege or to prove or, more important, has never suggested that it would ever be in a position to prove what milk any particular NFO dairy farmer may have shipped at any particular time.

NFO and NFO class claimants, of course, argue that some sort of an "aggregate damage award" should be awarded the NFO dairy farmers on the basis of exactly the same evidence offered by NFO, the corporation, to support the price reduction claim made by it throughout the course of this litigation.

We believe that no class may properly be certified in this case for reasons similar to those stated by Chief Judge Latchum in *Al Barnett & Son, Inc. v. Outboard Marine Corporation*, 64 F.R.D. 43 (Del.1974), when he refused to certify a Rule 23(b)(3) class action in that case. After a careful analysis of the nature of that antitrust case, Judge Latchum stated that: "It is quite clear at this point that the present class action involves numerous highly individualistic factual and legal issues relating to the fact of *and amount of damages* as to each member of the proposed class which predominate over the very limited common questions of law and fact." (Emphasis ours). (64 F.R.D. at 54).

*Outboard Marine* properly recognized that (1) the fact of damage and (2) the amount of damage in an antitrust case present separate and independent questions. Even if it be assumed that the *fact* of price reduction damage may be said to

have been determined by the Court of Appeals' decision, the separate question of the *amount* of damage suffered by each dairy farmer remains in the case. Plaintiffs in *Outboard Marine* made substantially the same "aggregate damage award" argument as that belatedly presented in this case. Judge Latchum noted that: "The named plaintiffs and the *amicus* suggest that all of these numerous and individual issues relating to the fact of damages *and amount of damage* could be easily handled in a class suit by a collective or fluid type of recovery based on average profits or average awards to the class members." (Emphasis ours). (64 F.R.D. at 55).

*Outboard Marine* concluded, however, that plaintiff's theory must be rejected for the reason that:

[I]t has been pointed out that individual questions arising from damage claims can not be solved by allowing damages in a treble damage antitrust case in the form of a fluid recovery because average awards erode due process. *Eisen v. Carlisle & Jacquelin*, 479 F.2d 1005, 1013–1014 (C.A.2, 1973) [15]; *In re Hotel Telephone Charges*, 500 F.2d 86 (C.A.9, 1974).

(64 F.R.D. at 55).

Footnote 15 stated that:

[15] The Supreme Court in reviewing the *Eisen* case left standing that part of the Court of Appeals decision which discussed the impropriety of so-called fluid recoveries. *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974).

(64 F.R.D. at 55 n. 15).

*Outboard Marine*, we believe properly held that:

It is this Court's judgment that the limited number of common issues of fact and law which exist do not predominate in this case over the numerous factual and legal issues which can only be determined on an individual basis. Accordingly, the Court finds that the "predomi-

nance" requirement of Rule 23(b)(3) has not been met.[63]

(64 F.R.D. at 56).

This Court made an express finding, which the Court of Appeals did not find to be clearly erroneous, that no one suffered any price reduction damages in regard to any milk that might have been sold on Order 30. We found in paragraph 1375 that:

> 1375. Any Wisconsin Grade A milk that NFO did not deliver to Order 30 bottling plants, including Wanzer, was sold to Wisconsin manufacturing plants generally, at prices which returned more money per cwt. to the NFO dairy farmer member than if that milk had been sold to Wanzer.

(510 F.Supp. at 484).

No showing has been made that any of the named NFO class representatives ever had any of their milk shipped to any of the other orders in which alleged price reduction damages were allegedly suffered by other unnamed NFO farmers. Nor have NFO or the NFO class claimants ever suggested that they knew the name of any NFO dairy farmer who allegedly suffered a direct loss as a result of any price reduction. A substantial additional question is presented as to whether appropriate class representatives have been properly suggested under all the circumstances.

We expressly find and conclude as a separate and alternate ground for denying the pending post-remand motion to certify a class of NFO dairy farmers that NFO and NFO class claimants have not carried the burden of establishing that a Rule 23(b)(3) class action should be certified under the circumstances of this case. It is therefore

ORDERED that the pending motion to certify a NFO dairy farmer class should be and the same is hereby denied.

---

**63.** *Outboard Marine* also, we believe, properly concluded that "[t]he individual issues relating to each absent class member, even if the members were known with any certainty, would require a plethora of mini-trials within an overall mammoth case. The unmanageability of a case with such diverse individualistic issues would be further complicated to the point of incomprehensibility by jury problems." (64 F.R.D. at 57).

**64.** This tenth and final issue was submitted on briefs filed and without oral argument.

## NFO'S MOTION FOR INTEREST ON COURT OF APPEALS AWARD OF ATTORNEYS' FEES AND COSTS [64]

### I.

On September 1, 1983, NFO filed its pending motion in this Court for interest on the Court of Appeals' award of attorneys' fees and costs on appeal. That motion was allegedly filed "pursuant to Federal Rule of Civil Procedure 54(b), section 4 of the Clayton Act, 15 U.S.C. § 15, and 28 U.S.C. § 1961" and alleged that the rate of interest should be calculated at 9 percent per year in accordance with Missouri Revised Statutes § 408.040 (1979).

NFO's motion also alleged that the "interest began to accrue on August 31, 1982, the date the Eighth Circuit issued its opinion, which unconditionally established NFO's right to the award." NFO, in its suggestions in reply to defendants' suggestions in opposition to its pending motion, in reliance upon the Eighth Circuit's opinion in *R.W.T. v. Dalton,* 712 F.2d 1225, 1234 (8th Cir.1983), contends that "interest should be assessed based on the August 31, 1982 judgment at the rate of 12.4%, rather than 9% as indicated earlier."

The defendants' suggestions in opposition to NFO's pending motion point out that they requested and received an order from the Court of Appeals staying the issuance of the mandate pending the disposition of their petitions for certiorari; that upon denial of the petitions, the Court of Appeals issued its mandate on May 27, 1982; that judgment was entered in accordance with that mandate in this Court on May 31, 1982; and that Mid-Am, AMPI, and CMPC paid their portions of the principal amount of $163,968.15 on July 13, 14, and 15, 1982, respectively.

The defendants' brief states that "defendants do not dispute that NFO is enti-

tled to the attorneys' fees, costs and expenses awarded, but request this Court to rule on the NFO motion that interest on those items is allowable only from May 31, 1983, the day on which this Court entered its judgment, up to and including the date immediately preceding the date each party paid its portion of these costs to NFO."

Defendants concede that the 1982 amendment to 28 U.S.C. § 1961 became effective October 1, 1982, prior to this Court's entry of judgment on May 31, 1983, and that under the formula provided in the amended statute, this Court should order the defendants to pay interest at the rate of 8.72% from May 31, 1982, until the date immediately preceding the day each of the defendants paid their portion of the judgment. Defendants argue that any order entered by this Court that would provide for interest to accrue prior to this Court's May 31, 1983 judgment would contravene the Supreme Court's decision in *Briggs v. Pennsylvania Railroad Co.*, 334 U.S. 304, 68 S.Ct. 1039, 92 L.Ed. 1403 (1948) as now codified in Rule 37, Federal Rules of Appellate Procedure.

We are satisfied for the reasons we shall state that an order should be entered that will provide that defendants shall pay interest at the rate of 8.72% from May 31, 1983 until the date immediately preceding the day of each defendant's payment of its respective portion of the judgment entered by the Court in accordance with the Court of Appeals mandate.

## II.

The files and records in this Court and in the Court of Appeals show that on December 13, 1982 the Court of Appeals entered an order awarding NFO a total of $163,-968.15 for attorneys' fees, expenses, and court costs on appeal. That order is published in full in *Alexander v. National Farmers Organization*, 696 F.2d 1210 (8th Cir.1982).

Those files and records further show that on May 27, 1983 the Clerk of the Court of Appeals forwarded to the Clerk of this Court the mandate of the Court of Appeals in the three appeals, Nos. 81–1235/36/37, which had been decided by the Court of Appeals on August 31, 1982, the opinion of that Court being reported in 687 F.2d 1173. That mandate, in accordance with Rule 41(a) of the Federal Rules of Appellate Procedure, consisted of "a certified copy of the judgment and a copy of the opinion of the court." The May 27, 1982 letter from the Clerk of the Court of Appeals to the Clerk of this Court carried a postscript which stated:

P.S. Enclosed is certified copy of order which relates to costs and attorneys fees. Copy of order is also enclosed to each of counsel.

That postscript, of course, referred to and the letter enclosed a certified copy of the Court of Appeals order of December 13, 1982 awarding costs and attorneys' fees which, as above stated, was published in 696 F.2d 1210.

The Court of Appeals, however, did not direct that any additional mandate issue other than that transmitted by its Clerk's letter of May 27, 1982. The May 27, 1982 mandate of the Court of Appeals did not contain any "instructions with respect to allowance of interest" as contemplated by the last sentence of Rule 37 of the Federal Rules of Appellate Procedure.

On May 31, 1982, the day the Clerk of this Court received the mandate from the Court of Appeals, judgment in accordance with that mandate was entered in this Court. The judgment of this Court, of course, did not include any allowance of interest on the attorneys' fees and costs awarded NFO by the Court of Appeals in its December 13, 1982 order.

The record is clear that NFO did not file a timely petition for rehearing after the Court of Appeals entered its December 13, 1982 order awarding costs and attorneys' fees, in accordance with the rule stated in *Riha v. International Tel. & Tel. Corp.*, 533 F.2d 1053 (8th Cir.1976). *Riha* stated that: "Rule 37 provided a simple and plain basis for plaintiff to have requested by petition for rehearing prior to the issuance

of our mandate explicit 'instructions with respect to the allowance of interest.'" *Riha, supra*, 533 F.2d at 1055. Nor has NFO ever filed a motion to recall mandate at any time after that mandate was issued by the Court of Appeals on May 27, 1982.

## III.

Both sides cite and rely on the Ninth Circuit's decision in *Perkins v. Standard Oil Company of California*, 487 F.2d 672 (9th Cir.1973) to support their respective positions. It is obvious that the parties are not in agreement as to what *Perkins* actually held. The Eighth Circuit has cited and approved *Perkins* in two recent cases. See *Dependahl v. Falstaff Brewing Corp.*, 653 F.2d 1208, 1218 (8th Cir.1981), and *R.W.T. v. Dalton*, 712 F.2d 1225, 1234 (8th Cir.) *cert. denied*, — U.S. —, 104 S.Ct. 527, 78 L.Ed.2d 710 (1983). We accordingly believe that the rationale of *Perkins* is applicable to the question presented by NFO's pending motion.

It is to be noted that the request considered in *Perkins* was filed directly in the Court of Appeals rather than by motion filed in the district court. It is thus obvious that the Ninth Circuit view of Rule 37 of the Federal Rules of Appellate Procedure is consistent with the view stated by the Eighth Circuit in *Riha v. International Tel. & Tel. Corp., supra.*

The Ninth Circuit in *Perkins* noted at the outset of its decision that both parties had, acting pursuant to Rule 37, requested that court's "instructions" with respect to the allowance of interest on certain awards of attorneys' fees. An earlier appeal in *Perkins*, reported in 474 F.2d 549 (9th Cir. 1973), shows that the Ninth Circuit had (1) reduced the district court's original $250,-000 award to $116,562; (2) reduced another award made in the district court in the amount of $25,000 to $11,680; (3) affirmed still another award made by the district court in the amount of $14,180 and; (4) most important for purposes of ruling NFO's pending motion, the Court of Appeals allowed the plaintiff an additional award of $1,500 for services performed by plaintiff's counsel on appeal. The Ninth Circuit recognized in its decision reported in 487 F.2d at 674 that the mandate issued following its February 12, 1973 decision on the earlier appeal (reported in 474 F.2d 549) "did not include instructions with respect to the allowance of interest on any of the [four] awards."

Certiorari was applied for in *Perkins* but denied on June 11, 1973. No stay of mandate was granted pending certiorari. The Ninth Circuit's mandate was accordingly issued on March 5, 1973 in accordance with Rule 41, Federal Rules of Appellate Procedure. On July 3, 1973, the defendant paid the principal amount of the two reduced judgments, paid the principal amount of the $1,500 awarded by the Court of Appeals, and paid the principal and interest on the one district court award which had been affirmed.

The defendant in *Perkins* contended that the Ninth Circuit should follow the Seventh Circuit's decision in *Harris v. Chicago Great Western Ry.*, 197 F.2d 829 (7th Cir. 1952), and compute the interest from June 11, 1973, the date the Supreme Court denied certiorari. Plaintiff, on the other hand, contended that interest on the two reduced district court awards should be computed from January 26, 1971, the date of the entry of the district court's original award, and that interest on the $1,500 award made by the Court of Appeals should be computed from February 12, 1973, the date the Court of Appeals filed its opinion in 474 F.2d 549.

*Perkins* held that interest on the two reduced district court awards should be accrued from the date of the district court's original judgments. *Perkins*, however, rejected plaintiff's contention in regard to the award made by the Court of Appeals and concluded that because "the $1,500 award authorized by our decision ... represented services which had not yet been performed at the time of the district court's original judgment [we] conclude that interest on that award should commence to run on the date of issuance of our mandate; i.e. March 5, 1973." 487 F.2d at

676. The Court of Appeals accordingly amended its mandate to include such instructions as required by Rule 37 of the Federal Rules of Appellate Procedure.

*Perkins'* conclusion, quoted with approval by the Eighth Circuit in *R.W.T. v. Dalton,* 712 F.2d at 1234, that "there exists no real distinction between judgments for attorneys' fees and judgments for other items of damages" does not answer the question presented in this case. *Perkins'* recognition that a Court of Appeals has "the power to recall and amend our mandate" and its citation of *Briggs v. Pennsylvania, supra,* established the Ninth Circuit's familiarity with the "mandate" rule of that Supreme Court case. The Notes of the Advisory Committee on Appellate Rules stated the following in regard to Rule 37:

> In *Briggs v. Pennsylvania R. Co.,* 334 U.S. 304, 68 S.Ct. 1039, 92 L.Ed. 1403 (1948), the Court held that where the mandate of the court of appeals directed entry of judgment upon a verdict but made no mention of interest from the date of the verdict to the date of the entry of the judgment directed by the mandate, the district court was powerless to add such interest.

The Notes added that "the second sentence of the proposed rule is a reminder to the court, the clerk, and counsel of the *Briggs* rule" and concluded by stating that:

> Since the rule directs that the matter of interest be disposed of by the mandate, in cases where interest is simply overlooked, a party who conceives himself entitled to interest from a date other than the date of entry of judgment in accordance with the mandate should be entitled to seek recall of the mandate for determination of the question.

*Clymore v. Far-Mar-Co., Inc.,* 709 F.2d 499, 505 (8th Cir.1983), is a recent example of the manner in which the Eighth Circuit will consider and give instructions in accordance with Rule 37 to the district court with respect to the allowance of interest on awards for attorneys' fees and expenses.

NFO's primary reliance on the per curiam opinion of the Fifth Circuit en banc in *Cooper Liquor, Inc. v. Adolph Coors Co.,* 701 F.2d 542 (5th Cir.1983) is untenable. For that case did no more than reflect the Fifth Circuit's conclusion that the rationale of the Ninth Circuit's opinion in *Perkins* should be followed and that an earlier Fifth Circuit divisional decision, *Carpa v. Ward Foods,* 567 F.2d 1316 (5th Cir.1978), which expressly refused to follow *Perkins,* should be overruled.

*Reeves v. International Tel. & Tel. Corp.,* 705 F.2d 750 (5th Cir.1983), decided shortly after *Cooper Liquor, Inc.,* reflects the Fifth Circuit's correct view that a district court may not properly allow interest on a judgment unless instructed to do so by the mandate of the Court of Appeals in accordance with Rule 37, Federal Rules of Appellate Procedure. The opening paragraph in *Reeves* appropriately stated the following:

> In our earlier opinion in this case, we increased the amount of the district court award but did not mention interest. Reeves then sought interest in the district court, which, *properly following our mandate,* denied relief. Now Reeves once again appeals. The district court decision is correct, and it is affirmed. (Emphasis ours). (Footnotes omitted).

*Reeves, supra,* 705 F.2d at 751.

Although the mandate of the Court of Appeals in the first *Reeves* appeal was issued in July 1980, the Court of Appeals determined that in spite of the fact the plaintiff sought interest in the wrong court almost three years after the mandate had issued in regard to that appeal, his appeal from the district court's later order, which properly denied interest, could and should nevertheless be treated as a "not unforgiveably belated request for proper relief." Specifically the Fifth Circuit held in the 1983 appeal that:

> Although Reeves incorrectly pursued his claim in the district court, rather than seeking relaxation of our mandate, he did promptly seek a judicial determination of

the interest question. We see no reason to penalize him for his procedural mistake. Therefore, we modify our original mandate to allow interest on the full award from the date of the original district court judgment. (Footnote omitted).

*Reeves, supra,* 705 F.2d at 752–53.

Plaintiff apparently then asked the Fifth Circuit what it had done for him lately. For it is clear that the Fifth Circuit concluded that it had done enough under the circumstances. The last paragraph of the Fifth Circuit's opinion in *Reeves* tells that story:

Finally, Reeves seeks attorneys' fees for the prosecution of the interest claim. The claim could have speedily been presented and disposed of had Reeves's counsel followed the correct course by petitioning for correction of our mandate. Because we affirm the judgment below, we allow no fees for counsel's efforts in the district court or on appeal.

(*Id.* at 753).

### IV.

■ We are satisfied that this Court properly followed the mandate of the Court of Appeals when judgment was entered for the total amount of $163,968.15 on May 31, 1983 in accordance with that Court's December 13, 1982 Order. We are further satisfied that under the mandate rule of *Briggs* this Court does not have power to enter judgment for an amount different from that directed in the Court of Appeals' mandate. That mandate contained no instructions with respect to interest as contemplated by Rule 37 of the Federal Rules of Appellate Procedure.

■ The cases we have discussed, particularly the Fifth Circuit's recent decision in *Reeves,* suggest that if the Eighth Circuit's failure to include instructions in regard to interest in its mandate was a matter of oversight, that Court has power and jurisdiction to correct any such inadvertent omission by treating an appeal from this Court's order denying NFO's motion as a belated request for proper relief in the

Court of Appeals to seek a change in the mandate of that court.

■ For the reasons stated, this Court will enter an order allowing interest from May 31, 1983 at the rate of 8.72% to the date immediately preceding the day each defendant paid its portion of the May 31, 1983 judgment entered by this Court.

■ That order will, of course, reflect our rejection of NFO's claim that the rate of interest to be allowed on this Court's judgment should be 12.41% under section 1961, as amended. The Clerk's office has advised that the average accepted auction price of the appropriate United States Treasury bills prior to the date of this Court's May 31, 1983 judgment resulted in the 8.72% rate of interest to be included in the order.

Accordingly, it is

ORDERED (1) NFO's motion for interest on award of attorneys' fees and costs on appeal, should be and is hereby denied. It is further

ORDERED (2) that defendants CMPC, Mid-Am and AMPI are ordered to pay interest at the rate of 8.72% on their respective portions of the Court of Appeals' $163,-968.15 award from May 31, 1983, the date this Court entered judgment in accordance with the Court of Appeals' mandate, until the date immediately preceding the day each defendant paid its portion of the $163,968.15 award to NFO.

### ORDERS DIRECTING FURTHER PROCEEDINGS

Our discussion of Issue No. 8—Costs, made clear that the Clerk cannot presently be directed to enter any final judgment at this stage of the post-remand proceedings. That discussion also made clear that this Court would follow the admonition stated by the Court of Appeals in *Obin v. Dist. No. 9 of Inter. Assn., supra,* and that, accordingly, it would delay the entry of all judgments on the merits until after all questions of attorneys' fee claims had been determined so that a single final judgment

could be entered which would determine all issues presented on remand.

The Court approved the provisions made in paragraph 8 of the post-oral argument order under which the parties agreed to "meet and confer in an attempt to reach agreement on the items contained in NFO's petition for costs." Paragraph 10 of that order reflects this Court's approval of counsels' agreement that they would also attempt to agree upon an "allocation formula or other reasonable resolution [of the issues posed] by NFO's request for Rule 37, Phase III fees and costs, together with NFO's request for undifferentiated costs for Phase I, II, and III as set forth in its cost petition."

Experience with the minimal procedure steps provided in the May 31, 1984 order under which counsel were to conduct their negotiations to reach agreement establishes that this Court's orders directing further proceedings that must be issued at the present time must contain more detailed procedural steps under which counsels' future negotiations are to be conducted than were contained in the March 31, 1984 order.

The fact that the minimal procedures provided in the May 31, 1984 order were inadequate for the successful negotiation of the costs issue establishes that those procedures would not be adequate to provide an appropriate method under which the more difficult problems of reaching an agreement in regard to the amount of attorneys' fees to be awarded that must be determined before final judgment may be entered in this case.

The files and records in *Rainsbarger v. Columbia Glass Co.*, 600 F.Supp. 299 (1984) to which we earlier directed attention, for example, show that applications for fees of three law firms were filed in that case. One firm sought an attorneys' award of $61,294.85 (plus an enhancement claim). The other two firms sought awards of $24,453 and $3,660, respectively. Compliance with detailed orders entered in that case, entered both before and after "two lengthy conferences with counsel" (*Rainsbarger, supra,* 600 F.Supp. at 304), produced an agreement that a total amount of $33,900 should be awarded all three firms.[65] Thus this Court, under the unusual factual circumstances presented in *Rainsbarger,* was required only to decide how the total agreed amount of $33,900 was to be divided between the three law firms that sought separate attorneys' fee awards.

The further proceedings directed in *Rainsbarger* are not appropriate for this case. For every case, and particularly this case, presents its own unique factual circumstances. It is therefore proper that we enter orders which, as a first step, will seek the cooperation and suggestions of counsel, in order that further proceedings may be directed to attain the ideal stated in *Hensley* that "litigants will settle the amount of a fee."

We believe that it is obvious that the time has come for NFO, in accordance with paragraph 12 of the May 31, 1984 order, to file its motion for Clayton Act attorneys' fees. Counsels' initial recommendations in regard to the direction of further proceedings shall therefore include a date on which

---

65. The agreement of the three law firms in *Rainsbarger* to reduce their total attorneys' fee applications from a total of $89,407.85 to an agreed total amount of $33,900 was undoubtedly due to the fact that at the conferences between the Court and counsel, "[c]ounsels' attention was ... directed to the fact that the notion expressed in various briefs filed by plaintiffs' counsel that attorneys' fees were to be automatically awarded for all hours expended on a particular case, regardless of the result obtained, had ... been expressly rejected by the Supreme Court in *Hensley v. Eckerhart,* 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). Specific atten-

tion was directed to the Supreme Court's conclusion stated in that case that 'the extent of a plaintiff's success is a crucial factor in determining the proper amount of award of attorneys' fees' and its statement that the 'degree of success obtained [is] the most critical factor to be evaluated.'" (*Id.* at 304). The Supreme Court, in a different context, quoted "the most critical factor" and other important language of *Hensley* with approval in *Marek v. Chesney,* —— U.S. ——, 105 S.Ct. 3012, 87 L.Ed.2d 396 (1985). The principles stated in *Hensley* are, of course, applicable to this case.

NFO's motions will be filed. Counsels' ultimate recommendations shall also include the detailed negotiation steps that they will agree to take in regard to that motion and in regard to all the other negotiations that must be conducted in connection with all the other questions presented in regard to the amount of attorneys' fees and costs to be awarded pursuant to the orders entered in this memorandum opinion.

The Court is satisfied that all counsel recognize that a much more detailed negotiation procedure must be directed than that which was provided in the May 31, 1984 order, else the numerous requests for attorneys' fees will, contrary to *Hensley*'s admonition, "result in a second major litigation." The Court, of course, stands ready to confer with counsel as it may be requested in order that effective procedures be established under which agreed orders directing further proceedings may be entered.

For the reasons stated, it is

ORDERED (1) that the Clerk shall not enter any final judgments in this case pursuant to Rule 58 of the Federal Rules of Civil Procedure until further order of Court. It is further

ORDERED (2) that on or before July 22, 1985 counsel for the parties shall meet and confer at an across-the-table conference for (1) the purpose of agreeing upon (a) the date NFO's motion for Clayton Act attorneys' fees will be filed, (b) the date upon which NFO will file its claims under the orders entered in regard to Issue No. 2, and (c) the date AMPI's Issue 3 cost petition will be filed and (2) for the purpose of agreeing upon the form of orders directing further proceedings which they recommend this Court should enter under the circumstances. It is further

ORDERED (3) that on or before July 31, 1985 counsel for the parties shall file a joint report, signed by all counsel, which, hopefully, will jointly recommend the form of orders directing further proceedings to be entered by this Court.

Should counsel be unable to reach total agreement in regard to their recommendations, (1) a joint report shall be filed which sets forth the items upon which counsel are in agreement and (2) separate reports shall be separately filed by the parties which will set forth the recommendations that such parties have suggested but which were not agreed to by opposing counsel. It is further

ORDERED (4) that, in recognition of the complexity of the problems presented and the fact that vacation schedules may present additional problems, the parties may agree upon an extension of the time schedule stated in Orders (2) and (3) and submit a new time schedule for approval of the Court. It is further

ORDERED (5) that if counsel feel the need for any further or more detailed explanation of the purpose of the orders above entered, the Court, if requested, will be happy to convene a conference with counsel at a time convenient for the Court and all counsel in the case.